UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
                                       :

                                       :

                                       :

*In re*                                :     INDEX NO. 07 CV 9416 (RJS)
FUWEI SECURITIES LITIGATION                  ECF CASE
                                       :

                                       :

                                       :

------------------------------------- X


**MAXIM GROUP LLC, CHARDAN CAPITAL MARKETS, AND WR HAMBRECHT +
CO., LLC'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**


DLA PIPER US LLP

Joshua S. Sohn
Caryn G. Schechtman
Kevin D. Galbraith
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500 (Telephone)
(212) 335-4501 (Facsimile)
joshua.sohn@dlapiper.com

Perrie M. Weiner (admitted *pro hac vice*)
1999 Avenue of the Stars
Suite 400
Los Angeles, CA 90067
(310) 595-3000 (Telephone)
(310) 595-3300 (Facsimile)

*Attorneys for Underwriters*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 4

    A. Fuwei Acquires the Brückner and DMT Production Lines ............................ 4

    B. The IPO ...................................................................................................... 5

    C. Post-IPO Events ......................................................................................... 8

    D. This Action .................................................................................................. 9

LEGAL ARGUMENT ............................................................................................... 11

I.    The Amended Complaint Does Not Allege any Actionable Misstatements or Omissions ........................................................................................................... 12

    A. Under Both the "Bespeaks Caution" Doctrine and the PSLRA Safe Harbor, The Registration Statement is Not Actionable ................................................ 13

    B. The Registration Statement Disclosed a Disputed Fact and the Possible Outcomes as Required Under the Securities Laws ........................................ 17

    C. There Was No Duty to Disclose the Arbitration ......................................... 19

II.    The Amended Complaint Does Not Adequately Allege Loss Causation ..................... 20

III.    Aftermarket Purchasers Do Not Have Standing to Bring Section 12(a)(2) Claims ........ 22

IV.    Plaintiffs Should Not Be Given Leave to Replead ......................................... 23

CONCLUSION .......................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)........................................................................................11, 20

*Avnet, Inc. v. Scope Indus.*,
    499 F. Supp. 1121 (S.D.N.Y. 1980)...................................................................................18

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)...................................................................................................11

*Bellikoff v. Eaton Vance Corp.*,
    481 F.3d 110 (2d Cir. 2007)............................................................................................23

*Caiafa v. Sea Containers, Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)..........................................................................11, 22

*Chamberlant v. A&P*,
    2007 WL 2669423 (2d Cir. Sept. 7, 2007) ........................................................................11

*Curto v. Bender*,
    231 Fed. Appx. 93 (2d Cir. 2007)....................................................................................11

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)............................................................................................12

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005).......................................................................................................20

*General Elec. Co. v. Rowe*,
    1992 WL 277997 (E.D. Pa. Sept. 30, 1992) ......................................................................19

*Gitnik v. Home Depot U.S.A., Inc.*,
    2007 WL 2728358 (S.D.N.Y. Sept. 18, 2007)....................................................................11

*Gotham Holdings, LP v. Health Grades, Inc.*,
    534 F. Supp. 2d 442 (S.D.N.Y. 2008)...............................................................................22

*Gustafson v. Alloyd Co., Inc.*,
    513 U.S. 561 (1995).......................................................................................................23

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)............................................................................................14

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir. 1991)..............................................................................12

*In re Cosi, Inc. Sec. Litig.*,
    379 F. Supp. 2d 580 (S.D.N.Y. 2005)................................................................22

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
    434 F. Supp. 2d 233 (S.D.N.Y. 2006)................................................................21

*In re NYSE Specialists Sec. Litig.*,
    503 F.3d 89 (2d Cir. 2007)................................................................................11

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006)................................................................21

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007)...........................................................14, 17

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y 2004)................................................................12

*In re WorldCom, Inc. Sec. Litig.*,
    2004 WL 1435356 (S.D.N.Y. June 28, 2004) ...................................................22

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007)..............................................................................11

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)..............................................................................20

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986)................................................................................13

*Nemo v. Allen*,
    466 F. Supp. 192 (S.D.N.Y. 1979) ....................................................................18

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)................................................................13, 14, 15, 17

*Ranger Oil Ltd. v. Petrobank Energy and Res. Ltd.*,
    2000 WL 33115906 (S.D.N.Y. May 23, 2000) .................................................18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)....................................................................... passim

*Ronson Corp. v. Liquifin Aktiengesellschaft*,
　　370 F. Supp. 597 (D.N.J. 1974) ......................................................................17

*Yung v. Lee*,
　　432 F.3d 142 (2d Cir. 2005).............................................................................22

## STATUTES, REGULATIONS, AND RULES

15 U.S.C. 77*l*(a)(2)............................................................................................12

15 U.S.C. § 78u-5(c)(1)(A)(i) .............................................................................14

17 C.F.R. § 229.103 ....................................................................................13, 19

Defendants Maxim Group LLC; WR Hambrecht + Co; and Chardan Capital Markets, LLC (collectively, the "Underwriters"), through their undersigned counsel, respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Consolidated Amended Class Action Complaint (the "Amended Complaint")[1] with prejudice.

## PRELIMINARY STATEMENT

Throughout their Amended Complaint, plaintiffs repeatedly invoke the existence of a Chinese criminal investigation like a talisman in their attempt to create an appearance that Fuwei Films (Holdings) Co., Ltd. ("Fuwei" or the "Company"), a manufacturing company located in China, is about to lose its two primary assets. The possibility of some future loss of these assets, production lines located in China, is actionable—according to plaintiffs—because the initial public offering of Fuwei's common stock in December 2006 was premised on a registration statement that ignored this supposed inevitable certainty (which has yet to occur). Plaintiffs' theory, however, is belied by both the law and the facts.

