EXHIBIT A
PART 1

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
 Email: pkim@rosenlegal.com
Laurence M. Rosen, Esq. (LR 5733)
 Email: lrosen@rosenlegal.com
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and Class

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

Case No. 07-CV-9416 (RJS)

In re FUWEI FILMS SECURITIES LITIGATION

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT

<u>JURY TRIAL DEMANDED</u>

------------------------------------------------------------X

Lead Plaintiff Nijat Tonyaz and named plaintiffs Daniil Reouk and Jerome Sahlman (collectively the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, alleges the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fuwei Films (Holdings) Co., Ltd., ("FFH", or the "Company"), securities analysts' reports and advisories about the Company, and

information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support

will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons

other than defendants who purchased FFH common stock in the Company's Initial Public Offering

(the "IPO") on December 19, 2006 or purchased FFH stock in the aftermarket pursuant, and/or

traceable to, the Company's Registration Statement and Prospectus issued in connection with the

IPO during the period from December 19, 2006 through November 12, 2007 (the "Class"). This

Complaint seeks to recover damages to Class members caused by defendants' violations of federal

securities laws and to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      The Company is in the business of manufacturing and selling plastic film for

consumer packaging and industrial uses. The Company owns two manufacturing production lines on

which all of its product output is manufactured.

3.      The Registration Statement issued by the Company in connection with the IPO

disclosed that FFH had purchased these production lines from intermediate entities that had

purchased the production lines in two separate auctions in 2003 and 2004.

4.      The two production lines were owned by Weifang Neo-Luck Plastics ("Neo-Luck

Plastics"), a subsidiary of Weifang Neo-Luck Group ("Neo-Luck Group").

5.      The Registration Statement included an opinion of counsel to the Company on the law

of the Peoples Republic of China ("PRC Counsel ") that, based on facts provided to PRC Counsel by

the Company, the purchases of the two production lines formerly owned by Neo-Luck Plastics, a

subsidiary of Neo-Luck Group, conformed with Chinese law, that no challenge to the legality of the

purchases had been initiated and that there was only a remote possibility that any creditor or government authority would seek to challenge the Company's purchase and ownership of the production lines.

6.     The Registration Statement also represented that the Company is "not currently a party to any material litigation and are not aware of any pending or threatened material litigation."

7.     In truth, at the time of the IPO, two of FFH's major shareholders, defendants Yin and Wang (90% owners of FFH), were under investigation for illegally selling the state owned assets of Neo-Luck Group and Neo-Luck Plastics, including the two production lines, which FFH ultimately purchased.

8.     In November 2006, prior to the IPO, the investigation culminated in a legal order restricting defendants' Yin and Wang's travel and Chinese authorities confiscated their passports.

9.     The Registration Statement failed to disclose that Yin and Wang, the owners of 90% of FFH's stock, were also the former and current Chairmen and executive managers of Neo-Luck Group respectively and were responsible for causing Neo-Luck Plastics to sell the two production lines at forced sale auctions to entities Yin and Wang controlled at below market value. These intermediate entities ultimately sold the production lines to FFH, an entity 100% owned by Yin, Wang and Zhou, an FFH director and former General Manager of Neo-Luck Group.

10.     In May 2007, after an audit of Neo-Luck Group by state regulators, Chinese authorities expanded their investigation and issued arrest warrants for defendants Yin, Wang and Zhou for creating a false bankruptcy and causing the auction sale of state owned assets, in particular the two manufacturing production lines owned by FFH, at less than fair market value.

3

11.     The Registration Statement was also false and misleading because in April 2006 the Company was served with an arbitration demand asserting damages of $1.25 million in connection with the purchase of one of the production lines by Neo-Luck Plastics. The arbitration sought to hold FFH liable for the debts of Neo-Luck Plastics in connection with the purchase of the production line.

12.     When the truth surrounding the false bankruptcy and illegal auction sale of the production lines to entities owned by former Neo-Luck Group executives, who were also the major stock owners of FFH, reached the market through a series of piecemeal disclosures, FFH's stock price dropped significantly, damaging investors.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77(o)).

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

15.     Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). Pursuant to 28 U.S.C. § 1391(d), FFH may be properly sued in any District in the United States, including the Southern District of New York. Moreover, FFH's common stock trades on the NASDAQ Global Market, which is located in this District. Thus, venue is proper in this District.

16.     In addition, the Underwriters all maintain offices in this District.

17.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Lead Plaintiff Nijat Tonyaz and named plaintiffs Daniil Reouk and Jerome Sahlman purchased FFH stock in the IPO, or in the aftermarket pursuant and/or traceable to the Company's Registration Statement and Prospectus issued in connection with the IPO, and were economically damaged thereby. Mr. Reouk's and Mr. Sahlman's PSLRA certification forms are attached hereto and are incorporated by reference herein. Mr. Tonyaz has previously filed a PSLRA certification form with the Court, which is incorporated by reference herein.

19.     Defendant FFH is a Cayman Islands Corporation with its principal place of business in the People's Republic of China. FFH, through its wholly owned subsidiaries, develops, manufactures, and distributes plastic films using the biaxial-oriented, stretch technique.