As a threshold matter, despite plaintiffs' talismanic repetition of the fact that three significant Fuwei shareholders have been arrested by the Chinese government, there is not—and has never been—any action brought seeking to rescind the transactions through which Fuwei acquired those two production lines. Moreover, even if such an action had been brought, Fuwei's registration statement unequivocally disclosed the possibility not only that those transactions could be challenged, but also that successful challenges would threaten Fuwei's ability to continue as a business. Because no challenges have been made, however, there is

---

[1] The Amended Complaint is attached as Exhibit A to the annexed Declaration of Joshua S. Sohn, dated May 14, 2008 ("Sohn Decl.").

simply no reasonable basis to allege that the rescission of the transactions is threatened—much less imminent.

The Amended Complaint alleges that Fuwei, its Underwriters, and certain of its directors violated the Securities Act of 1933 (the "1933 Act") by making misstatements and omissions in connection with the December 2006 initial public offering of Fuwei's common stock (the "IPO"). Putative class members purchased the Company's shares either in the IPO or in the aftermarket "pursuant and/or traceable to" the registration statement. That registration statement and prospectus (collectively, the "Registration Statement") allegedly described the circumstances of the Company's acquisition of its two primary assets—the DMT and Brückner production lines located in China (the "Production Lines")—inaccurately.

Plaintiffs' claims rest on their theory that three Fuwei shareholders—Jun Yin, Duo Wang, and Tonghu Zhou—perpetrated a fraud on the Chinese government in connection with the acquisition of the Production Lines by entities who subsequently sold them to Fuwei and are now in prison as a result. According to plaintiffs, because of those alleged criminal acts, a Chinese court might—at some future date—set aside the DMT and Brückner transactions. The Amended Complaint, however, does not—and cannot—allege that any pending or threatened action seeks this result, even though Chinese authorities have been investigating the allegedly criminal conduct since at least July 2006.

Moreover, plaintiffs do not even allege how this doomsday scenario could happen. Instead, they repeatedly invoke the investigations and subsequent arrests of Yin, Wang, and Zhou. This incantation simply ignores that there are no allegations that they were arrested or investigated in connection with anything specifically having to do with the Production Lines. Moreover, even if they had been, plaintiffs do not allege how that would actually impact the

Company's title to the Production Lines. Finally, plaintiffs choose to ignore the myriad cautionary statements in the Registration Statement warning investors that Fuwei's acquisitions of the Production Lines may be challenged (which they have not been) and that if any of those challenges were successful, Fuwei would have significant difficulty operating.

Because of both their factual and legal shortcomings, the allegations in the Amended Complaint fail to state a claim against the Underwriters for violations of either Section 11 or Section 12(a)(2) of the 1933 Act. First, the Amended Complaint fails to allege any actionable material misstatement or omission. The Registration Statement contained detailed, explicit disclosures with regard to the transactions by which the Company acquired its Production Lines. Additionally, it described the "tremendous risk" posed by those transactions, including the risk that the Company would cease operations if the transactions were successfully challenged. These disclosures entitle the Underwriters to protection under both the "bespeaks caution" doctrine and the safe harbor provision of the Private Securities Litigation Reform Act ("PSLRA"), as well as under the Second Circuit precedent governing disclosure of disputed facts and legal questions.

Second, the Amended Complaint fails to adequately plead loss causation. Months after the disclosure of the criminal investigations and arrests, the Company's stock continued trading well above its IPO price. As such, plaintiffs do not allege—and could never demonstrate—that their losses were caused by the materialization of any risk the Amended Complaint alleges was fraudulently concealed.

And finally, part of the putative class—including the named plaintiff—lacks standing to bring Section 12 claims against the Underwriters. The Supreme Court and the Second Circuit have clearly articulated and consistently applied the rule limiting Section 12 claims to those who

3

purchased their shares in the public offering.  Accordingly, the Court should dismiss the claims of those plaintiffs who purchased their shares in the aftermarket.

The Amended Complaint describes a small cadre of men intent on deceiving the Company's lawyers, auditors, and investors.  It makes no allegation that plausibly suggests a failure on the Company or Underwriters' part, or any misstatements or omissions contained in the Registration Statement.  In short, the Amended Complaint makes plain that the Underwriters were nothing more than innocent bystanders to this alleged scheme.

## FACTUAL BACKGROUND

### A.    Fuwei Acquires the Brückner and DMT Production Lines

Fuwei operates in the People's Republic of China, where it manufactures and sells plastic film for consumer packaging and industrial use.[2]  Fuwei acquired its primary operating assets—the Brückner and DMT manufacturing lines—from Shandong Neo-Luck Plastics Co., Ltd. ("Neo-Luck") in 2003 and 2004 bankruptcy-related auctions.[3]  Neo-Luck is a state-owned enterprise with ownership stakes in more than ten companies in China as well as three companies located in the United States, Australia, and Hong Kong.

According to the Amended Complaint, in the years following these acquisitions, there were public statements made in China questioning the circumstances surrounding the auctions.[4]  Specifically, there was at least one Chinese press report that Chinese authorities were investigating the conduct of Yin, Wang, and other Neo-Luck Group managers for their role in the alleged sale of state-owned assets—namely the Production Lines—for less than fair market

---

[2] Sohn Decl. Exhibit A, Amended Complaint ¶¶ 19-20.