20.     The Company's products include printing base film, stamping foil-base film, metallization film or aluminum-plating base film, laser-holographic base film, single/double surface matte film, anti-counterfeit film, chemically pretreated film, and high-gloss film. Its films are used in consumer-based packaging, such as food, pharmaceutical, cosmetics, tobacco, and alcohol industries; imaging, such as masking film, printing plates, and microfilms; electronics and electrical industries, such as wire and cable wrap, capacitors and motor insulation; and in magnetic products, such as audio and video tapes.

21.     FFH's primary operating assets are two factory production lines for the manufacture of plastic films: the "DMT Line" and the "Bruckner Line" (collectively the "Production Lines"). At

5

the time of the IPO, these two production lines were the source for all of FFH's manufacturing output, and hence revenue.

22.    FFH's common stock trades on the NASDAQ Global Market under ticker "FFHL."

23.    Defendant Xiaoan He ("He") was at all relevant times herein the Company's Chairman and Chief Executive Officer, and a control person of the Company within the meaning of the Securities Act.

24.    Defendant Mark Stulga ("Stulga") was at all relevant times herein a director and a control person of the Company within the meaning of the Securities Act. Stulga is listed as the authorized United States representative of the Company in the Registration Statement and Prospectus

25.    Defendant Jun Yin ("Yin") was a 79% owner of the Company at the time of the Company's IPO. Yin, through his ownership and control of the Company, was a controlling person of FFH within the meaning of the Securities Act. Yin was also the Chairman and a control person of Weifang Neo-Luck Group ("Neo-Luck Group") and its subsidiary Weifang Neo-Luck Plastics[1], the entity that owned the Production Lines before being sold at auction to entities controlled by defendants Yin, Wang and Zhou.

26.    Defendant Tongju Zhou ("Zhou") was at all relevant times herein a Company Director. Zhou, along with Wang, owned 21% of FFH at the time of the Company's IPO. Zhou, through his ownership and control of the Company, was a controlling person of FFH within the meaning of the Securities Act.[2] Zhou was also the General Manager and a control person of Neo-

---

[1]    "Neo-Luck Plastics" was also known at different times as Weifang Neo-Luck and Shandong Neo-Luck.

[2]    At the time of the IPO, Wang and Zhou jointly owned 21% of FFH by virtue of each owning a 50% interest in Good Success Enterprises Ltd., which owned a 100% interest in

Luck Group and its subsidiary Weifang Neo-Luck Plastics, the entity that owned the Production Lines before being sold at auction to entities controlled by defendants Yin, Wang and Zhou.

27.    Defendant Duo Wang ("Wang") and defendant and Company director Zhou collectively were 21% owners of FFH at the time of the Company's IPO. Wang, through his ownership and control of the Company, was a controlling person of FFH within the meaning of the Securities Act. Wang is also the Chairman and a control person of Neo-Luck Group and its subsidiary Weifang Neo-Luck Plastics, the entity that owned the Production Lines before being sold at auction to entities controlled by defendants Yin, Wang and Zhou..

28.    On September 26, 2003, the day Shandong Baorui was established, defendant Yin resigned as Chairman of Neo-Luck Group. Shortly thereafter, defendant Wang assumed the position of Chairman of Neo-Luck Group upon Yin's resignation. Shandong Baorui was one of the intermediate owners of the Production Lines when purchased in the Neo-Luck Plastic's auctions. Chinese news media alleges that even after Yin resigned from Neo-Luck Group he continued to control Neo-Luck Group secretly through Wang.

29.    Defendants He, Stulga, Yin, Wang, and Zhou are collectively referred to hereinafter as the "Individual Defendants."

30.    Each of defendants Stulga, He, and Zhou signed the Registration Statement.

31.    Defendant Maxim Group LLC ("Maxim") is an investment bank with its principal executive offices located at 405 Lexington Avenue, New York, New York 10174. Maxim acted as the lead underwriter for the Company's shares in the IPO.

---

Easebright Investments Ltd, which owned 21% of FFH.

32.     Defendant WR Hambrecht + Co ("WR Hambrecht") is an investment bank with offices located at 420 Lexington Avenue, Suite 1825, New York, NY 10170. WR Hambrecht served as one of the underwriters of the Company's shares in the IPO.

33.     Defendant Chardan Capital Markets, LLC ("Chardan") is an investment bank with offices located at 17 State Street, Suite 1600, New York, NY 10004. Chardan served as one of the underwriters of the Company's shares in the IPO.

34.     Maxim, WR Hambrecht and Chardan are collectively referred to herein as the "Underwriters".

35.     The Underwriters earned fees and non-accountable expenses of approximately $3.35 million in selling the shares to Class members in the IPO.

## DEFENDANTS FALSE AND MISLEADING STATEMENTS IN THE PROSPECTUS:

## THE SHORT STORY

36.     On December 15, 2006, the Company filed with the Securities Exchange Commission ("SEC") an amended registration statement on Form F-1/A. The Registration Statement contained, *inter alia*, a Prospectus. A copy of the Registration Statement is attached hereto as Exhibit 1, and is incorporated herein by reference.