[3] *Id.* ¶ 39.

value.[5]  Similarly, a Chinese asset-management company is alleged to have alerted the public

through the Chinese media that it believed the Neo-Luck Group's senior management had

improperly caused Neo-Luck Plastics to sell its state-owned assets to private companies owned

by the executive managers and control persons of Neo-Luck Group.[6]  As explained in the

memorandum of law submitted by Defendants Fuwei, Xiaoan He, and Mark Stulga in connection

with their motions to dismiss the Amended Complaint, these supposed complaints had nothing to

do with Fuwei.[7]

In April 2006, an arbitration before the ICC International Court of Arbitration was

commenced by DMT S.A., the seller of the DMT production line, against Neo-Luck, challenging

some aspects of the acquisition of the production line, and seeking $1.25 million in damages (the

"Arbitration").[8]  This Arbitration was not brought against Fuwei and did not seek the rescission

of the DMT transaction.

### B.     The IPO

Also in April 2006, Fuwei began work to prepare for its initial public offering of stock in

the United States.  It hired defendant Maxim to act as its lead underwriter and defendants

---

[4] *Id.* ¶¶ 63, 117.

[5] Sohn Decl. Exhibit A, Amended Complaint ¶ 63.

[6] *Id.* ¶ 117.

[7] *See* Memorandum of Law in Support of Defendants Fuwei Films, Xiaoan He, and Mark Stulga's Motion to Dismiss (the "Fuwei MOL").  The Underwriters adopt by reference the arguments contained in the Fuwei MOL.

[8] Sohn Decl. Exhibit A, Amended Complaint ¶ 120.

Chardan Capital Markets and WR Hambrecht + Co., LLC to serve as co-underwriters.[9]  At that time, Fuwei's assets exceeded $57 million.[10]

As part of the IPO process, the Company's registration statement was prepared.  It described in detail the key aspects of its business, including not only the circumstances surrounding its acquisition of the Brückner and DMT Production Lines, but also generally that there may be some questions concerning those processes.  At the outset, the Registration Statement disclosed that "[t]he circumstances under which [the Company] acquired ownership of [its] main productive assets may jeopardize [its] ability to continue as an operating business."[11]  It then stated that the Production Lines—which were substantially all of the Company's assets— were acquired through two auctions governed by Chinese law.[12]  The first, for the Brückner line, occurred in 2003 in a foreclosure proceeding enforcing a court judgment.[13]  And the second, for the DMT line, was in 2004 in a commercial auction from a consigner who obtained the line through a bankruptcy proceeding.[14]

The Registration Statement also included the opinion of the Company's Chinese counsel that the auctions were valid under Chinese auction and bankruptcy law.[15]  It added the caveat that the attorneys' opinion was based, in large part, on representations the Company made to

---

[9] *Id.* ¶¶ 31-33.

[10] *Id.* Amended Complaint, Exhibit 1 at F-32.

[11] Sohn Decl. Exhibit A, Amended Complaint ¶ 39.

[12] *Id.*.

[13] *Id.*

[14] *Id.*

[15] *Id.*

them.[16]  It discussed the possibility that someone might challenge the validity of the auctions and the Company's title to the Production Lines.[17]  And specifically, it warned that "[t]here can be no assurance that relevant authorities or creditors of the predecessor owner of these assets will not challenge the effectiveness of these asset transfers based upon the facts and circumstances of these transfers . . . ."[18]

The Registration Statement also stated that "assuming the representations and reports received by [Chinese] counsel are true and correct in all material respects, [Chinese] counsel is of the opinion that the auctions of the Brückner and DMT Production Lines were valid under [Chinese] law," that the chances of a successful challenge to the transactions were "remote."[19] The Registration Statement immediately balanced that judgment by making plain that while the Company believed the result unlikely, a successful challenge could result in the forfeiture of the assets, which would "materially affect" the Company's ability to continue operations.[20]

On December 15, 2006, the Company filed with the SEC its Registration Statement, which included a prospectus.[21]  On December 18, 2006, at 4:30 p.m., the Registration Statement became effective.[22]

---

[16] *Id.*

[17] Sohn Decl. Exhibit A, Amended Complaint ¶ 39.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶ 36.

[22] *Id.* ¶ 37.

On December 19, 2006, the Company filed its prospectus with the SEC and commenced its IPO, selling its stock at $8.28 per share.[23] On December 22, 2006, the Company announced that it had sold 4,312,500 shares of its stock at that price.[24]

## C.    Post-IPO Events

In January 2007, the ICC International Court of Arbitration found that despite not having been a party to the DMT Transaction, Fuwei had to appear in the Arbitration. Fuwei subsequently disclosed the existence of the Arbitration and the January 2007 decision in its April 2, 2007, Form 20-F filed with the SEC.[25] That day, Fuwei stock closed at $10.07. Three days later, its stock price had *increased* to $12.00.[26]

A month later, on May 7, 2007, Chinese police disclosed that several government agencies had undertaken a special investigation into the activities of Neo-Luck Group's executive management, specifically, their creation of a false bankruptcy and their below-fair-market-value sale of state-owned assets.[27] This disclosure did not identify the Production Lines as the subject of that investigation. That day, Fuwei stock closed at $9.35. Two days later, its stock price had *increased* to $9.63.[28]

---

[23] *Id.* ¶ 38.