37.     On December 18, 2006, at 4:30 p.m., the Company's Registration Statement became effective.

38.     On December 19, 2006, the Company filed its Prospectus[3] with the SEC and commenced its IPO, selling shares at a price of $8.28 per share. On December 22, 2006, the

---

3     The Prospectus is nearly identical in all material respects to the Registration Statement (Ex. 1, hereto) filed with the SEC on December 15, 2008. The Prospectus is available at

8

Company announced it had sold 4,312,500 shares of its stock at $8.28 per share—which included 562,500 additional shares issued to cover over-allotments. Total gross proceeds from the offering were $35,708,500.

39.    The Registration Statement and Prospectus (hereinafter referred to collectively as the "Registration Statement") stated in pertinent part:

> ***The circumstances under which we acquired ownership of our main productive assets may jeopardize our ability to continue as an operating business***
>
> Substantially all of our operating assets were acquired through two auction proceedings under relevant PRC law. We acquired the Brückner production line in 2003 as a result of a foreclosure proceeding enforcing an effective court judgment and the DMT production in 2004 as a result of a commercial auction from a consigner who obtained such assets through a bankruptcy proceeding. **In the opinion of our PRC counsel, Concord & Partners, these proceedings are both valid under Chinese auction and bankruptcy law based on certain factual assumptions.** Our PRC counsel's opinion solely relates to the legal procedure of the auctions and is based upon certain factual assumptions, written representations of the Company and written reports of the auction company and other related parties. **There can be no assurance that relevant authorities or creditors of the predecessor owner of these assets will not challenge the effectiveness of these asset transfers based upon the facts and circumstances of these transfers, despite the existence of independent appraisals, and other facts and circumstances of the auctions that cannot be verified by our PRC counsel.** Taking into consideration the facts known by our PRC counsel related to the auction of the Brückner production line and the significant difference in the price paid for the DMT production line at the two bankruptcy auctions involved in our purchase of that asset and, assuming the representations and reports received by our PRC counsel are true and correct in all material respects, **our PRC counsel is of the opinion that the auctions of the Brückner and DMT production lines were valid under PRC law and the possibility of the creditors of Shandong Neo-Luck successfully exercising recourse or claiming repayment with respect to our assets purchased in the bankruptcy proceeding should be remote. However, should any such challenge be brought in China (or elsewhere) and prevail, we may incur substantial liabilities and be required to pay substantial damages as a result of acquiring these assets. Although we believe any such challenge is unlikely to lead to the**

---

http://www.sec.gov.

**forfeiture of the related assets, it could materially affect our ability to continue
operations.** (Ex. 1, Reg. Stmt. pg. 11-12)

\* \* \*

## Our Operating History and Corporate Structure

Shandong Fuwei, our PRC operating subsidiary, was formed on January 28, 2003, as
a sino-foreign equity joint venture under the name Weifang Fuwei Plastic Co., Ltd. In
July 2003, this company began production of BOPET film, initially renting the
necessary fixed assets from Shandong Neo-Luck, a company involved in BOPET
film production for which Mr. Xiaoming Wang and Dr. Yongping Bai, our current
executive officers, each served as executive officers at the time.

Shandong Fuwei subsequently acquired these fixed assets through two auction
proceedings, the first in October of 2003 and the second in December 2004. At the
first auction proceeding in October 2003, Shandong Fuwei acquired assets related to
the Brückner production line that it had been renting from Shandong Neo-Luck. This
line had been previously mortgaged by Shandong Neo-Luck to the Bank of China,
Weifang city branch as security for several loans extended to Shandong Neo-Luck's
affiliates. When these loans went into default, the Bank of China brought a series of
legal actions in Weifang Municipal People's Court that resulted in the assets securing
the loans being sold at public auction. Following its successful bid at auction, on
October 9, 2003, Shandong Fuwei acquired the Brückner production line (with an
appraised value of approximately RMB 169 million) for RMB 156 million.

In November 2003, Shandong Fuwei's shares were sold to Shenghong Group Co.,
Ltd. ("Shenghong Group") and Shandong Baorui for an aggregate consideration of
RMB 98.2 million. Tongju Zhou, one of our directors, and Duo Wang each indirectly
own 50% of Easebright Investments Limited ("Easebright"), one of our principal
shareholders, and are both officers and directors of Shandong Baorui. Jun Yin and
Duo Wang own 17.5% and 4.6%, respectively, of Shandong Baorui. In 2004, Messrs.
Zhou and Wang, along with Jun Yin established several offshore holding companies
(including the issuer of the shares being sold in this offering) in the British Virgin
Islands and the Cayman Islands to acquire and hold these shares. In October 2004,
Fuwei (BVI) entered into a sale and purchase agreement with Shenghong Group and
Shandong Baorui pursuant to which Fuwei (BVI) acquired the respective equity
interest of Shenghong Group and Shandong Baorui in Shandong Fuwei for an
aggregate consideration of RMB 91 million. Shandong Fuwei thereafter became a
wholly-owned subsidiary of Fuwei (BVI) and was converted into a wholly-foreign
owned enterprise pursuant to PRC law. As a result of this transfer, our financial
statements have been prepared with regard to Shandong Fuwei, as the predecessor
company, for the period from January 28, 2003 until October 26, 2004 and with

regard to Fuwei Films (Holdings) Co., Ltd and its subsidiaries for periods beginning on and after August 9, 2004. The acquisition was accounted for in accordance with the purchase method of accounting in our financial statements.