[24] *Id.*

[25] Fuwei Film (Holdings) Co., Ltd., Annual Report (Form 20-F), filed Apr. 2, 2007.

[26] *See* Sohn Decl. Exhibit B, Fuwei Film (Holdings) Co., Ltd. Historical Price Stock Chart.

[27] *See* Sohn Decl. Exhibit A, Amended Complaint ¶ 144; *see also* Sohn Decl. Exhibit C, Fuwei Film (Holdings) Co., Ltd., Report of Foreign Private Issuer (Form 6-K), at Exhibit 99.1, filed June 26, 2007.

[28] *See* Sohn Decl. Exhibit. B, Historical Price Stock Chart.

Six weeks later, on June 25, 2007, Fuwei announced that three of its largest shareholders—Yin, Wang, and Zhou—were being criminally investigated by Chinese authorities.[29]  The announcement also disclosed the relationship among the Company and the three individuals.  And although there was no indication of whether the investigation included the Production Lines transaction, Fuwei reminded the public that the Company purchased them from Neo-Luck.[30]

Over three months later, in October 2007, the Company disclosed that Yin, Wang, and Zhou had been arrested on suspicion of the crimes of "irregularities for favoritism" and the sale of state-owned assets at improperly low prices.[31]  After starting the month at $8.50, the price of the Company's shares ranged from $6.20 to $10.75 throughout the month.[32]

In April 2008, the Arbitration between DMT and Neo-Luck was settled.  As part of that settlement Neo-Luck agreed to pay DMT $900,000 in exchange for releases of Fuwei and Neo-Luck from any and all claims relating to the original sale of the DMT Production Line.[33]

D.    **This Action**

On October 19, 2007, plaintiffs filed a class action complaint against the Company and four individuals that alleged violations of Sections 11 and 15 of the Securities Act. Subsequently, on November 12, 2007, a second set of plaintiffs filed a class action complaint

---

[29] *See* Sohn Decl. Exhibit A, Amended Complaint ¶ 161.

[30] Sohn Decl. Exhibit A, Amended Complaint ¶ 161.

[31] *Id.* ¶ 163.

[32] *See* Sohn Decl. Exhibit B, Historical Price Stock Chart.

[33] Sohn Decl. Exhibit D, Fuwei Film (Holdings) Co., Ltd., Annual Report (Form 20-F), at 53-54, filed Apr. 14, 2008.

against the Company, the Underwriters, and six individuals that alleged violations of Sections 11, 12(a)(2), and 15 of the Securities Act.

From December 18, 2007, through January 17, 2008, competing plaintiffs filed motions and briefs concerning consolidation, appointment as lead plaintiffs, and approval of selection of lead counsel. On January 24, 2008, the Court consolidated the cases, appointed plaintiff Tonyaz as lead plaintiff, and approved Tonyaz's selection of The Rosen Law Firm as his counsel.

On March 14, 2008, plaintiffs filed the Amended Complaint, which purports to state claims under Sections 11, 12(a)(2), and 15 of the 1933 Act against, variously, Fuwei and the Underwriters, as well Mark Stulga, Jun Yin, Tongju Zhou, Duo Wang, each of whom are or were Fuwei directors.

The Amended Complaint generally alleges that the Company's Registration Statement contains three primary categories of misrepresentations or omissions. First, it alleges that the Registration Statement concealed the investigation of Yin, Wang, and Zhou, as well as the relationships among those three men and the entities involved in the Production Lines' acquisitions. Second, despite the fact that the transactions through which Fuwei acquired the Production Lines have never been challenged—much less set aside—plaintiffs claim that the Registration Statement improperly suggests that those transactions were lawful, and that the opinion of Chinese counsel to the contrary was based on faulty information.[34] And third, it alleges that the Registration Statement wrongly failed to disclose the pending Arbitration related to the DMT production line. Plaintiffs attempt to use these alleged misstatements or omissions to show that Fuwei's investors were misled into believing that Fuwei is not facing an imminent

---

[34] Sohn Decl. Exhibit A, Amended Complaint ¶¶ 40-42.

threat of losing both Production Lines.  As will be shown below, this attempt is entirely

unavailing for the simple reason that there is no such undisclosed threat—imminent or otherwise.

## LEGAL ARGUMENT

In ruling on this motion to dismiss, the Court must accept as true all facts alleged in the

Amended Complaint and should draw "all reasonable inferences in the plaintiffs' favor."[35]

Nevertheless, a court "need not accord [l]egal conclusions, deductions or opinions couched as

factual allegations . . . a presumption of truthfulness."[36]  Both the Supreme Court and the Second

Circuit have made plain that "labels and conclusions, and a formulaic recitation of the elements

of a cause of action will not do."[37]  Instead, under the current pleading standard, "[t]o survive

dismissal, the plaintiff[s] must provide the grounds upon which [their] claim[s] rest[] through

factual allegations sufficient 'to raise a right to relief above the speculative level.'"[38]

Accordingly, claims must now travel "across the line from conceivable to plausible."[39]  Here,

---

[35] *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004) (internal quotation marks omitted) (affirming dismissal of securities action).

[36] *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (vacating in part and affirming in part dismissal of securities action), *cert. denied*, 128 S. Ct. 1707.

[37] *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (affirming dismissal of securities fraud complaint where allegations were not plausible on their face); *see also ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007) (applying *Twombly* standard and affirming dismissal).