As a result of its ongoing financial difficulties, Shandong Neo-Luck was declared bankrupt by the Weifang Municipal People's Court in the PRC on September 24, 2004. Prior to the bankruptcy, Shandong Neo-Luck's then major operating asset, the DMT production line, had been pledged by Shandong Neo-Luck to Weifang City Commercial Bank. When Shandong Neo-Luck was declared bankrupt, the Shandong Branch of the Bank of China seized the production line by order of the Qingdao Intermediate People's Court and the Qingdao Southern District People's Court while the Weifang Branch of Bank of Communications did so through Weifang Intermediate People's Court. As such, the effectiveness of the pledge in favor of Weifang City Commercial Bank was under dispute. Subsequently, pursuant to the decision from Weifang Intermediate People's Court, Weifang City Commercial Bank ranked senior in terms of the right of claims.

The pledged DMT production was put up for public auction by the Shandong Neo-Luck liquidation committee on October 22, 2004. In view of the above complexities, the auction was deemed to be tremendously risky at that time, and therefore, our PRC operating subsidiary did not directly participate in the first auction, which began with a bid price of approximately RMB 53 million by reference to an independent valuation performed on a forced sale basis. However, due to the potential tremendous risk involved, the auction had been withdrawn twice and the starting bid price had been further reduced to approximately RMB 34 million and was finally purchased by Beijing Baorui, a company indirectly controlled by Shandong Baorui. When the DMT production line was put for public auction by Beijing Baorui three months later, our PRC operating subsidiary purchased it for approximately RMB 119 million, which was supported by an independent valuation performed on a going concern basis. We considered the arrangement to have the DMT production line acquired through Beijing Baorui through the first auction as an effective way to minimize the risk associated with the uncertainties arising from the bankruptcy of Shandong Neo-Luck. The price difference of approximately RMB 85 million represented a risk premium paid to Beijing Baorui, which bore the ultimate risks of recourse from creditors of Shandong Neo-Luck.

We have obtained an opinion of PRC counsel with respect to the validity of the auction proceedings under PRC law, although you should read the description of the opinion set forth under the title "Risk Factors — The circumstances under which we acquired ownership of our main productive assets may jeopardize our ability to continue as an operating business." (Reg. Stmt. pg. 34-35)[4]

---

4    One U.S. Dollar ($1.00)  was equal to roughly RMB 8.00 at the time the Registration

* * *

**Legal Proceedings**

We are not currently a party to any material litigation <u>and are not aware of any</u>
<u>pending or threatened material litigation</u>.  (Ex. 1, Reg. Stmt. pg. 67) (Emphasis
added.)

## **Misrepresentations Concerning the Legality of the Acquisition of the Production Line**

40.     The Registration Statement was false and misleading because it erroneously stated

that FFH had acquired its primary operating assets (the Production Lines) lawfully under Chinese

laws and regulations.  In truth, FFH had acquired the Production Lines, its main operating assets,

through transactions that were neither lawful, nor valid transactions under Chinese laws and

regulations.

41.     The acquisition of the Production Lines violated Chinese law because defendant Jun

Yin, the former Chairman of Neo-Luck Group, with the assistance of defendants Wang (Neo-Luck

Group's current Chairman) and Zhou (Neo-Luck Group's former General Manager) improperly put

the Neo-Luck Plastics subsidiary into bankruptcy and caused the Production Lines to be sold for less

than fair value at auctions to companies that Yin, along with defendants Wang and Zhou, controlled

(defendants Yin, Wang, Zhou are sometimes referred to herein as the "Transferees").  By causing

Neo-Luck Plastics, a state-owned enterprise to sell its Production Lines at substantially less than fair

value, the auction sales of the Production Lines arranged by Yin, Wang and Zhou violated Chinese

law.

---

Statement was declared effective. (Ex., 1 Reg. Stmt. p. 30).

42.    By causing Neo-Luck Plastics to transfer the Production Lines, which were state-owned assets of Neo-Luck Group, to FFH at below fair-market values, the Transferees violated, among other applicable Chinese laws, Article 52 of Contract Law of the People's Republic of China, which states:

A contract shall be null and void under any of the following circumstances:

(1)  A contract is concluded through the use of fraud or coercion by one party to damage the interests of the State;
(2)  Malicious collusion is conducted to damage the interests of the State, a collective or a third party;
(3)  An illegitimate purpose is concealed under the guise of legitimate acts;
(4)  Damaging the public interests;
(5)  Violating the compulsory provisions of the laws and administrative regulations.