[38] *ATSI*, 493 F.3d at 98 (quoting *Twombly*, 127 S. Ct. at 1965); *see also Iqbal v. Hasty*, 490 F.3d 143, 158 (2d Cir. 2007) (applying *Twombly*'s "plausibility" standard); *Curto v. Bender*, 231 Fed. Appx. 93, No. 05-2339, (2d Cir. Aug. 14, 2007) (summary order available at http://www.ca2.uscourts.gov) (applying *Twombly* pleading standard and dismissing complaint); *Chamberlant v. A&P*, 247 Fed. Appx. 237, No. 06-3536, (2d Cir. Sept. 7, 2007) (summary order available at http://ww.ca2uscourts.gov) (same); *Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007) (same).

[39] *Gitnik v. Home Depot U.S.A., Inc.*, No. 07-1244, 2007 WL 2728358, slip op. at *1 (S.D.N.Y. Sept. 18, 2007) (dismissing complaint).

plaintiffs' allegations do not cross this line and accordingly should be dismissed as a matter of law.

I.  **The Amended Complaint Does Not Allege any Actionable Misstatements or Omissions**

The Amended Complaint fails to allege any actionable material misstatements or omissions. Section 11 of the 1933 Act provides a cause of action for anyone "acquiring a security issued pursuant to a materially false registration statement unless the purchaser knew about the false statement at the time of acquisition."[40] A misstatement under Section 11 is established when "material facts have been omitted or presented in such a way as to 'obscure[] or distort[]' their significance."[41] Similarly, a plaintiff may bring a Section 12 claim against a seller who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading."[42] When courts decide whether a registration statement is materially misleading, their central inquiry is whether the representations, read together and in context, would have "misled a reasonable investor about the nature of the investment."[43]

---

[40] *DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003) (affirming dismissal).

[41] *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (affirming dismissal where plaintiff could "prove no set of facts which would demonstrate that the language . . . of the prospectus, read in context, [was] materially misleading. [And as] a matter of law . . . reasonable minds could not differ on [the] issue.").

[42] *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 659 (S.D.N.Y 2004) (citing 15 U.S.C. 77l(a)(2)).

[43] *Id.* at 657-58 (the "touchstone" of the materiality inquiry is whether defendants' representations or omissions would mislead a reasonable investor regarding the nature of the securities offered).

Here, the Registration Statement made detailed, explicit disclosures about the transactions through which the Company acquired the two Production Lines. Specifically, it described the "tremendous risk" posed by those transactions, including the risk that they could be challenged and the Company could cease operations. These disclosures entitle the Underwriters to protection under both the "bespeaks caution" doctrine and the safe harbor provision of the PSLRA, as well as under Second Circuit precedents governing disclosure of disputed facts and foreign legal questions. In addition, the Amended Complaint alleges the Company wrongly failed to disclose the pending Arbitration, but that Arbitration was not a "material legal proceeding" as a matter of law, so the Company had no obligation to disclose it.[44]

A.    **Under Both the "Bespeaks Caution" Doctrine and the PSLRA Safe Harbor, The Registration Statement is Not Actionable**

Even assuming that there were some imminent threat that Fuwei is about to lose one or both of the Production Lines—which there is not—the disclosures in the Registration Statement plainly disclose precisely that risk. These disclosures trigger the "bespeaks caution" doctrine, which protects issuers and underwriters who have included warnings along with the forward-looking information they provide to the marketplace.[45] Accordingly, appropriate cautionary language renders certain types of alleged misrepresentations or omissions immaterial as a matter

---

[44] *See* Reg. S-K, Item 103, Instr. 2, 17 C.F.R. § 229.103(2) (2008).

[45] *Rombach*, 355 F.3d at 173 (affirming dismissal of Section 11 and 12 claims against underwriters, holding that "alleged misrepresentations in a stock offering are immaterial as a matter of law [if no] . . . reasonable investor could consider them important in light of . . . cautionary language"); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) ("prominent and specific" cautionary language bespoke caution); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (affirming dismissal of securities fraud claims where offering memorandum statements "clearly 'bespeak caution'").

of law.[46]  Where a disclosure contains cautionary language, the court's task is to examine—as a whole—the materials alleged to be fraudulent to see whether a reasonable investor would have been misled.[47]  The key question is whether the statements, "considered together and in context, would affect the total mix of information" and thereby mislead an investor.[48]  If they do not, there can be no liability.  Much like the "bespeaks caution" doctrine, under the PSLRA's safe harbor, a forward-looking statement does not give rise to liability under the securities laws if it is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."[49]

Two recent Second Circuit cases illustrate how cautionary language—like that in the Registration Statement—effectively puts the marketplace on notice of the risk inherent in the purchase of specific securities and effectively protects underwriters from Section 11 or 12 liability.  In *Olkey v. Hyperion*, the Second Circuit affirmed the district court's dismissal of Section 10(b), Section 11, and Section 12 claims against all defendants, including underwriters.  There, plaintiffs complained that the defendants' descriptions of an investment strategy were overly optimistic and did not adequately explain the dire results that could occur if the defendants' interest rate and return projections did not materialize.[50]  The Second Circuit found,

---

[46] *Rombach*, 355 F.3d at 173.

[47] *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (affirming district court's dismissal of securities fraud class action complaint).

[48] *Id.* at 357.

[49] 15 U.S.C. § 78u-5(c)(1)(A)(i)); *see also In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 380 (S.D.N.Y. 2007) (citing statute); *Rombach*, 355 F.3d at 173 (reciting standard).