43.    That the Transferees' simultaneous sale and purchase at auction of the Production Lines through companies under their control was flagrantly illegal is reinforced by the fact that, prior to the effective date of the Registration Statement, Chinese authorities initiated an investigation and legal proceedings against the Transferees concerning the illegal purchases of the Production Lines, state-owned assets, at below fair market values.   As part of the investigation and legal proceedings, in November, 2006, Chinese authorities ordered that the passports of defendants Yin and Wang be confiscated and that they both be prohibited from traveling outside mainland China.

44.    The illegality of FFH's acquisition of the Production Lines is further demonstrated by the arrest of defendants Yin, Wang and Zhou by the Chinese authorities.  On October 16, 2007, FFH announced that "an arrest notice has been issued by the People's Procuratorate of Shandong Province, People's Republic of China on September 28, 2007, for Mr. Jun Yin, Mr. Duo Wang, and Mr. Tongju

Zhou, relating to the suspicion of the crime of irregularities for favoritism and to sell state-owned assets at low prices."

45.    The Registration Statement misrepresented the inherent illegality of FFH's acquisitions of the Production Lines by stating that, according to the opinion of FFH's counsel, which was based on the facts that FFH *itself* provided to its counsel, the acquisitions were legal, and the risk that there might be any successful legal challenges to the acquisitions was "remote."

46.    Contrary to statements in the Registration Statement, at the time of the IPO, FFH's ownership of the Production Lines was not merely subject to a *remote potential* challenge under civil law, but rather FFH's ownership of the Production Lines was the object of an ongoing investigation and legal proceedings.

## Failure to Disclose Material Facts Concerning FFH's Acquisition of the Production Lines

47.    The Registration Statement failed to provide complete disclosures as to the "circumstances" relating to FFH's acquisition of its main productive operating assets that rendered the statements made in the Registration Statement materially false and misleading.

48.    More specifically, the Registration Statement misrepresented how FFH acquired its two primary assets, two Production Lines (the Bruckner Line and the DMT Line), from Neo-Luck Plastics, in which Neo-Luck Group, a state-owned company, had a 59% ownership interest.

49.    The undisclosed facts are that three management executives and control persons of the state-owned Neo-Luck Group, namely Yin, a founder and former chairman of Neo-Luck Group, Wang, the chairman of Neo-Luck Group, and Zhou, a general manager of Neo-Luck Group, engineered a way to transfer the Production Lines, which were the assets of Neo-Luck Group's

14

subsidiary, Neo-Luck Plastics, to themselves at an exceedingly low price, while simultaneously arranging for Neo-Luck Plastics to go into a fake bankruptcy, stripping various creditors of their claims, and looting the state of its assets.

50.     The success of the scheme to loot Neo-Luck Plastic's assets through the false bankruptcy was facilitated by Yin, Wang, and Zhou by concealing their respective identities as the ultimate transferees.

51.     The Transferees created multiple transactions involving many entities, also of their creation, such that, in the end, the Production Lines became the property of Shandong Fuwei,[5] which was a subsidiary in a chain of five subsidiaries, which were all actually owned entirely by the Transferees collectively.

52.     Throughout the Complaint are references to Charts 1-5; attached together as Exhibit 2 are Charts 1-5. Each chart displays a different transaction involved in the transfers of the Production Lines from Neo-Luck Plastics to the Transferees within the context of the relationships between the myriad relevant entities.

53.     The Registration Statement failed to disclose the material fact that defendants Yin and Wang, owners of 79% and 10.5% respectively of FFH's common stock, were the management executives and control persons of both Neo-Luck Group, a state-owned entity, and its Neo-Luck Group's subsidiary, Neo-Luck Plastics.  Yin was the founder and Chairman of Neo-Luck Group from its inception and resigned from his position as Chairman on September 26, 2003, the same date he

---

[5]     Shandong Fuwei was also known at different times as Fuwei Films Shandong and Fuwei Plastics.

created Shandong Baorui for the purpose of purchasing the Production Lines at the bankruptcy auctions. Wang became Chairman of Neo-Luck Group thereafter.

54.    The Registration Statement also failed to disclose that Zhou owned 13.35% of the shares of Shandong Baorui, and that Yin controlled the entities which together owned an additional 51.05% of the shares of Shandong Baorui.

55.    Moreover, the Registration Statement failed to disclose that Waifeng Jiasheng Investment, an intermediate owner of one of the Production Lines, was owned entirely by Wang.

56.    Further, the Registration Statement failed to disclose that Beijing Changfu, an intermediate owner of the Production Lines, was controlled by Yin.

57.    These omitted facts were material because they demonstrate that defendants Yin, Wang and Zhou together exercised complete control of Neo-Luck Group and Neo-Luck Plastics, the entities that sold the Production Lines in forced sale auctions **and** that these same defendants simultaneously exercised majority control over Shandong Baorui and Bejing Baorui, Waifeng Jiasheng Investment, and Beijing Changfu ( (the intermediate purchasers and owners of the Production Lines) and owned 100% of FFH, the ultimate purchaser and owner of the Production Lines.