[50] *Olkey*, 98 F.3d at 4.

however, that the defendants had warned that if interest rates fell, investors could suffer losses.[51] As a result, it held that the cautionary language was "too prominent and specific" to be disregarded and the plaintiffs' claims necessarily failed as a matter of law.[52]

Similarly, in *Rombach*, the Second Circuit affirmed the dismissal of Section 11 and Section 12 claims against all defendants, including underwriters. There, plaintiffs complained that the disclosures did not reveal that the offering was being made in response to deteriorating cash flow and pressure from creditors, or that some recently acquired properties were having operations problems.[53] The district court found, and the Second Circuit affirmed, that the registration statement disclosed losses, warned that some new facilities might experience operational trouble, and generally presented a "sobering picture" of the company's condition.[54] The Second Circuit found that because of cautionary language included in the registration statement and related materials, a reasonable investor would not have been misled and concluded that the defendants were protected by the "bespeaks caution" doctrine and therefore entitled to have the claims against them dismissed.[55]

Here, plaintiffs allege that the Registration Statement is false and misleading because it omits certain details about the criminal investigations and arrests, as well as stating that the Company acquired the Production Lines lawfully.[56] As a threshold matter, plaintiffs' allegations

---

[51] *Id.* 5-6.

[52] *Olkey*, 98 F.3d at 5.

[53] *Rombach*, 355 F.3d at 173-174.

[54] *Id.* at 176.

[55] *Id.* at 173.

[56] Sohn Decl. Exhibit A, Amended Complaint ¶ 40.

related to the supposed omissions and misstatements require that there be some previously undisclosed imminent threat that the criminal investigations and arrests will somehow cause Fuwei to lose the Production Lines. As the recently settled Arbitration makes plain, however, this is simply not the case. There are no pending or threatened actions alleged in the Amended Complaint (or elsewhere) that threaten to rescind either acquisition. In fact, the only proceeding that had been brought concerning either Production Line was settled by Neo-Luck for $900,000 in exchange for *a full release of all claims related to the acquisition of the DMT Production Line*.

Even assuming some imminent risk that Fuwei were about to lose either or both Production Lines, the Registration Statement is replete with warnings of precisely that possibility. These warnings balanced the opinion that the acquisitions were lawful by describing the risk associated with the acquisitions, including the risk that the transactions may be challenged and that the Company might cease operations if those challenges were successful.[57] It cautioned investors that if the transactions were rescinded, the Company might have to shut its doors.[58]

Like the statements of the defendants in *Olkey* and *Rombach*, this blunt cautionary language warned prospective investors of precisely the risk of which plaintiffs now complain. In fact, the statements were contained in the "Risk Factors" segment of the Registration Statement, which warns, "If any of the following risks actually occurs, our business, financial condition and results of operations would suffer. If this happens, the trading price of our ordinary shares would

---

[57] Sohn Decl. Exhibit A, Amended Complaint ¶ 39.

[58] *Id.*

likely decline and you might lose all or part of your investment in our ordinary shares."[59]  These

balancing statements were both "prominent and specific."[60]  The Registration Statement

presented an accurate assessment of the Company's condition, and with regard to the potential

consequences to the Company if the acquisitions of the Production Lines were overturned, it

presented a "sobering picture."[61]  As a result of these "meaningful cautionary statements,"[62] the

Court should dismiss the Amended Complaint on the basis of both the "bespeaks caution"

doctrine and the PSLRA safe harbor.

### B.    The Registration Statement Disclosed a Disputed Fact and the Possible Outcomes, as Required Under the Securities Laws

In addition to complaining that the Registration Statement failed to provide the complete

factual story surrounding the acquisition of the Production Lines, plaintiffs also complain that the

representations concerning the legal opinion of Fuwei's Chinese counsel are actionable.[63]

Plaintiffs are wrong as a matter of law.

Where a question of foreign law is the focus of a securities fraud allegation, a court's

duty is to analyze whether the company brought the question to the attention of the investors.[64]

The Court has previously explained that "the law requires only that the disputed facts and the

---

[59] Sohn Decl., Exhibit A, Amended Complaint, Exhibit 1 at 10.

[60] *Olkey*, 98 F.3d at 5.

[61] *Rombach*, 355 F.3d at 176.

[62] *In re Sierra Wireless, Inc.*, 482 F. Supp. 2d at 380.

[63] Sohn Decl., Exhibit A, Amended Complaint ¶ 40.

[64] *Ronson Corp. v. Liquifin Aktiengesellschaft*, 370 F. Supp. 597, 608 (D.N.J. 1974) ("Court need not decide points of [foreign] law, but only whether these foreign legal questions have been fully and fairly called to the attention" of shareholders).

possible outcomes be disclosed."[65]  Here, the Court need only determine whether the questions

have been "fully and fairly called to the attention of the . . . shareholders."[66]

Setting aside the specifics of Chinese auction and bankruptcy law, it is clear that

plaintiffs' allegations center on a foreign legal question, *i.e.*, whether Chinese counsel's opinion

on the legality of the transactions was correct.  Here, the Registration Statement included a

lengthy description of the transactions by which the Company acquired the Production Lines and

described "tremendous risk" associated with the transactions.[67]  It disclosed the possible

outcome, *i.e.*, that the Company might have to fold up its operations.[68]  The Amended Complaint

alleges only that the legal opinion provided by Chinese counsel was based on incomplete facts.