58.    Had Yin, Wang and Zhou's *simultaneous* control of Neo-Luck Group and ownership of FFH been fully disclosed it is unlikely that FFH could have obtained a legal opinion that the acquisition of the Production Lines was lawful according to Chinese laws. These omitted facts demonstrate that Yin, Wang and Zhou possessed the ability and motive to, and did in fact, illegally engineer a false bankruptcy to transfer the Production Lines through the auction sales to FFH: the net effect of which was to transfer ownership of the Production Lines for about one-third to one-fifth of

their true value from a state-owned entity, Neo-Luck Group, to FFH, an entity owned 100% by Yin, Wang and Zhou.

59.    Defendants Yin, Wang and Zhou thus violated Chinese law by transferring state-owned assets to themselves for less than fair value. Because the acquisition of the Production Lines by FFH was illegal under Chinese laws, the Registration Statement was false and misleading.

60.    Just as the charts (Ex. 2) appear so confusing that one may find it daunting to try to figure them out, the Transferees, Yin, Wang and Zhou created such a maze replete with transactions and entities related to the purchases and sales of the Production Lines that probably no one involved in the auctions, except for those who supported the nefarious activities of the Transferees, realized that the Transferees were the ultimate *transferees* of the Production Lines.

### Failure to Disclose the Pending Investigation and Legal Proceedings

61.    The Registration Statement falsely stated that at the time of the IPO there were no pending or threatened legal challenges or proceedings regarding the Production Lines or the auction-transactions by which FFH acquired the Production Lines.

62.    The Registration Statement failed to disclose pending and threatened material legal proceedings against FFH and its two controlling shareholders, Yin and Wang at the time of the IPO.

63.    In or about July 2006, Chinese news media reported that Chinese authorities had initiated an investigation of defendants Yin, Wang and other former Neo-Luck Group managers in connection with the alleged sale of state-owned assets for less than fair market value.

64.    The investigation related to allegations that Yin, Wang and other Neo-Luck Group managers had caused Neo-Luck Group to initiate a false bankruptcy of its Neo-Luck Plastics subsidiary, among other Neo-Luck Group subsidiaries, in an effort to transfer state-owned assets to

17

companies owned and controlled by Yin and Wang at less than fair market value. As part of the investigation, Chinese authorities initiated legal proceedings against Yin, Wang and others obtaining a legal order confiscating their passports and prohibiting these defendants from traveling outside of mainland China.

65.     The Registration Statement failed to disclose these material facts, predating (nearly a month) the effective date of the Registration Statement: that an investigation and legal proceedings were commenced by Chinese authorities against defendant Yin (a 79% controlling shareholder of FFH), and defendant Wang (a 10.5% controlling shareholder of FFH).

66.     Additionally, when Yin and Wang's passports were confiscated in November 2006 (approximately a month before the Registration Statement was declared effective), their respective abilities to engage in business outside of China, were severely restricted. FFH conducts significant business in the United States, Japan, and India. Thus, this restriction was a material fact that was required to be disclosed in the Registration Statement

67.     The Registration Statement also erroneously stated that the likelihood of any recourse or action by the original owners of the DMT or Bruckner production lines, the creditors of the original owners or relevant authorities was "remote," when in actuality the risk of any such action was imminent and real, as *prior to the IPO* the Chinese Government had commenced an investigation and proceedings against Yin and Wang (owners of 90% of FFH's stock) concerning FFH's acquisition of the Production Lines and questioning the legality of FFH's acquisition of its operating assets under Chinese laws and regulations.

### Failure To Disclose Material Arbitration Proceedings Against FFH

68.    The Registration Statement falsely stated that at the time of the IPO there were no pending or threatened legal challenges or proceedings regarding the Production Lines or the auction transactions by which FFH acquired the Production Lines.

69.    The Registration Statement misleadingly failed to disclose that an arbitration proceeding was commenced in the ICC International Court of Arbitration against FFH in connection with the sale of the DMT Line to Neo-Luck Plastics, the subsidiary of Neo-Luck Group that had owned the DMT Line.  The arbitration sought damages of $1,250,000 from FFH in connection with the purchase by Neo-Luck Plastics of the DMT Line – claiming that FFH is responsible for the debt of Neo-Luck Plastics based on the nature of the auction proceedings and sale of the DMT Line to entities controlled by the same persons (Yin, Wang and Zhou) that control FFH and Bejing Baorui and had also controlled Neo-Luck Group and Neo-Luck Plastics prior to the sale of the DMT Line at auction.

70.    The arbitration concerning the DMT Line had been filed in April 2006, about eight months prior to the date the Registration Statement and Prospectus were declared effective.  Not only did this omission of fact  render the statements in Registration Statement materially false, its non-disclosure did not comply with applicable SEC regulations as the subject of the adverse claims was valuable property belonging to FFH, namely the DMT Line..