Plaintiffs, however, do not allege how those supposedly omitted facts would change the Chinese

counsel's ultimate conclusion: that the transactions involving *Fuwei's* acquisitions of the

Production Lines, which have been neither challenged nor set aside, appear to be lawful.  The

securities laws require disclosure of the existence of a foreign-law question and its possible

outcomes.  Accordingly, the disclosures made in the Registration Statement were sufficient as a

matter of law.

---

[65] *Avnet, Inc. v. Scope Indus.*, 499 F. Supp. 1121, 1125 (S.D.N.Y. 1980) (dismissing claim, observing that purpose of disclosure requirements served where dispute and possible outcomes are stated); *see also Ranger Oil Ltd. v. Petrobank Energy and Res. Ltd.*, No. 00-3139, 2000 WL 33115906, at * 12 (S.D.N.Y. May 23, 2000) (refusing to enjoin tender offer where disclosure was adequate); *Nemo v. Allen*, 466 F. Supp. 192, 195 (S.D.N.Y. 1979) (dismissing complaint upon finding that proxy statement adequately revealed facts and need not characterize questionable conduct as criminal).

[66] *See Avnet, Inc.*, 499 F. Supp. at 1125 (citing *Ronson*).

[67] Sohn Decl. Exhibit A, Amended Complaint ¶ 39.

[68] *Id.*

### C.      There Was No Duty to Disclose the Arbitration

Finally, plaintiffs allege that the Registration Statement's failure to disclose the pendency of the Arbitration is an actionable omission.  This argument is similarly unavailing for at least two reasons.  First, when filed in April 2006, the Arbitration was brought by DMT against Neo-Luck and sought damages in connection with *their* 2005 transaction.  Fuwei was not a party to that original transaction and was not named as a party in the Arbitration.  It was not until January 2007, after the filing of the Registration Statement, that the ICC Court of International Arbitration ruled that Fuwei had to appear in the Arbitration.  Shortly after this event, Fuwei disclosed the Arbitration in its Form 20-F.

And second, under Regulation S-K a company must disclose only legal proceedings that seek ten percent or more of a company's assets.[69]  Here, the Arbitration sought damages of $1.25 million.[70]  At the time the Registration Statement was filed, however, the Company's assets were approximately $57.6 million.[71]  Accordingly, the Arbitration sought damages of approximately two percent of the Company's assets.  There was simply no duty to disclose the pending Arbitration because not only was Fuwei not a party, but also because it was not a "material pending legal proceeding" as a matter of law.[72]

---

[69] *See* Reg. S-K, Item 103, Instr. 2, 17 C.F.R. § 229.103(2) (2008); see also *General Elec. Co. v. Rowe*, No. Civ. A. 89-7644, 1992 WL 277997 (E.D. Pa. Sept. 30, 1992) (dismissing complaint premised, in part, on improper reading of 17 C.F.R. § 229.103).

[70] Sohn Decl. Exhibit A, Amended Complaint ¶¶ 11, 68-70; *see also id.*, ¶ 39 (quoting Registration Statement assertion that the Company is "not aware of any pending or threatened *material* litigation") (emphasis supplied).

[71] Sohn Decl. Exhibit A, Amended Complaint, Exhibit. 1 at F-32.

[72] *See* Reg. S-K, Item 103, Instr. 2, 17 C.F.R. § 229.103(2) (2008).

## II.    The Amended Complaint Does Not Adequately Allege Loss Causation

In addition to the pleading failures described above, the Amended Complaint does not properly plead loss causation. To survive a motion to dismiss, the Second Circuit requires that a complaint clearly allege that the complained-of conduct proximately caused the plaintiffs' economic harm.[73] Accordingly, plaintiffs must plead that a misstatement or omission "concealed something from the market that, when disclosed," drove the share price down.[74] There are simply no allegations that this occurred here.

Here, as late as October 2007—well after the complained-of information had been publicly revealed—the Company's stock traded above the December 2006 IPO price. Putative class members who purchased their shares through the IPO—the only ones with standing to bring Section 12 claims, as discussed below—paid $8.28 per share. In the months following the IPO, the following events occurred:

- April 2, 2007: Fuwei announced that arbitration proceedings against it were before the ICC International Court of Arbitration.[75] (A week later, on April 9, the Company's shares opened at $12.22.[76])

- May 7, 2007: Shandong Police disclosed that a special investigation had been undertaken by several government agencies to review the activities of Neo-Luck Group's executive management, specifically, their

---

[73] *ATSI*, 493 F.3d at 107 (affirming dismissal of securities fraud claims) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

[74] *Lentell*, 396 F.3d at 173, 174 (affirming dismissal of claims, holding "plaintiff must allege . . . that the *subject* of the fraudulent statement or omission [caused] actual loss suffered") (emphasis in original) (internal quotation omitted); *see also ATSI*, 493 F.3d at 107; *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347-48 (2005) (reversing circuit court's refusal to dismiss a complaint that failed to adequately plead loss causation, warning that allowing such claims to go forward could encourage the filing of abusive class actions and "transform a private securities action into a partial downside insurance policy").

[75] Sohn Decl. Exhibit A, Amended Complaint ¶ 120.