## THE LONG STORY:

### HOW THE PRODUCTION LINES WERE ILLEGALLY TRANSFERRED STEP-BY-STEP FROM NEO-LUCK TO SHANDONG FUWEI, INDIRECTLY OWNED BY YIN, WANG AND ZHOU

**Bruckner Line Transfer**

71.    In order to better comprehend the how the Bruckner Line transfer occurred and who the relevant parties to the transfer were, please refer to Chart 1, which is attached as part of Exhibit 2.

72.    In October 2003 the Bank of China foreclosed on the Bruckner Line after Neo-Luck Group defaulted on a loan.

73.    At the time of its auction, the Bruckner Line was appraised at RMB 285 million. This is contrary to the false statement in the Registration Statement that the Bruckner Line was appraised at RMB 169 million.

74.    Despite being appraised at such a high value, *through the machinations of Defendants Yin, Wang and Zhou,* Shanghong Fuwei was able to buy the Bruckner Line at the auction far below market-value, for RMB 106 million.[6]

75.    Shandong Fuwei was a shell created only for the purpose of transferring ownership of state-owned Neo-Luck Plastic's assets to Neo-Luck Group's controllers, Yin, Wang and Zhou: The Transferees.

76.    Shandong Fuwei was founded on or about January 28, 2003 by a company called Jimswood Group Ltd.,[7] having 49% ownership of Shandong Fuwei, and Beijing Changfu, having 51% ownership of Shandong Fuwei.

77.    What really happened is that while Jimswood Group Ltd.'s interest in Bruckner Line remained intact (as it owned as much as 41% of Neo-Luck Group, which owned the Bruckner Line before the purchase, and it owned 49% of Shandong Fuwei, which owned the Bruckner Line after the

---

[6]    While various Chinese media reports state that FFH purchased the Bruckner Line for RMB 106 million, the Prospectus claims that FFH purchased it for RMB 156 million.

purchase), Neo-Luck Group's interest in the Bruckner Line, through its 59% ownership of Neo-Luck Group, was transferred to an entity called Beijing Changfu, through Beijing Changfu's 51% ownership of Shandong Fuwei, whereby Beijing Changfu was indirectly controlled by Defendant Yin.[8]

78.     In essence, Yin, the founder and former Chairman of the Board of state-owned Neo-Luck Group, controlled its subsidiary Neo-Luck Plastics and secretly exploited his position as Chairman by selling Neo-Luck's interest in the Bruckner Line to a private company that he controlled.   Yin's actions constituted illegal transfer of state-owned assets for less than fair value: a crime under Chinese law.

79.     Shandong Fuwei, a new company, did not have RMB 106 million to spend on the purchase of the Bruckner Line.

80.     Shandong Fuwei obtained RMB 156 million, more than enough money to purchase the Bruckner Line, by taking out a loan in that amount from China Bank of Communications on condition that, of the debt owed to many banks by Neo-Luck Plastics, the debt owed to China Bank of Communications by Neo-Luck Plastics would be assigned to Shandong Fuwei – thereby assuring repayment of Neo-Luck Plastics' debts to China Bank of Communications at the expense of Neo-Luck Plastics' other creditors.

81.     In this way, all the other creditors of Neo-Luck Plastics were blocked from asserting a claim against the Bruckner Line, which was valuable enough that it could have been utilized to satisfy much of the debt the creditors were owed.

---

[7]     Jimswood Group Ltd. was also known as American Jingfu.

[8]     -Jun Yin controlled Beijing Changfu Investment Co. Ltd, which controlled Beijing

82.     Meanwhile the Transferees looted Neo-Luck Plastics, obtaining a windfall in the purchase of the Bruckner Line for little more than one-third of its value, using money they could not have raised were it not for their offer to pay back China Bank of Communications (favoring it over other Neo-Luck creditors):   money that Defendants themselves were responsible, as Neo-Luck Group's executives, for borrowing on behalf of Neo-Luck Group.

83.     While China Bank of Communications was able to protect its loan, other creditors of Neo-Luck Plastics were left with RMB 216 to write off as bad loans.

**The First Transfer of the Shares of Shandong Fuwei with its Asset, the Bruckner Line**

84.     In order to more clearly understand how the first transfer of the shares of Shandong Fuwei occurred and who the relevant parties to the transfer were, please refer to Chart 2, which is attached as part of Exhibit 2.

85.     The Transferees were careful to prevent the public from becoming aware that the Transferees were transferring the assets of Neo-Luck Plastics to themselves (or entities under the control of the Transferees). As managers and directors of Neo-Luck Group, a state-owned enterprise, the Transferees had a responsibility to protect Neo-Luck Plastics' assets and prevent their transfer for less than fair value.

86.     The Transferees made the purchase of the Bruckner Line through the entity of Shandong Fuwei, as stated above, and subsequently the Transferees arranged for the transfer of the shares of Shandong Fuwei from Jimswood Group Ltd. and Beijing Changfu to Shenghong Group Co. Ltd.[9] and Shandong Baorui,[10] other entities that the Transferees appeared only to minimally control.

---

Changfu.
9     Shenghong Group Co. Ltd. was also known as China Shenghong Group.