[76] *See* Sohn Decl. Exhibit. B, Historical Price Stock Chart.

creation of a false bankruptcy and their below-fair-market-value sale of state-owned assets.[77] (Four days later, on May 11, the Company's shares opened at $9.21.[78])

- June 25, 2007: Fuwei announced that Yin, Wang, and Zhou were being criminally investigated by Chinese authorities, disclosed the relationship among the Company and the three individuals, and reminded the public of the fact that the Company purchased equipment from Neo-Luck at auction.[79] (While the stock price fell on that date from $7.05 to $6.14, less than two weeks later, it was again trading above the IPO price, at $8.40.[80])

Moreover, three months after the Company announced the criminal investigation, on October 11, 2007, the Company's shares were trading at $10.29—*two dollars above the IPO price.*[81] The share price thus remained twenty-four percent higher than its IPO price despite a steady stream of revelations concerning the Company, including those at the heart of this litigation. If the defendants' misstatements and omissions had improperly inflated the stock price, then these "corrective" disclosures should have swiftly driven the price down. They did not. Accordingly, the Amended Complaint should be dismissed because the plaintiffs have failed to adequately plead loss causation.[82]

---

[77] Sohn Decl. Exhibit A, Amended Complaint ¶ 144.

[78] *See* Sohn Decl. Exhibit B, Historical Price Stock Chart.

[79] Sohn Decl. Exhibit A, Amended Complaint ¶ 161.

[80] *See* Sohn Decl. Exhibit B, Historical Price Stock Chart.

[81] *See id.*

[82] *See In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 588-91 (S.D.N.Y. 2006) (dismissing Section 12 claims where availability of loss causation defense was plain from face of complaint); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238-40 (S.D.N.Y. 2006) (same).

### III.    Aftermarket Purchasers Do Not Have Standing to Bring Section 12(a)(2) Claims

The Amended Complaint also alleges that the Underwriters violated Section 12(a)(2). Part of the putative class, however, lacks standing to bring this claim. Well-established precedents in the Second Circuit and this Court hold that Section 12(a)(2) plaintiffs must allege that they purchased their shares in the public offering—not the aftermarket.[83] It is irrelevant whether they can trace their purchases to a registration statement and prospectus.[84]

Here, the proposed class explicitly *includes* aftermarket purchasers.[85] Specifically, the Amended Complaint proposes a class of all people who bought the Company's stock in the IPO or "*in the aftermarket* pursuant, and/or traceable to" the registration statement and prospectus, between December 19, 2006 and November 12, 2007.[86] In fact, named plaintiff Reouk first purchased the Company's stock in October 2007, over ten months after the IPO.[87] Simply put,

---

[83] *Yung v. Lee*, 432 F.3d 142, 148 (2d Cir. 2005) (affirming dismissal of Section 12 claims, holding "purchasers in private or secondary offerings are precluded from bringing" such claims); *see also Gotham Holdings, LP v. Health Grades, Inc.*, 534 F. Supp. 2d 442, 444-45 (S.D.N.Y. 2008) (dismissing 12(a)(2) claim where investors purchased shares in the secondary market); *Caiafa*, 525 F. Supp. 2d at 407 (S.D.N.Y. 2007) (dismissing 12(a)(2) claim where complaint did not allege that plaintiffs purchased shares in a public offering); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) (rejecting claim brought under tracing theory); *In re WorldCom Sec. Litig.*, No. 02-3288, 2004 WL 1435356, at *5 (S.D.N.Y. June 28, 2004) (same).

[84] *Yung*, 432 F.3d at 148; *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d at 589; *In re WorldCom Sec. Litig.*, 2004 WL 1435356, at *5.

[85] Sohn Decl. Exhibit A, Amended Complaint ¶ 1.

[86] *Id.* (emphasis supplied).

[87] *See* Sohn Decl. Exhibit A, Amended Complaint, attachment to Reouk Certification.

any plaintiff who purchased shares in the aftermarket lacks standing to bring Section 12(a)(2) claims. The Court should dismiss those plaintiffs' claims, regardless of traceability.[88]

## IV.    Plaintiffs Should Not Be Given Leave to Replead

Plaintiffs in this action have already had ample opportunity to amend their claims, having filed two complaints to date. In addition, the plaintiffs had the chance to address the issues raised by both the Company and the Underwriters as expressed in pre-motion letters to the Court. They declined, electing to stand on the Amended Complaint. Plaintiffs' decision should have a consequence: the Amended Complaint should be dismissed with prejudice.[89]

---

[88] *Gustafson v. Alloyd Co.*, 513 U.S. 561, 578, 584 (1995) (holding that a private contract of sale concerning securities is not a "prospectus" for purposes of Section 12(a)(2) claims, was not a public offering, so such claims were barred).

[89] *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (finding that denial of leave to amend was appropriate where plaintiffs already had two previous opportunities to amend and should not be afforded "yet another bite at the proverbial apple").

## CONCLUSION

Because the Amended Complaint does not allege: any actionable misstatements, any actionable omissions, or loss causation, the Amended Complaint should be dismissed with prejudice.

Dated: May 14, 2008  
      New York, NY

DLA Piper US LLP

By: _____  
    Joshua S. Sohn  
    Caryn G. Schechtman  
    Kevin D. Galbraith  
1251 Avenue of the Americas  
New York, NY 10020  
(212) 335-4500 (Telephone)  
(212) 335-4501 (Facsimile)  
joshua.sohn@dlapiper.com

Perrie M. Weiner (admitted *pro hac vice*)  
DLA Piper US LLP  
1999 Avenue of the Stars  
Suite 400  
Los Angeles, CA 90067  
(310) 595-3000 (Telephone)  
(310) 595-3300 (Facsimile)

*Attorneys for the Underwriter Defendants*