22

87.     On or about November 21, 2003, Jimswood Group Ltd. and Beijing Changfu, which together owned 100% of Shandong Fuwei, transferred 90% of their combined shares to Shenghong Group Co. Ltd. and 10% of their combined shares to Shandong Baorui in consideration for their joint receipt of RMB 98.2 million.[11]

88.     The ownership of Shandong Baorui, in percentage of shares, was as follows: Neo-Luck Working Committee of Yunfei Hotel had 19.6%, Working Committee of Shandong Neo-Luck had 14.7%, Neo-Luck Plastics Working Committee had 9.85%, Fuhua Hotel had 6.9%, Yongsheng Yang had 2.5%, Xiaofang Ji had 3%, Wang had 4.6%, Yin had 17.5%, Zhou had 13.35%, and shareholders whose identities are unknown to Plaintiff had 8%.

89.     The Registration Statement omitted to state the material fact that Zhou owned 13.35% of Shandong Baorui. This was a material fact because the Prospectus also failed to disclose that Yin and Wang were the former and current Chairman respectively of Neo-Luck Group – thus placing Yin and Wang on both sides of the auction sale transactions by which FFH acquired the Production Lines.

90.     Rather, the Registration Statement noted only the shares of Shandong Baorui that were owned by Yin and Wang, amounting to a combined 22.1%.

91.     As Yin and Wang were the founder and former chairman and incumbent chairman respectively of Neo-Luck Group, upon information and belief, they also controlled the following affiliates of Neo-Luck Group, whose combined percentage interest in Shandong Baorui was 51.05%:

---

10     Shandong Baorui was also known as Shandong Baorui Investment Co. Ltd. and Shandong Fuhua Investment.
11     At the time of the filing of this Complaint, the identities of the control persons of Shenghong Group Co. Ltd. are unknown to Plaintiff.

Neo-Luck Working Committee of Yunfei Hotel, Working Committee of Shandong Neo-Luck, Neo-Luck Plastics Working Committee, and Fuhua Hotel.

### DMT Line Transfer

92.    In order to more clearly understand how the DMT Line transfer occurred and who the relevant parties to the transfer were, please refer to Chart 3, which is attached as part of Exhibit 2.

93.    On or about October 22, 2004, a month after Neo-Luck Plastics became bankrupt on or about September 24, 2004, a company named Beijing Baorui, which was owned by Shandong Baorui (already mentioned above) and by a company called Waifeng Jiasheng Investment, purchased the DMT Line at an auction, after three of Neo-Luck's creditors sought to seize the assets. The three creditors had competed in court for rights to the DMT Line as collateral for loans to Neo-Luck Plastics.  Ultimately, pursuant to a court order, Wiefang City Commercial Bank received the proceeds of the DMT Line sale at the auction.

94.    The DMT Line was purchased by Beijing Baorui at auction for RMB 33.848 million despite that its book value was RMB 171 million and that it was appraised at RMB 105 million.

95.    Said appraisal for RMB 105 million, a material fact, was not disclosed in the Prospectus, which stated that the value was "...RMB 53 million by reference to an independent valuation performed on a forced sale basis."

96.    According to the Prospectus, Beijing Baorui purchased the DMT Line for the discounted amount of RMB 33.848 million because of the risks "associated with the uncertainties arising from the bankruptcy of ... Neo-Luck."

97.    The Registration Statement failed to disclose how great the risks were that a challenge to the purchase would be successfully asserted, and why this risk was so big.

98.    The risks of huge loss to FFH were great due to the illegality of the Transferees having looted state-owned assets of Neo-Luck Plastics.

99.    The Transferees caused Neo-Luck Plastics to go bankrupt in order to facilitate transferring both the Bruckner Line, as described above, and the DMT Line to their very own selves.

100.    In fact, almost 50% of the shares of Beijing Baorui, which purchased the DMT Line, were indirectly owned by the Transferees, and Beijing Baorui was almost 100% controlled by the Transferees.

101.    Waifeng Jiasheng Investment owned 20% of the shares of Beijing Baorui, and Shandong Baorui owned 80% of the shares of Beijing Baorui.

102.    Another material fact that the Registration Statement failed to disclose is that Wang, one of the Transferees, owned 100% of Waifeng Jiasheng Investment.

103.    Although the Registration Statement stated that Yin and Wang together owned 22.1% of the shares of Shandong Baorui, it also failed to disclose, as stated above, that Zhou owned 13.35% of the shares of Shandong Baorui and that, upon information and belief, Yin and Wang controlled the entities who together owned an additional 51.05% of the shares of Shandong Baorui. Thus, the Registration Statement omitted to disclose that the Transferees owned almost 50% of the stock of Beijing Baorui and controlled 89% of the stock of Beijing Baorui.

104.    When Beijing Baorui bought the DMT Line, Neo-Luck's state-owned asset, at RMB 33.848 million, which was between one third and one fifth of its actual value, the relevant authorities and other interested parties were unable to discover that the Transferees, that is, those who were the controllers of Neo-Luck Plastics, the original owner, were also the real buyers of the DMT Line.

**Second Transfer of Shares of Shandong Fuwei, and its Asset, Bruckner Line**