EXHIBIT D
PART 2

- promotion via our corporate website. Information on our products and services are also found on our corporate website www.fuweifilms.com which allows us to reach out to potential domestic and overseas customers.

Our sales personnel also conduct PRC domestic and overseas market surveys and research. The statistics, findings and information obtained from such surveys and research are then passed on to our management and production department for their analysis on the demand for and supply of our products, which allows them to make adjustments to our production and sales targets as well as our marketing strategies.

**Suppliers and Raw Materials**

*Suppliers*

We purchase raw materials according to the relevant technical specifications and production requirements. We select our suppliers based on the following considerations and/or methods:

- the consistency of the quality of raw materials supplied and any relevant certifications;

- our inspection of the supplier's quality control system;

- positive feedback from the supplier's other customers;

- pricing of raw materials;

- timely delivery of raw materials;

- the supplier's financial position and viability;

- the service provided by the supplier;

- qualifying suppliers by sample testing and batch purchasing of their raw materials; and

- annual evaluation and review of our suppliers.

The following are the suppliers that supplied 5% or more of our purchases of raw materials for each of the years ended December 31, 2005, 2006 and 2007:

| Name of Supplier | Supply | Percentage of total purchases (%) | | |
|---|---|---|---|---|
| | | 2005 | 2006 | 2007 |
| Sinopec Yizheng | PET resin | 66.6 | 58.5 | 46.4 |
| Hyosung Corporation | PET resin | - | 2.5 | 18.0 |
| Yizheng Tianbao Polyester Co., Ltd. | Additives | 16.7 | 23.9 | 16.6 |
| Jiangyin Xingtai New Material Co., Ltd. | PET resin | - | 6.7 | 12.3 |

We purchase the majority of our PET resin from Sinopec Yizheng as the quality of its supply of PET resin consistently meets our requirements. We currently have an annual supply agreement with Sinopec Yizheng pursuant to which Sinopec Yizheng has agreed to supply us fixed quantities of PET resin monthly at the prevailing market prices, such supply agreement is renewable annually. We have not entered into any long-term supply contracts with any other supplier. Our purchases of raw materials are on a cash basis. While we believe that there are only a limited number of suppliers of PET resin that can consistently meet our quality and quantity requirements on a timely basis, there are numerous PET resin suppliers in the PRC or overseas market from whom we may easily obtain PET resin, on a short-term basis, if necessary.

None of our directors or principal shareholders or any of their affiliates has any interest, direct or indirect, in any of our major suppliers mentioned above.

27

*Raw Materials*

The main raw materials that we purchase from our suppliers are as follows:

| Raw Material | Percentage of Total Purchases (%) | | | |
| --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | Country |
| PET resin | 75.7 | 68.0 | 59.8% | PRC |
| Additives | 24.3 | 27.1 | 22.1% | PRC |
| PET resin | - | 4.9 | 18.2% | Korea |

The market prices of PET resin and additives may fluctuate due to changes in supply and demand conditions. Any sudden shortage of supply, or significant increase in demand, of PET resin and additives may result in higher market prices and thereby increase our costs of sales. The prices of PET resin and additives are, to a certain extent, affected by the price movement of crude oil. Even though the price of the crude significantly increased globally in 2007, there is only a slight increase in prices of PET resin and additives during 2007.

As we are unable to predict the price movements of such raw materials and to minimize the impact of such price fluctuations on our cost, we generally purchase such raw materials in quantities sufficient for our production process for approximately one week. We may also adjust the prices of our end products, when appropriate, and pass limited cost increases to our customers.

**Competition**

We face intense competition in the PRC plastic film industry. We believe that there are currently many plastic film manufacturers in the PRC and we expect further entrants into this market in the future. Among the flexible packaging industries, in particular those involving packaging of processed food and pharmaceutical products, the primary types of plastic films in the packaging products include BOPET, Biaxially oriented polyester (BOPP); and Biaxially oriented polyamide (BOPA).

The following table gives a general comparison of the key differences in the technical specifications and usage of the above types of plastic films.

**Comparison of BOPP Film, BOPET Film and BOPA Film[1]**

| Features | BOPP | BOPET | BOPA |
| --- | --- | --- | --- |
| Water vapor barrier | Excellent | Fair | Poor |
| Gas barrier properties | Poor | Excellent | Excellent |
| Break down voltage | Poor | Excellent | Excellent |
| Machine-ability | Fair | Excellent | Excellent |
| Print-ability | Fair | Excellent | Fair |
| Suitability for Metallizing | Poor | Excellent | Fair |
| Density (gm/cc) | Low (0.91) | High (1.39) | Medium (1.15) |
| Tensile strength | Poor | Excellent | Excellent |

The production of BOPET film in the PRC presents high barriers to entry such as requiring a large capital investment to acquire or manufacture a production line (approximately US$30 million) and to support productive research and development of new products, and the need for the services of experienced management and personnel with technical expertise. We believe that we are one of the few BOPET film manufacturers in the PRC with research and development capabilities and that these barriers to entry have enabled us to maintain our overall competitive position in the PRC BOPET film market.

---

[1]    This comparison is based on the book of Biaxially Oriented Plastics Film, edited by Yanping Yin and published by China Chemical Press in August 1999.

We believe that the major competitive factors in our industry include:

- research and development capability;

- quality and reliability of products;

- technical/manufacturing capability; and

- industry reputation.

We believe that our major competitors in BOPET manufacturing are currently:

- Dupont Hongji Films Foshan Co., Ltd;

- Yihua Toray Polyester Film Co., Ltd.

We believe that we have established a good reputation and management track record as a manufacturer of BOPET film and are able to offer quality products.

**C. Organizational structure.**

The following table set forth the details of our subsidiaries as at the date of this Annual Report:

| Name | Country of Incorporation | Ownerships Interests | Direct Parent |
|------|--------------------------|----------------------|---------------|
| Fuwei Films (Shandong) Co., Ltd. | China | 100% wholly owned by Direct Parent | Fuwei Films (BVI) Co. Ltd. |
| Fuwei (BVI) Co., Ltd. | British Virgin Islands | 100% wholly owned by Direct Parent | Fuwei Films (Holdings) Co. Ltd. |

**D. Property, plant and equipment.**

Our corporate headquarters and production and ancillary facilities occupy an area of approximately 74,251 square meters in Weifang City, Shandong Province. The land at our facilities is covered by land use rights held by us. The land use rights for the land upon which our buildings and facilities are located have terms of 50 years, the earliest of which expires in November 2050. All of our research and development, manufacturing, warehousing and administrative functions are conducted at our corporate headquarters. The total gross floor area of production and other facilities owned by us is approximately 29,808 square meters. We own all the buildings and facilities on the premises. Most of our land use rights, office buildings and two facilities in operation have been mortgaged to a bank in the PRC for loans totaling RMB 152.6 million. Additionally, the workshop area of the leased production line is 9,310 square meters (including warehouse).

We are in the process of constructing our new production line located in Weifang Hi & New Technology Development Zone. We anticipate that this new production line will produce BOPET film that is between 50 to 200 microns thick. The BOPET film produced using this new production line is targeted at industrial use, for example, TFT-LCD screen films. We expect the construction of this new BOPET film production line will be completed by the end of 2008, if the fund raising for the shortage of investment for this project will be available in first half of 2008.

**Item 4 A. Unsolved Staff Comments**

None.

Item 5. Operating and Financial Review and Prospects

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

You should read the following discussion and analysis of our financial condition and results of operations in conjunction with our consolidated financial statements included in this Annual Report beginning on page F-1. The consolidated financial statements have been prepared in accordance with U.S. GAAP. The following discussion and analysis contain forward-looking statements that involve risks and uncertainties.

### Overview

We develop, manufacture and distribute high quality plastic film using the biaxial oriented stretch technique, otherwise known as BOPET film. Since the establishment of our predecessor company in 2003, all of our revenues have been derived from the sales of BOPET film. We sell most of our BOPET film products to domestic customers in the flexible packaging industry. We established an international sales division in June 2004 and have been selling our products into overseas markets, most notably Korea the US, and Europe, etc.

### Our Operating History and Corporate Structure

The diagram below illustrates our corporate structure:



Shandong Fuwei, our PRC operating subsidiary, was formed on January 28, 2003, as a Sino-foreign equity joint venture under the name Weifang Fuwei Plastic Co., Ltd. In July 2003, this company began production of BOPET film, initially renting the necessary fixed assets from Shandong Neo-Luck, a company involved in BOPET film production for which Mr. Xiaoming Wang, our current executive officer, served as executive officer at the time.

Shandong Fuwei subsequently acquired these fixed assets through two auction proceedings, the first in October of 2003 and the second in December 2004. At the first auction proceeding in October 2003, Shandong Fuwei acquired assets related to the Brückner production line that it had been renting from Shandong Neo-Luck. This line had been previously mortgaged by Shandong Neo-Luck to the Bank of China, Weifang city branch as security for several loans extended to Shandong Neo-Luck's affiliates. When these loans went into default, the Bank of China brought a series of legal actions in Weifang Municipal People's Court that resulted in the assets securing the loans being sold at public auction. Following its successful bid at auction, on October 9, 2003, Shandong Fuwei acquired the Brückner production line (with an appraised value of approximately RMB 169 million) for RMB 156 million.

In November 2003, Shandong Fuwei's shares were sold to Shenghong Group Co., Ltd. ("Shenghong Group") and Shandong Baorui for an aggregate consideration of RMB 98.2 million. Tongju Zhou, a former director of the Company, and Duo Wang each indirectly own 50% of Easebright Investments Limited ("Easebright"), one of our principal shareholders, and are both officers and directors of Shandong Baorui. Jun Yin and Duo Wang own 17.5% and 4.6%, respectively, of Shandong Baorui. In 2004, Messrs. Zhou and Wang, along with Jun Yin established several offshore holding in the British Virgin Islands and the Cayman Islands to acquire and hold these shares. In October 2004, Fuwei (BVI) entered into a sale and purchase agreement with Shenghong Group and Shandong Baorui pursuant to which Fuwei (BVI) acquired the respective equity interest of Shenghong Group and Shandong Baorui in Shandong Fuwei for an aggregate consideration of RMB 91 million. Shandong Fuwei thereafter became a wholly-owned subsidiary of Fuwei (BVI) and was converted into a wholly-foreign owned enterprise pursuant to PRC law.

As a result of its ongoing financial difficulties, Shandong Neo-Luck was declared bankrupt by the Weifang Municipal People's Court in the PRC on September 24, 2004. Prior to the bankruptcy, Shandong Neo-Luck's then major operating asset, the DMT production line, had been pledged by Shandong Neo-Luck to Weifang City Commercial Bank. When Shandong Neo-Luck was declared bankrupt, the Shandong Branch of the Bank of China seized the production line by order of the Qingdao Intermediate People's Court and the Qingdao Southern District People's Court while the Weifang Branch of Bank of Communications did so through Weifang Intermediate People's Court. As such, the effectiveness of the pledge in favor of Weifang City Commercial Bank was under dispute. Subsequently, pursuant to the decision from Weifang Intermediate People's Court, Weifang City Commercial Bank ranked senior in terms of the right of claims.

The pledged DMT production line was put up for public auction by the Shandong Neo-Luck liquidation committee on October 22, 2004. In view of the above complexities, the auction was deemed to be tremendously risky at that time, and therefore, our PRC operating subsidiary did not directly participate in the first auction, which began with a bid price of approximately RMB 53 million by reference to an independent valuation performed on a forced sale basis. However, due to the potential tremendous risk involved, the auction had been withdrawn twice and the starting bid price had been further reduced to approximately RMB 34 million and was finally purchased by Beijing Baorui, a company indirectly controlled by Shandong Baorui. When the DMT production line was put for public auction by Beijing Baorui three months later, our PRC operating subsidiary purchased it for approximately RMB 119 million, which was supported by an independent valuation performed on a going concern basis. We considered the arrangement to have the DMT production line acquired through Beijing Baorui through the first auction as an effective way to minimize the risk associated with the uncertainties arising from the bankruptcy of Shandong Neo-Luck. The price difference of approximately RMB 85 million represented a risk premium paid to Beijing Baorui, which bore the ultimate risks of recourse from creditors of Shandong Neo-Luck.

We have obtained an opinion of PRC counsel with respect to the validity of the auction proceedings under PRC law, although you should read the description of the opinion set forth under the title *"Risk Factors — The circumstances under which we acquired ownership of our main productive assets may jeopardize our ability to continue as an operating business."*

## Key Factors Affecting Our Results of Operations

The following are key factors that affect our financial condition and results of operations and we believe them to be important to the understanding of our business:

### *Raw Material Prices*

During the period from the years ended 2005, 2006 and 2007, the total cost of raw materials made up approximately 77.6%, 80.9% and 76.0% of our cost of goods sold, respectively. The primary raw materials used in our production of BOPET film are polyethylene terephthalate (or PET) resin and additives, which made up approximately 78.5%, and 21.5% of our total cost of raw materials in 2007. PET resin trades as a commodity and its market price is influenced significantly by global energy prices, including the price of crude oil. In addition, PET resin is also largely used in the textile industry and accordingly the demand from that industry will also affect the price of PET resin.

Although we try to pass on any increase in our raw material costs to our customers, and have generally been able to pass limited certain increases in recent years on to them, we are occasionally constrained in this regard by industry practice and preexisting obligations. We obtain a significant amount of the PET resin used at our facilities from one supplier, who has agreed to supply us fixed quantities of PET resin monthly at the prevailing market price. We have not engaged in any hedging transactions to limit our exposure to fluctuations in the market prices of these raw materials or their components. We believe that, there are sufficient alternative suppliers of PET resin if our existing suppliers are unable to supply us PET resin in the amounts or in the time frame we may require.

### *Prices of Our Products*

Our BOPET film products generally fall into two categories: commodity products and specialty products. The price of commodity products, such as our printing, stamping foil and metallization films, is typically driven by supply and demand conditions in the market. Our specialty products, such as our laser holographic based film, and our matte and high-gloss films, are slightly as affected by market conditions and thus we have more control over setting the prices for these products.

As selling prices are generally higher for those types of BOPET film products which require higher technical expertise, our revenue will be affected, to certain extent, by our product mix. Our product mix is dependent on, *inter alia*, our production facilities. Presently, our Brückner production line is capable of producing single-layer BOPET film while our DMT production line is capable of producing both single-layer and three-layer BOPET films.

### Demand for Our Products

Our BOPET film products are mostly sold to customers in the flexible packaging industry for consumer products such as processed foods, pharmaceutical products, cosmetics, tobacco and alcohol. In the fiscal years ended December 31, 2005, 2006 and 2007, approximately 87.9%, 79% and 75.5%, respectively, of our total revenue was derived from the PRC. The demand for our products is therefore, to a large extent, affected by the general economic conditions in the PRC. A significant improvement in the economic environment in the PRC will likely improve consumer spending, increase the demand for our customers' products and consequently increase the demand for our BOPET film.

We have been able to expand our product range and markets by introducing new products required by customers. We believe that our technical expertise is important in introducing products that are in demand.

### Production Capacity and Utilization Rates

Our sales volume is limited by our operational annual production capacity.

As we grow our business in the future, our ability to fulfill more and larger orders will be dependent on our ability to increase our production capacity. As our business is capital-intensive, our ability to expand our production capacity will depend on, *inter alia*, the availability of capital to meet our needs of expansion or upgrading of production lines.

### Competition

We believe that we are currently one of the few producers of BOPET film in the PRC with research and development capability. Our past financial performance is attributable to our market position in the industry. Over time, there may be new entrants into our industry. We believe that our major competitors in the BOPET manufacturing market in the PRC are Dupont Hongji Films Foshan Co., Ltd, and Yihua Toray Polyester Film Co., Ltd.

Our ability to enhance existing products, introduce new products to meet customers' demand, deliver quality products to our customers and maintain our established industry reputation will affect our competitiveness and our market position.

Our ability to compete against new and existing competitors to maintain or improve our market position and secure orders will affect our revenue and financial performance.

## Description of Certain Statements of Income Line Items

### Revenues

Revenue from sale of our domestic BOPET film products is recognized when significant risks and rewards of ownership have been transferred to the buyer. No revenue is recognized if there are significant uncertainties regarding recovery of the consideration due, associated costs or the possible return of goods, or when the amount of revenue and costs incurred or to be incurred in respect of the transaction cannot be measured reliably. In respect of our overseas sales, we ship directly to the destinations of our overseas customers and our revenue is recognized at the time when we receive customs clearance of our exports. Most of our overseas sales were conducted on a Cost, Insurance and Freight (or "CIF") basis, meaning that we pay the costs and freight necessary to get the products to the port of destination, and the risk of loss is transferred from us to the buyer when the goods pass the ship's rail at the port of destination. In addition, we have to procure marine insurance against the buyer's risk of loss of damage to the goods during the carriage. Most of our sales invoices are denominated in the Renminbi Yuan, although certain of our overseas sales are denominated in US dollars.

*Cost of Goods Sold*

Our cost of goods sold comprises mainly materials costs, factory overheads, packaging materials and direct labor. The breakdown of our cost of goods sold in percentage is as follows:

|  | Year Ended Dec. 31, 2005 | Year Ended Dec. 31, 2006 | Year Ended Dec. 31, 2007 |
|---|---|---|---|
| Materials costs | 77.6% | 80.9% | 80.9% |
| Factory overhead | 18.8% | 15.9% | 15.5% |
| Packaging materials | 2.8% | 2.6% | 2.7% |
| Direct labor | 0.8% | 0.6% | 0.9% |

*Material Costs*

As noted above, the raw materials used in our BOPET film production are PET resin and additives, which made up approximately 78.5% and 21.5%, respectively of our total materials costs in 2007.

*Factory Overhead*

For periods as of December 31, 2007, factory overhead comprises primarily of depreciation, electricity and water charges, and repair and maintenance of our machinery and equipment. In 2007, the repair and maintenance of our machinery and equipment are RMB 3.77 million, accounting for 1.1% of Cost of Goods Sold.

*Packaging Materials*

Our packaging materials comprise, among others, packaging pallets and carton boxes, used for the packaging of our BOPET film products for delivery to customers. Generally, our unit cost of packaging materials does not fluctuate significantly and our total costs for packaging materials typically vary in line with our sales volume.

*Direct Labor*

Direct labor cost includes salaries, wages, bonuses and other payments to our employees in the PRC who are involved in the production of our products. The main factors affecting our direct labor cost are the demands and supply of semi-skilled labor and the implementation or changes of any new government policies or laws relating to employment such as defined contribution plans stipulated by the PRC municipal government.

*Operating Expenses*

Our operating expenses are comprised of administrative expenses, distribution expenses and other operating expense.

Our administrative expenses are comprised mainly of allowance for doubtful trade receivables, administrative staff salaries and related welfare costs, entertainment expenses, depreciation charges of office equipment, furniture and fixtures, amortization charges relating to our trademark and land use rights, professional fees, government duties and fees, insurance expenses, rental expenses, travel expenses, office expenses, research and development expenses, and other miscellaneous expenses.

33

Our distribution expenses are comprised mainly of freight costs, travel expenses, selling and promotion expenses as well as salaries, allowances and welfare benefits paid to our sales and marketing personnel.

Our gross margins may not be comparable to those of other entities, since some entities include all of the costs related to their distribution network in cost of goods sold.

Other operating expenses are comprised mainly of loss on disposal of property, plant and equipment and other miscellaneous expenses.

**Finance Costs**

Finance costs are comprised mainly of interest expense relating to our loans and interest paid on discounting outstanding accounts receivable.

**Income Tax Expense**

Shandong Fuwei has been granted preferential tax treatment by the Tax Bureau of the PRC. According to the PRC Income Tax Law and various approval documents issued by the Tax Bureau, Shandong Fuwei's profit is taxed at a rate of 7.5%.

For the period from January 28, 2003 to December 31, 2004, Shandong Fuwei was granted certain tax relief under which it was exempted from PRC income tax. As of January 2005, Shandong Fuwei has been a wholly foreign-owned enterprise under the laws of the PRC. Accordingly, Shandong Fuwei is entitled to tax concessions whereby the profit for the first two financial years beginning with the first profit-making year (after setting off tax losses carried forward from prior years) is exempt from income tax in the PRC and the profit for each of the subsequent three financial years is taxed at 50% of the prevailing tax rates set by the relevant tax authorities.

On March 16, 2007, the National People's Congress of the PRC passed the Enterprise Income Tax Law of the People's Republic of China, which law will take effect as of January 1, 2008 (the "New Tax Law"). Under the New Tax Law, domestic enterprises and foreign-invested enterprises will generally become subject to a unified enterprise income tax rate of 25%, except that enterprises incorporated prior to March 16, 2007 may continue to enjoy existing preferential tax treatments until January 1, 2013. According to the New Tax Law, if Shandong Fuwei continues to maintain its high-tech enterprise status, Shandong Fuwei will be subject to enjoy the same preferential tax rate of 15%, otherwise, Shandong Fuwei will be subject to the increased 25% unified enterprise income tax rate..

**Inflation**

Inflation in the PRC has not had any material impact on our business in 2005, 2006 and 2007. But since 2007, the increase in raw materials and energy in China has resulted in the increase of our costs, e.g. raw materials costs, the freight costs and packaging costs, meanwhile, Chinese government has required increasing salaries of the employees to a certain level, resulting in the increase of our labor costs in 2007 to a certain level. According to the National Bureau of Statistics of China, the change in the consumer price index in China was 1.8% and 1.5%, 4.8% in 2005, 2006 and 2007, respectively.

**Critical Accounting Policies**

We prepare our financial statements in accordance with U.S. GAAP, which requires us to make estimates and assumptions that affect the reported amounts of our assets and liabilities, to disclose contingent assets and liabilities on the date of the financial statements, and to disclose the reported amounts of revenues and expenses incurred during the financial reporting period. We continue to evaluate these estimates and assumptions based on the most recently available information, our own historical experience and various other assumptions that we believe to be reasonable under the circumstances. We rely on these evaluations as the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from those estimates. Some of our accounting policies require higher degrees of judgment than others in their application. We consider the policies discussed below to be critical to an understanding of our financial statements as their application assists management in making their business decisions.

*Goodwill Impairment.* Goodwill is tested for impairment at least annually based on a two-step approach. The first step is conducted by comparing the fair value of each reporting unit to its carrying amount, including goodwill. If the fair value of a reporting unit is less than its carrying amount, the second step requires a comparison of the implied fair value of goodwill to its carrying value. The excess of the fair value of the reporting unit over the amounts assigned to the assets and liabilities is the implied fair value of goodwill. This allocation process is only performed for purposes of evaluating goodwill impairment and does not result in an entry to adjust the value of any assets or liabilities. An impairment loss is recognized for any excess in the carrying value of goodwill over its implied fair value.

We have determined that Shandong Fuwei, our operating subsidiary in the PRC, is the reporting unit for goodwill impairment testing. The fair value of Shandong Fuwei is determined based on the discounted expected cash flow method. The discount rate was based on the subsidiary's weighted average cost of capital. The use of discounted cash flow methodology requires significant judgments including estimation of future revenues and costs, industry economic factors, future profitability, determination of Shandong Fuwei's weighted average cost of capital and other variables. Although we believe that the assumptions adopted in our discounted cash flow model are reasonable, those assumptions are inherently unpredictable and uncertain.

We had goodwill of RMB 10.3 million, as of December 31, 2005, 2006 and 2007. The estimated fair value of the reporting unit significantly exceeded its carrying value at December 31, 2007. Consequently, no goodwill impairment has been recognized.

***Collectibility of Accounts Receivable.*** Our management has a credit policy in place and the exposure to credit risk is monitored on an ongoing basis. Credit evaluations are performed on all customers requiring credit over a certain amount. Generally, we offer our customers in the PRC credit terms of up to 30-45 days. Our international sales are settled via T/T and letters of credit, which generally have payment terms of between 30 and 60 days.

We adopt a risk assessment model to our customer credit management system, and we offer different credit terms to our customers based on criteria such as working relationship, payment history, creditworthiness and their financial position. All credit terms are to be approved by our finance department, in consultation with our sales and marketing department. For extension of larger credit limits, approvals have to be sought from our credit committee which is made up of members from our finance department, sales department and the General Manager. Our finance department and sales and marketing department review our outstanding debtor balances on a monthly basis and follow up with customers when payments are due. We do not impose interest charges on overdue balances.

As of December 31, 2007, our largest trade debtor was Woo Sung Multi-film Co., Ltd,, a company based in Korea. The trade receivables from Woo Sung Multi-film Co., Ltd amounted to approximately RMB3.9 million as of December 31 2007, all of which were within the credit term granted.

We make specific allowance for doubtful trade receivables when our management takes the view (taking into account the aging of trade receivables and in consultation with our sales and marketing department) that we will not be able to collect the amounts due. Our customers pay by installments, creating long accounts receivable cycles. We provide for an allowance for doubtful accounts based on our best estimate of the amount of losses that could result from the inability or intention of our existing customers not to make the required payments. We generally review the allowance by taking into account factors such as historical experience, age of the accounts receivable balances and economic conditions.

Specific write-off of trade receivables is made when the outstanding trade receivables have been due for more than two years.

The analysis of the allowance for doubtful amounts for 2005, 2006 and 2007 is as follows (000's):

|  | 2005 | 2006 | 2007 | 2007 |
|---|---|---|---|---|
|  | RMB | RMB | RMB | US$ |
| Balance at beginning of year | 1,008 | 2,015 | 872 | 120 |
| Bad debt expense/(recovery) | 1,007 | (1,143) | 1,772 | 242 |
| Write-offs | - | - | - | - |
| Balance at end of year | 2,015 | 872 | 2,644 | 363 |

*Impairment of Long-lived Assets*. We review periodically the carrying amounts of long-lived assets, including property, plant and equipment and intangible assets, to assess whether they are impaired. We test these assets for impairment whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable such as a change of business plan, technical obsolescence, or a period of continuous losses. When we determine an asset or asset group is not recoverable, we adjust the carrying amount to fair value. We measure the recoverability of assets by comparing the carrying amount of an asset to the estimated undiscounted future cash flows expected to be generated by the asset, or, for identifiable intangibles with finite useful lives, by determining whether the amortization of the intangible asset balance in the remaining life can be recovered through undiscounted future cash flows. In determining estimates of future cash flows, significant judgment in terms of projection of future cash flows and assumptions is required. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized for the excess of the carrying amount of the asset over its fair value. Fair value is determined by discounting forecasted cash flow or utilizing an observed market value if readily determinable. There have been no impairment charges recognized for the periods/year through December 31, 2005, December 31, 2006 and December 31, 2007.

## Results of Operations

The following discussion of our results of operations is based upon our audited consolidated financial statements beginning on page F-1 in this annual report.

The table below sets forth certain line items from our Statement of Income as a percentage of revenues:

|  | Year Ended Dec. 31, 2005 | Year Ended Dec. 31, 2006 | Year Ended Dec. 31, 2007 |
|---|---|---|---|
|  | (% of Total Revenue) | | |
| Gross Profit | 25.2 | 23.5 | 22.2 |
| Operating expenses | 6.1 | 5.6 | 7.9 |
| Other income/(expense) | (2.6) | (2.2) | (2.7) |
| Income tax (expense)/benefit | - | (0.2) | (1.0) |
| Net income | 16.5 | 15.5 | 10.6 |

### Fiscal year ended 2007 compared to fiscal year ended 2006

*Revenues*

Our revenue can be analyzed as follows:

|  | December 31, 2006 (RMB in thousands) | % of Total | December 31, 2007 (RMB in thousands) | % of Total |
|---|---|---|---|---|
| Printing film | 95,315 | 21.8 | 83,453 | 18.6 |
| Stamping film | 99,856 | 22.9 | 94,366 | 21.0 |
| Metallization film | 34,772 | 8.0 | 30,668 | 6.8 |
| Base film for other applications | 46,784 | 10.7 | 70,925 | 15.8 |
| Special film | 160,157 | 36.6 | 169,961 | 37.8 |
|  | 436,884 | 100 | 449,373 | 100 |

During the fiscal year ended December 31, 2007, our revenues were RMB 449.4 million, RMB 12.5 million or 2.9% higher than the same period for last year. In 2007, sales of special films were RMB 170.0 million and 37.8% of our total revenues as compared to RMB 160.2 million and 36.7% in 2006, RMB 9.8 million or 6.1% higher than last year. The increase was largely attributable to an increase in the sales of heat-sealable films, high-gloss films, and other special films as more customers shifted to use high-end special films for packaging to enhance their product image, and continued growth in export sales to Korea, the United States and Europe, etc. The increase was also due to increased sales from the rental production.

### Cost of Goods Sold

Our cost of goods sold amounted to RMB 349.5 million for the year ended December 31, 2007, and was RMB 15.2 million or 4.5% higher than last year. The increase was resulted from the increase of raw material costs, packaging costs, and labor costs. In addition, since the second half of 2007, the decrease of export tax rebates rate from 11% to 5% has also largely increased our cost of goods sold by RMB 2.5 million.

### Gross Profit

Our gross profit during the year ended December 31, 2007 amounted to RMB 99.8 million representing a gross margin of 22.2%. Gross margin decreased from 23.5% for the year ended December 31, 2006 to 22.2% in 2007 mainly due to increased raw material consumption on the re-tal production line. Decrease in gross profit mainly resulted from the increase of raw material costs. In addition, since the second half of 2007, the decrease of export tax rebates rate from 11% to 5% has also decreased our gross profit.

### Operating Expenses

Our operating expenses during the year ended December 31, 2007, amounted to RMB 35.6 million, RMB 11.1 million or 45.1% higher than last year, which is mainly a result of increases in: 1) the costs of professional service fees related to being as a public company; and 2) administrative expenses, such as wage increases. During the 2007 year, our operating expenses as a percentage of revenue was 7.9% which was comparable with that in the previous comparable period of 5.6%.

### Other Income/(Expense)

Our other expenses during the year ended December 31, 2007, amounted to RMB 12.3 million, 28.1% higher than previous comparable period mainly due to the decrease of other income by RMB 2.8 million.

### Income Tax Expense

The effective tax rate was 8.7% in 2007, and 1.1% in 2006. The higher effective tax rates were primarily attributable to the fact that our operating subsidiary Shandong Fuwei is subject to the 7.5% income tax rate in 2007 pursuant to the prevailing PRC income Tax Law, while such rate was 0% in 2006.

### Fiscal Year Ended 2006

### Revenues

Our revenue can be analyzed as follows:

| | December 31, 2005 (RMB in thousands) | % of Total | December 31, 2006 (RMB in thousands) | % of Total |
|---|---|---|---|---|
| Printing film | 103,682 | 29.9 | 95,315 | 21.8 |
| Stamping film | 94,711 | 27.4 | 99,856 | 22.9 |
| Metallization film | 39,647 | 11.5 | 34,772 | 8.0 |
| Base film for other applications | 59,826 | 17.3 | 46,784 | 10.7 |
| Special film | 48,339 | 13.9 | 160,157 | 36.6 |
| | 346,205 | 100.0 | 436,884 | 100 |

During the fiscal year ended December 31, 2006, our revenues were RMB 436.9 million, RMB 90.7 million or 26.2% higher than the same period for last year. In 2006, sales of special films were RMB 160.2 million and 36.6% of our total revenues as compared to RMB 48.3 million and 13.9% in 2005, RMB 111.8 million or 231.3% higher than last year. The significant increase was largely attributable to the increase in sales volume by over 22% and an increase in the sales of heat-sealable films, high-gloss films, and other special films as more customers shifted to use high-end special films for packaging to enhance their product image, and continued growth in export sales to the United States, Canada and Korea, which command a higher selling price as compared to other non-special films. We expect that the sales of special film will continue to increase in the future.

*Cost of Goods Sold*

Our cost of goods sold amounted to RMB 334.3 million for the year ended December 31, 2006, and was RMB 259.1 million or 29.0% higher than last year. The increase was generally in line with the increase in sales as a result of the increase in export sales. In 2006, total export sales was RMB91.8 million and 21.0% of our total revenues as compared to RMB 41.8 million and 12.1% in 2005, RMB 50.0 million or 119.6% higher than last year.

*Gross Profit*

Our gross profit during the year ended December 31, 2006 amounted to RMB 102.5 million representing a gross margin of 23.5%. Gross margin decreased from 25.2% for the year ended December 31, 2005 to 23.5% in 2006 mainly due to the increase in the price of raw materials in 2006 as a result of the increase in global oil prices, although we increased the price of our products by approximately 3.2% to offset a portion of the 5% increase in the price of raw materials.

*Operating Expenses*

Our operating expenses during the year ended December 31, 2006, amounted to RMB 24.5 million, RMB 3.4 million or 16.1% higher than last year. During the 2006 year, our operating expenses as a percentage of revenue was 5.6% which was comparable with that in the previous comparable period of 6.1%.

*Other Income/(Expense)*

Our other expenses during the year ended December 31, 2006, amounted to RMB 9.6 million, 7.4% higher than previous comparable period. The increase was mainly due to the decrease of interest income by RMB 0.86 million, as compared to the previous year.

*Income Tax Expense*

The effective tax rate was 1.1% 2006 and (0.1)% in 2005. The low effective tax rates were primarily attributable to the fact that our operating subsidiary Shandong Fuwei enjoyed income tax exemption during both periods pursuant to the prevailing PRC income Tax Law.

**Fiscal Year Ended 2005**

*Revenues*

Our revenue can be analyzed as follows:

| | December 31, 2005 | % of Total |
|---|---|---|
| | (RMB in thousands) | |
| Printing film | 103,682 | 29.9 |
| Stamping film | 94,711 | 27.4 |
| Metallization film | 39,647 | 11.5 |
| Base film for other applications | 59,826 | 17.3 |
| Special film | 48,339 | 13.9 |
| | 346,205 | 100.0 |

38

Our revenues were RMB 346.2 million in 2005. During 2005, we experienced a decline in the average selling price of our products by 4.2% as a result of the entry of new manufacturers and increased competition in the commercial BOPET market. The products experiencing the most significant price declines were printing film, stamping film and base film. We expect this pricing trend to continue as a result of increased competition in the market.

### Cost of Goods Sold

Our cost of goods sold amounted to RMB 259.1 million in 2005. Our costs of goods sold are affected by the purchase price of our primary raw materials. While the prices of PET resin and additives are, to a certain extent, affected by the price movements of crude oil which generally increased globally in 2005, the actual demands of PET resins in China's textile industry declined as a result of the implementation of a new quota system for exporting textiles to the United States and other European countries, thus resulting in a decline in prices of PET resin and additives by 4.8% during 2005 which led to cost of goods sold in 2005, as a percentage of revenue, being lower when compared to the preceding period.

### Gross Profit

Our gross profit for 2005 was RMB 87.1 million, representing a gross margin of 25.2%. This gross margin was higher than in the preceding period mainly as a result of increased volume which was partially offset by the decline in average selling price in 2005. The sales of our commercial BOPET films contributed approximately 86% of our total sales in 2005. In order to maintain our competitiveness in the industry, we lowered the selling price of our commercial products by approximately 4%. Based on anticipated increased levels of competition, we expect this trend to continue until the second half of 2007.

### Operating Expenses

Our operating expenses were RMB 21.1 million in 2005. During 2005, our operating expenses as a percentage of revenue were slightly higher than in the preceding period as a result of our increased distribution costs due to our increase in export sales to markets outside of the PRC.

### Other Income/(Expense)

Our other income/(expense) was RMB (8.9) million in 2005. Other income/(expenses) in 2005 included a full year of significantly higher interest costs due to our new capital structure following the acquisition of the DMT production line. Our total outstanding interest-bearing borrowings were approximately RMB 248.0 million at December 31, 2005.

### Income Tax Benefit

Our income tax benefit was RMB 0.059 million in 2005. The effective tax rate was (0.1)% in 2005, primarily attributable to the fact that our operating subsidiary, Shandong Fuwei, enjoyed income tax exemption during 2005 pursuant to the prevailing PRC Income Tax Law.

### Liquidity and Capital Resources

Since inception, our sources of cash were mainly from cash generated from our operations and borrowings from financial institutions and capital contributed by our shareholders.

Our capital expenditures in 2007 have been primarily financed through short-term borrowings from financial institutions and IPO funds. The interest rates of short-term borrowings from financial institutions during the three year period from 2005 to 2007 ranged from 5.76% to 6.73%, and these borrowings may not be prepaid prior to maturity. We believe that our principal banker in Shandong Province had been granting short-term loans to its customers as a result of the efforts of the bank branch to reduce the level of its long-term loans.

Since our inception, we have utilized significant amounts of secured short-term financing to fund our acquisition of the Brückner and DMT production lines and for our working capital needs. At December 31, 2007, we have borrowings of RMB 188.0 million including several different loan agreements with three financial institutions in the PRC. Subsequently, we renegotiated substantially all of our outstanding indebtedness resulting in approximately RMB 148.6 million of secured indebtedness of the total outstanding. During 2007, we had received an interest-free loan of RMB 20 million from the Weifang City Commercial Bank entrusted by the Weifang City Hi & New Technology Project Industrial Development Fund. Each of the related loan agreements contains provisions regarding collateral, covenants prohibiting us from engaging in certain activities (including selling, mortgaging or otherwise disposing of or encumbering all or substantially all of our assets or before any merger, acquisition, spin-off, or other transaction resulting in a change in our corporate structure) without the lenders consent and acceleration (and setoff) provisions in the event of default in payment or failure to comply with such covenants. Because of appreciation of the exchange rate of RMB vs. US dollars, the estimated purchase price of the new thick BOPET film production line has been adjusted to USD$ 35 million range, resulting in an available fund shortage of USD$15-20 million. Management is seeking sources of financing in order to recommence this project soon.

We are of the opinion that, after taking into consideration our present banking facilities, existing cash and the expected cash flows to be generated from our operations, we have adequate sources of liquidity to meet our short-term obligations, and our working capital.

A summary of our cash flows for 2005, 2006 and 2007 is as follows:

|  | Year Ended Dec. 31, 2005 | Year Ended Dec. 31, 2006 | Year Ended Dec. 31, 2007 |
|---|---|---|---|
|  | (RMB in thousands) | | |
| Net cash generated from operating activities | 43,587 | 58,492 | 82,856 |
| Net cash used in investing activities | (31,479) | (43,479) | (246,787) |
| Net cash (used in)/generated from financing activities | (10,583) | 227,499 | (51,651) |
| Effect of foreign exchange rate change | (1) | — | (3,448) |
| Net increase/(decrease) in cash and cash equivalents | 1,524 | 242,512 | (219,030) |
| Cash and cash equivalents as at the beginning of the year | 5,903 | 7,427 | 249,939 |
| Cash and cash equivalents as at the end of the year | 7,427 | 249,939 | 30,909 |

*Operating Activities*

Net cash from operating activities was RMB 82.9 million for the year ended December 31, 2007 as compared to RMB 58.5 million for the year ended December 31, 2006. This increase is primarily attributable to the decrease in accounts receivable and prepaid expenses and other current assets which is partial offset by the increase in inventories.

During the year ended December 31, 2007, we implemented better controls over the collection of accounts receivable from customers and resulted in a smaller balance of accounts receivable as of December 31,2007. We anticipated there would be increase in sales in 2008. As such, we purchase more inventories near the year end date of 2007.

Net cash from operating activities was RMB 58.5 million for the year ended December 31, 2006. During this period we experienced an increase in bills receivables of RMB29.5million as a result of increase in new customers who are required to pay by bills with maturity period from one to six months.

Net cash from operating activities was RMB 43.6 million in 2005. During this period we experienced (i) an increase in trade receivables as a result of longer credit period of 30 days granted to customers in order to maintain a long term business relationship; and (ii) an increase in inventories as a result of increase in finished goods level to meet anticipated sales orders in early 2006. In order to generate growth in sales, more inventories were accumulated towards the year end and a longer credit period was offered to creditworthy customers, thereby lowering cash flows from operating activities.

*Investing Activities*

Net cash used in investing activities was RMB (246.8 million) in 2007, and was generally higher as a result of an increase in purchases of property, plant and equipment in connection with the Production Line 3 and Trial Production Line.

40

Net cash used in investing activities was RMB (43.4 million) in 2006, and was generally higher as a result of an increase in purchases of property, plant and equipment.

Net cash used in investing activities was RMB 31.5 million in 2005, and was generally lower as a result of a decrease in purchases of property, plant and equipment.

### Financing Activities

Net cash generated from financing activities was RMB (51.7 million) in the year ended December 31, 2007 as compared to RMB 227.5 million used in financing activities during the year ended December 31, 2006. In 2007, the Company repaid short-term loans to banks.

Net cash generated from financing activities was RMB 227.5 million in the year ended December 31, 2006 as compared to RMB 10.6 million used in financing activities during the year ended December 31, 2005. In December 2006, the Company was successfully listed on the NASDAQ Global Market and received net proceeds of RMB235.9 million.

Net cash used in financing activities was RMB 10.6 million in 2005. This was attributable to the net proceeds received from new bank loans of RMB 47.5 million in 2005 (excluding the bank loans of RMB 199.6 million assumed upon purchase of Shandong Fuwei in October 2004), which was used to finance the capital expenditure in relation to the new production line and was offset by the payment of a dividend of RMB 26.3 million in 2005 and repayment of advance from related parties of RMB 30.0 million in 2005.

### Foreign Exchange Exposure

### Translations

Our reporting currency is RMB. The functional currency of our operating subsidiary in the PRC is RMB and our operating subsidiary also maintains its books and records in RMB. Accordingly, we are not exposed to any material foreign currency translation effects.

### Transactions

We are, to a certain extent, exposed to transaction foreign currency exposure arising from our operations in the PRC.

We began conducting part of our sales in foreign currency in 2004 with the commencement of our overseas sales business. During 2005, 2006 and 2007, approximately 87.9%, 79.0% and 75.5%, respectively, of our revenue was denominated in RMB and the remainder was in US dollars. As most of our supplies are procured within the PRC, most of our purchases are denominated in RMB.

Our foreign currency exchange risk arises mainly from this mismatch between the currency of our sales, purchases and operating expenses. To the extent that our sales, purchases and operating expenses are not fully matched in exactly the same currency, we may be susceptible to foreign exchange exposure.

In addition, we also maintain US dollars accounts with financial institutions for our US dollars receipts and US dollars payments. We may also incur foreign exchange gains or losses when we convert the US dollars balances into RMB.

Currently, we do not have a formal foreign currency hedging policy as our foreign exchange gains and losses in 2005, 2006 or 2007 were insignificant. Our management believes that it is more efficient for us to assess the hedging need of each transaction on a case-by-case basis. We will continue to monitor our foreign exchange exposure in the future and will consider hedging any material foreign exchange exposure should such need arise.

41

Capital Expenditures and Contractual Commitments

*Capital Expenditures*

Our capital expenditures in 2005, 2006 and 2007 were as follows:

| | Year Ended Dec. 31, 2005 | Year Ended Dec. 31, 2006 | Year Ended Dec. 31, 2007 |
|---|---|---|---|
| | | (RMB in thousands) | |
| Buildings | — | — | — |
| Plant and equipment | 1,412 | 37,051 | 1,685 |
| Motor vehicles | 433 | — | 184 |
| Assets under construction | 20,505 | — | 181,308 |
| Others (computer and furniture fittings) | 61 | 422 | 114 |
| Total | 22,411 | 37,473 | 183,291 |

The following table summarizes our contractual commitments as of December 31, 2007 and the effect those commitments are expected to have on our liquidity and cash flow in future periods:

| | | Payments Due by Period | | | |
|---|---|---|---|---|---|
| Contractual Commitments | Total | Less than 1 Total Year | 1-3 Years | 3-5 Years | More than 5 Years |
| | | (RMB in thousands) | | | |
| Equipment Purchase Contract(i) | 155,058 | 155,058 | — | — | — |
| Related party loans | — | — | — | — | — |
| Bank loans(ii) | | | | | |
| Principal | 188,027 | 188,027 | — | — | — |
| Interest(iii) | 11,915 | 11,915 | — | — | — |
| Operating leases(iv) | 6,800 | 3,555 | 3,245 | — | — |
| Total | 361,800 | 358,555 | 3,245 | — | — |

(i)     The purchase of equipment has been financed by the sale of our ordinary shares and in the future would be financed by bank borrowings and internally generated funds from operations.

(ii)    We had short-term bank loans of RMB 188.0 million at December 31, 2007, that are due at various times in 2008 We renegotiated substantially all of our outstanding indebtedness resulting in approximately RMB 148.6 million of secured indebtedness of the total outstanding. Our obligations under our existing loans have been mainly met through the cash flow from our operations and our financing activities. In the past, cash flow from operations has been sufficient to meet payment obligations and/or we have been able to extend our borrowings. In the event that our cash flows are insufficient to satisfy these obligations, we may consider additional bank loans, issuing bonds, or other forms of financing to satisfy our capital requirements.

(iii)   The interest expenses are estimated based on the interest rate of short-term borrowings adopted by People Bank of China on December 31, 2007 plus an estimated risk premium on borrowing.

(iv)   The operating leases mainly relate to our rental of production line, warehouse and staff quarters, etc. The term of these leases typically ranges from 1 to 5 years, and are renewable, subject to renegotiation of terms, upon expiration. We intend to finance these operating leases from our cash flows from operations.

43

**Off-Balance Sheet Arrangements and Contingent Liabilities**

We do not have any off-balance sheet guarantees, any outstanding derivative financial instruments, interest rate swap transactions or foreign currency forward contracts.

**Inflation**

Inflation in China has not had a material impact on our results of operations in recent years. According to the National Bureau of Statistics of China, the change in the consumer price index in China was 1.8%, 1.5% and 4.8%in 2005, 2006 and 2007 respectively.

**Recent Accounting Pronouncements**

*FASB Interpretation No. 48*. In July 2006, FASB issued FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - an Interpretation of FASB Statement No. 109" ("FIN 48"), which clarifies the accounting for uncertainty in income taxes recognized in the Group's financial statements in accordance with SFAS No.109, Accounting from Income Taxes. FIN 48 provides guidance on the measurement, recognition, classification and disclosure of tax positions, along with accounting for the related interest and penalties. FIN 48 is effective for fiscal years beginning after December 15, 2006, and is to be applied to all open tax years as of the date of effectiveness. The Company has no material unrecognized tax benefit which would favorably affect the effective income tax rate in future periods and do not believe there will be any significant increases or decreases within the next twelve month. The Company has elected to classify interest and penalties related to unrecognized tax benefits, if and when required, as part of interest expenses and administrative expenses in the statements of income, respectively. No Interest or penalties have been accrued at the date of adoption.

In February 2007, FASB issued FASB Statement No. 159, The Fair Value Option for Financial Assets and Financial Liabilities. FAS 159 is effective for fiscal years beginning after November 15, 2007. Early adoption is permitted subject to specific requirements outlined in the new Statement. Therefore, calendar-year companies may be able to adopt FAS 159 for their first quarter 2007 financial statements.

The new Statement allows entities to choose, at specified election dates, to measure eligible financial assets and liabilities at fair value that are not otherwise required to be measured at fair value. If a company elects the fair value option for an eligible item, changes in that item's fair value in subsequent reporting periods must be recognized in current earnings. FAS 159 also establishes presentation and disclosure requirements designed to draw comparison between entities that elect different measurement attributes for similar assets and liabilities. On January 1, 2008, the Company elected not to adopt the option statement.

In December 2007, the FASB issued SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements". This Statement amends ARB 51 to establish accounting and reporting standards for the noncontrolling (minority) interest in a subsidiary and for the deconsolidation of a subsidiary. It clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements. SFAS No. 160 is effective for the Company's fiscal year beginning October 1, 2009. Management is currently evaluating the effect of this pronouncement on financial statements.

In December 2007, the FASB issued SFAS No. 141(R), "Business Combinations". This Statement replaces SFAS No. 141, Business Combinations. This Statement retains the fundamental requirements in Statement 141 that the acquisition method of accounting (which Statement 141 called the purchase method) be used for all business combinations and for an acquirer to be identified for each business combination. This Statement also establishes principles and requirements for how the acquirer: a) recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquire; b) recognizes and measures the goodwill acquired in the business combination or a gain from a bargain purchase and c) determines what information to disclose to enable users of the financial statements to evaluate the nature and financial effects of the business combination. SFAS No. 141(R) will apply prospectively to business combinations for which the acquisition date is on or after Company's fiscal year beginning October 1, 2009. While the Company has not yet evaluated this statement for the impact, if any, that SFAS No. 141(R) will have on its consolidated financial statements, the Company will be required to expense costs related to any acquisitions after September 30, 2009.

On March 19, 2008, the Financial Accounting Standards Board (FASB) issued FASB Statement No. 161, Disclosures about Derivative Instruments and Hedging Activities. The new standard is intended to improve financial reporting about derivative instruments and hedging activities by requiring enhanced disclosures to enable investors to better understand their effects on an entity's financial position, financial performance, and cash flows. It is effective for financial statements issued for fiscal years and interim periods beginning after November 15, 2008, with early application encouraged. "Use and complexity of derivative instruments and hedging activities have increased significantly over the past several years. This has led to concerns among investors that the existing disclosure requirements in FASB Statement No. 133, Accounting for Derivative Instruments and Hedging Activities, do not provide enough information about how these instruments and activities affect the entity's financial position and performance," explained Kevin Stoklosa, project manager. "By requiring additional information about how and why derivative instruments are being used, the new standard gives investors better information upon which to base their decisions." The new standard also improves transparency about the location and amounts of derivative instruments in an entity's financial statements; how derivative instruments and related hedged items are accounted for under Statement 133; and how derivative instruments and related hedged items affect its financial position, financial performance, and cash flows. FASB Statement No. 161 achieves these improvements by requiring disclosure of the fair values of derivative instruments and their gains and losses in a tabular format. It also provides more information about an entity's liquidity by requiring disclosure of derivative features that are credit risk-related. Finally, it requires cross-referencing within footnotes to enable financial statement users to locate important information about derivative instruments. Management is currently evaluating the effect of this pronouncement on financial statements.

## Research and development, patents and licenses, etc

We rely on copyright, patent, trademark and other intellectual property law, nondisclosure agreement and technical know-how to protect our intellectual property and proprietary rights. We enter into confidentiality and licensing agreements with our employees, suppliers and distributors. Our senior employees and employees who work in our research and development department and other technical departments are required to sign agreements acknowledging that we own the rights to all technology, inventions, trade secrets, works of authorship, developments and other processes generated in connection with their employment with us or their use of our resources or relating to our business or our property and that they must assign any ownership rights that they may claim in those works to us. As most of our business is currently conducted in mainland China, we have not taken any action outside mainland China to protect our intellectual property.

As of the date of this annual report, we have received four patents from, and have three patent applications pending with, the Patent Office of the National Intellectual Property Office of China with respect to our BOPET film technology. Two of these applications are not being used in our production process as they require expensive imported raw materials and, most importantly, they have been replaced by the films used in LCD and electronic products in the market.

We currently sell our products in the PRC under our brand "Fuwei Films." We have a pending application for the registration of the trademark "Fuwei Films" with the Trademark Bureau of the State Administration of Industry and Commerce in the PRC. Our ability to compete in our markets and to achieve future revenue growth will depend, in significant part, on our ability to protect our proprietary technology and operate without infringing upon the intellectual property rights of others. An infringement upon these rights may reduce or eliminate any competitive advantage we have developed, causing us to lose sales or otherwise harm our business. We are not aware of any infringement or unauthorized use of our intellectual property rights. We will take appropriate legal actions to protect our rights if there is any unauthorized use or infringement of our rights in the future. To date, we have not been sued for infringement of intellectual property rights by any third party.

## Trend Information

Other than as disclosed elsewhere in this Annual Report, we are not aware of any trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on our net sales, profitability, liquidity or capital resources, or that caused the disclosed financial information to be not necessarily indicative of future operating results or financial conditions.

## Item 6. Directors, Senior Management and Employees

## A. Directors and senior management.

Our directors and executive officers and their present positions with our company, as at March 31, 2008, are as follows:

**Directors and Executive Officers**

| Name | Age | Position |
|------|-----|----------|
| Xiaoan He | 45 | Chairman and Chief Executive Officer |
| Cindy Lu[1] | 37 | Director and Chief Financial Officer |
| Xiuyong Zhang[2] | 37 | Director |
| Tee Chuang Khoo | 61 | Independent Director |
| Changrong Ji | 61 | Independent Director |
| Yudong Huang | 42 | Independent Director |
| Bo Xu | 44 | Secretary |
| Zhibing Qian | 42 | Senior Vice President |
| Bin Sun | 52 | President of Shandong Fuwei |
| Xiaoming Wang | 47 | Vice President (Production) of Shandong Fuwei |
| Hanyong Lee[3] | 51 | Vice President (Research & Development) of Shandong Fuwei |

(1) Ms. Lu resigned as a director and Chief Financial Officer of the Company, effective March 31, 2008.

45

(2) Mr. Zhang was appointed to serve as Chief Financial Officer of the Company on April 11, 2008.

(3) Mr. Hanyong Lee has been the Vice President of Research and Development of Shandong Fuwei since January 8, 2008.

**Information about Directors and Officers**

Set forth below is certain information with respect to each director and officer as of December 31, 2007:

*Xiaoan He* has been the Chairman of the Board of Directors and Chief Executive Officer of our Company since 2005 and is responsible for the formulation and implementation of our business strategies and management of our business operations. Mr. He has gained more than ten years of management experience in the plastics and packaging industries in the PRC. From June 2004 to January 2005, Mr. He was our General Manager responsible for our daily operation and management. Prior to joining us as the General Manager in June 2004, Mr. He was the general manager of Suzhou Broadway Plastic Packaging Co., Ltd from 1996 to 2003. From 1990 to 1996, he was the vice general manager at Suzhou Xiangxuehai Freezer Co., Ltd and from 1983 to 1990, he was the vice general manager at Suzhou Marine Machinery Co., Ltd. Mr. He obtained his EMBA from the China Europe International Business School in 2003 and Bachelor in Engineering from the Shanghai Jiaotong University in 1983.

*Cindy Lu* was our Chief Financial Officer and Director from June 1, 2007 until March 31, 2008. Prior to joining the Company, Ms. Lu served as the Secretary of the Board of Directors of Tiens Biotech Group (USA) from 2004 to early 2007. From 1999 to 2001, Ms. Lu worked as an associate at GE Capital Asia Pacific. Ms. Lu was a Financial Analyst for Sargent & Lundy LLP (Chicago) from 1997 to 1999. Ms. Lu has expertise in equity finance, corporate finance, mergers and acquisitions, and corporate risk management. Ms. Lu obtained her MBA in 1996 from Southeastern University, Washington DC and her Bachelor Degree in Economics in 1993 from Shandong University.

*Xiuyong Zhang* has been a Director of our Company. He began serving as our Chief Financial Officer on April 11, 2008. He had accumulated more than 10 years of experience in investment, accounting and financial fields. He is responsible for the day-to-day management of our investment, financing, accounting and auditing matters in the Company and financing, financial and taxation matters for its subsidiary. Prior to join us as a director of the Company since November 2007, Mr. Zhang has also been the director of Fuwei Films (Shandong) Co., Ltd. since July 2004, and the Vice President since January 2005. Mr. Zhang was the vice-head of an audit firm, Shandong Zhengyuan Hexin Auditors, Weifang branch from 1999 to 2004. From 1991 to 1999, he was an accounting supervisor at the main office of the Weifang City Local Products Company. He has received the Professional Certification in Laws from China University of Political Science and Law and China Central Radio and TV University. Mr. Zhang was jointly certified as a Public Valuer by the Ministry of Personnel and Ministry of Finance in the PRC in 2004. He was certified as the Chinese Certified Public Accountant by the Ministry of Finance of the PRC in 1997. He received the Certification of Financial Accounting from the Shandong Television University in 1996.

*Tee Chuang Khoo* has been a director of our company since November 2007. Mr. Khoo was a Senior Partner in Management Consulting at DENEC Management Consulting Co. Ltd. ("DENCE") in Shanghai from October 2005 to October 2007. From November 2000 to September 2005, Mr. Khoo was a Senior Partner at Improve Management Consulting Services in Malaysia where he was responsible for reducing manufacturing costs and process improvement. Mr. Khoo was an Executive Director at JPK (M) Sdn Bhd, a Malaysian-listed company, from October 1998 to September 2000, where he assisted the Managing Director with the entire operation of the company. From November 1996 to August 1998, he was the General Manager of Broadway Group's (a Singapore-listed company) product factories in Johor Baru, Malaysia, and in China. He also held managerial positions at the Malaysian conglomerate, The Lion Group, and he was a Human Resources Manager at Metal Box Singapore Ltd, a Singapore-listed company owned by the British Metal Box Group. Mr. Khoo has a Bachelor of Arts in Finance & Management from the University of Oregon (USA), a Masters in Business Administration (MBA) from University of Southern California (USA) and a diploma in Accounting from the Association of International Accountants from the United Kingdom.

46

*Changrong Ji* has been a director of our company since March 2007. Mr. Ji is currently the Investigation Officer of the People's Bank of China, Weifang city central branch. Mr. Ji was the president of People's Bank of China, Weifang City central branch from 2001 to 2004 and was the president of People's Bank of China, Weihai City central branch from 1999 to 2001. From 1989 to 1997, Mr. Ji was the vice-president of People's Bank of China, Weifang city central branch. He joined the State Administration of Foreign Exchange, Weifang branch as its deputy director from 1989 to 1997 and was appointed as the director of the State Administration of Foreign Exchange, Weihai branch from 1999 to 2001. Mr. Ji was the director of the State Administration of Foreign Exchange, Weifang branch from 2001 to 2004. Mr. Ji obtained his Master's degree in Economics in 1999 from Shanghai Fudan University and his bachelor's degree in international economics in 1993 from East China Normal University.

*Yudong Huang* has been a director of our company since November 2007. Professor Huang is a Professor and Director of the Department of Applied Chemistry of Harbin Institute of Technology. His research coverage includes PET films. Since 1992, Professor Huang has performed more than 20 research projects, out of which 3 projects have won science and technology awards at the provincial and ministerial levels. He has published more than 60 papers in the national and international levels. He was awarded the "Excellent Scientist Prize" of Heilongjiang Province in 1998. Professor Huang graduated from Department of Applied Chemistry of Harbin Institute of Technology with doctor degree.

*Bo Xu* joined the Company in October 2006 and was appointed as the Secretary of the Company in December 2006. From 2002 to September 2006, he was the director of finance for Beijing Platinum Investment Co., Ltd. where he was in charge of accounting and finance. Prior to that, he was a finance manager at Weifang Wanyou Enterprise Co., Ltd. from 1993 to 2002. Mr. Xu received his bachelor in finance from Weifang Staff and Worker's University in 1989.

*Zhibing Qian* was appointed as the Senior Vice President in April 2007. From 2003 to March 2007, he was the general manager of Beijing Capital Jindian Technology Limited. From 2000 to 2003, Mr. Qian was appointed as the general manger of Beijing Zhongguancun International Incubator Limited, comprehensively responsible for the company's set up and operations. Mr. Qian also worked at senior management level at other state-owned and joint venture companies in China. Mr. Qian received his Doctor and Master degrees from University of Idaho in 1995 and 1993.

*Bin Sun* has been the President of Shandong Fuwei since January 2007, and is responsible for the general management of our business operations. Mr. Sun has gained more than ten years of management experience in the Mechanical & Electrical and plastics industries before he joined us. Mr. Sun was the general manager of Jiangsu Geliling Group from 2005 to 2006, and he was the general manager of Wuxi Dayu Electric Group from 2002 to 2004. Mr. Sun obtained his Master degree in Economics from the Renmin University of China in 1994 and bachelor in Engineering from the Northwestern Polytechnical University in 1981.

*Xiaoming Wang* has been Vice President (Production) of Shandong Fuwei since January 2005 and is responsible for the management of our production facilities. Prior to joining us, Mr. Wang was the vice manager of Weifang Engine Manufacturing Co. from 1986 to 1998 and the deputy general manager of Shandong Neo-Luck from 1998 to 2003. Mr. Wang was certified as a professional economist by the Shandong Province Human Resources Committee in 2001 and obtained a certificate in Economics Management awarded by the PRC Central Party Learning Institute and obtained a certificate in Business Enterprises Operational Management from the Shandong Television University in 1986.

*Hanyong Lee* has been Vice President of Research and Development of Shandong Fuwei since January 8, 2008. He has more than 22 years of experience in the BOPET film industry, especially in the aspects of development and management. He worked for 18 years at SKC Co., Ltd., a world-famous BOPET supplier. From 2002 to 2007, Mr. Lee was Vice President of i-components and Polystar International in Korea. From 1987 to 1997, he was mainly responsible for the management of the R&D team, including the development of the BOPET film technology, the refinement of the manufacturing process and the production in general at SKC in Korea. At SKC from 1998 to 2000, he worked in the American Branch of SKC where he was responsible for evaluating the technology, monitoring the production growth and managing a professional staff.

None of our directors or officers is related to each other; and to the best of our knowledge and belief, there are no arrangements or understandings with any of our principal shareholders, customers, suppliers, or any other person, pursuant to which any of our directors or executive officers were appointed.

The business address of our directors and executive officers is No. 387 Dongming Road, Weifang Shandong, People's Republic of China, Postal Code: 261061.

**Board Committees**

Our board of directors has appointed an Audit Committee, Compensation Committee and a Corporate Governance and Nominating Committee, and adopted charters for each of these committees. We have appointed independent directors to each of our committees.

Under the Nasdaq Marketplace Rule 4350(c)(5), it is provided that a Controlled Company is exempt from the requirements to have a majority of independent directors. A "Controlled Company" is a company of which more than 50% of the voting power is held by an individual, a group or another company. Currently, Apex Glory Holding Limited holds 53% of the outstanding ordinary shares of the Company. As a result, Fuwei can be considers itself a Controlled Company and operated under the exemption from December 25, 2007 until March 31, 2008, when Ms. Lu resigned from her position as the Chief Financial Officer and Director of the Company.

*Audit Committee*

Our Audit Committee currently consists of Tee Chuang Khoo, Changrong Ji and Yudong Huang. On November 21, 2007, Tee Chuang Khoo was appointed as the Chairman of our Audit Committee. On December 16, 2007, Cindy Lu resigned as a member of the Audit Committee. On December 16, 2007, Yudong Huang was appointed a member of the Audit Committee . The audit committee will oversee our accounting and financial reporting processes and the audits of our financial statements. The audit committee is responsible for, among other things:

- selecting the independent auditors and pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

- reviewing and approving all proposed related-party transactions;

- discussing the annual audited financial statements with management and the independent auditors;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- meeting separately and periodically with management and the independent auditors;

- reviewing such other matters that are specifically delegated to our audit committee by our board of directors from time to time; and

- reporting regularly to the full board of directors.

*Compensation Committee*

Effective November 21, 2007, Tee Chuang Khoo, Yudong Huang and Changrong Ji were appointed as members of our Compensation Committee. The Committee is responsible for, among other things:

- reviewing and determining the compensation package for our senior executives;

- reviewing and making recommendations to our board with respect to the compensation of our directors;

- reviewing and approving officer and director indemnification and insurance matters;

- reviewing and approving any employee loan in an amount equal to or greater than RMB 100,000; and

- reviewing periodically and approving any long-term incentive compensation or equity plans, programs or similar arrangements, annual bonuses, employee pension and welfare benefit plans.

### *Corporate Governance and Nominating Committee*

Our corporate governance and nominating committee consists of Changrong Ji. The Corporate Governance and Nominating Committee is responsible for, among other things:

- identifying and recommending to the board nominees for election or re-election to the board;

- making appointments to fill any vacancy on our board;

- reviewing annually with the board the current composition of the board in light of the characteristics of independence, age, skills, experience and availability of service to us;

- identifying and recommending to the board any director to serve as a member of the board's committees;

- advising the board periodically with respect to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any corrective action to be taken; and

- monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

### Duties of Directors

Under Cayman Islands laws, our directors have a common law duty of loyalty to act honestly in good faith with a view to our best interests. Our directors also have a duty to exercise the skill they actually possess and such care and diligence that a reasonably prudent person would exercise in comparable circumstances. In fulfilling their duty of care to us, our directors must ensure compliance with our memorandum of association. A shareholder has the right to seek damages if a duty owed by our directors is breached. You should read "Description of Share Capital - Differences in Corporate Law" for a more complete discussion of these matters.

### B. Compensation.

### Compensation of Directors and Executive Officers

All directors receive reimbursements from us for expenses which are necessary and reasonably incurred by them for providing services to us or in the performance of their duties. Our directors who are also our employees receive compensation in the form of salaries, housing allowances, other allowances and benefits in kind in their capacity as our employees. Our directors do not receive any compensation in their capacity as directors in addition to their salaries and other remunerations as members of our management team. We pay their expenses related to attending board meetings and participating in board functions.

The aggregate cash compensation and benefits that we paid to our directors and executive officers, a group of nine persons for the year ended December 31, 2007 was approximately RMB 2.8 million. No executive officer is entitled to any severance benefits upon termination of his or her employment with our company.

### Employment and Service Agreements

### *Directors*

We have also entered into an additional Employment Agreement as of April 27, 2005 with Mr. He for the position of Chief Executive Officer for a three year period effective December 25, 2006. Under this agreement Mr. He's annual basic salary will be RMB 500,000 and he will be eligible for a discretionary bonus. Our directors and officers, Cindy Lu and Xiuyong Zhang have entered into service agreements (the "Service Agreements" and each a "Service Agreement") with us. The term of service for the executive officers is for an initial fixed period of two years in case of Cindy Lu commencing from March 26, 2007 and three years commencing from March 1, 2006 in the case of Xiuyong Zhang. Under the terms of their respective Service Agreements, each of Cindy Lu and Xiuyong Zhang is entitled to an annual basic salary of RMB 500,000 and RMB 300,000. After the initial period, either party can terminate the Employment Agreement upon three months prior written notice or by paying the other party a sum equal to three months salary in lieu of such notice. The agreement may also be terminated by either party without prior notice or payment pursuant to the applicable

provisions of the China Labor Law. Effective March 31, 2008, Ms. Zhu resigned as Chief Financial Officer of the Company.

*Executive Officers*

Each of our executive officers, Bo Xu, Zhibing Qian, Bin Sun, Xiaoming Wang, and Hanyong Lee have entered into service agreements (the "Service Agreements" and each a "Service Agreement") with us. The term of service for the executive officers commenced from March 1, 2006 in the case of Xiaoming Wang, December 6, 2006 in the case of Mr. Xu, and we entered into a service agreement with Bin Sun from January 2007, in case of Zhibing Qian commencing from April 2, 2007 and in case of Hanyong Lee commencing from January 8, 2008. We may only terminate the Service Agreement prior to the expiration of the Initial Period (save by mutual agreement and except as provided in the Service Agreement) upon the occurrence of certain events including, without limitation, for cause, disability or personal bankruptcy. The term of service of each of our executive officers shall be renewed for successive periods of one year each after the expiration of the Initial Period. The Service Agreement can be terminated by not less than three months' notice in writing served by either party to the Service Agreements. We shall have the option to pay the executive officer salary in lieu of any required period of notice of termination. Under the terms of their respective Service Agreements, each of Bo Xu, Zhibing Qian, Bin Sun, Xiaoming Wang, and Hanyong Lee are entitled to an annual basic salary of RMB 1.9 million totally. Their annual salaries may be revised at the discretion of the Compensation Committee. We may pay them discretionary management bonuses for any financial year, the payment and the amount of which are subject to the approval of the Compensation Committee. Except for the payment in lieu of notice described above, there are no provisions for benefits for termination of employment of our executive officers under the Service Agreements.

## Share Option Plan

We plan to adopt a share option plan that is a share incentive plan, the purpose of which is to recognize and acknowledge the contributions the eligible participants had or may have made to our company. The share option plan will provide the eligible participants an opportunity to have a personal stake in our company with the view to achieving the following objectives:

- motivate the eligible participants to optimize their performance efficiency for the benefit of our company; and

- attract and retain or otherwise maintain an on-going business relationship with the eligible participants whose contributions are or will be beneficial to our long-term growth.

## Indemnification

Cayman Islands law does not limit the extent to which a company's articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Cayman Islands courts to be contrary to public policy, such as to provide indemnification against civil fraud or the consequences of committing a crime. Pursuant to our memorandum and articles of association, our directors and officers, as well as any liquidator or trustee for the time being acting in relation to our affairs, will be indemnified and secured harmless out of our assets and profits from and against all actions, costs, charges, losses, damages and expenses that any of them or any of their heirs, executors or administrators may incur or sustain by reason of any act done, concurred in or omitted in or about the execution of their duties in their respective offices or trusts. Accordingly, none of these indemnified persons will be answerable for the acts, receipts, neglects or defaults of each other; neither will they be answerable for joining in any receipts for the sake of conformity, or for any bankers or other persons with whom any moneys or effects belonging to us may have been lodged or deposited for safe custody, or for insufficiency or deficiency of any security upon which any moneys of or belonging to us may be placed out or invested, or for any other loss, misfortune or damage which may happen in the execution of their respective offices or trusts. This indemnity will not, however, extend to any fraud or dishonesty which may attach to any of said persons.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us pursuant to the foregoing provisions, we have been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

50

**C. Board practices.**

Our Articles provide that our board of directors shall consist of not less than two directors. Each director shall retire from office at least once every three years, but a director who is appointed by the board shall retire at the next annual general meeting of our Company following his appointment. A retiring director shall be eligible for re-election.

**D. Employees.**

As of December 31, 2007, our total staff consisted of 330 employees.

We do not have any collective bargaining agreements with our employees. We have never experienced any material labor disruptions and are unaware of any current efforts or plans to organize employees. We believe we have good relationships with our employees.

**Item 7.  Major Shareholders and Related Party Transactions**

**A. Major shareholders.**

The following table sets forth information with respect to the beneficial ownership, within the meaning of Rule 13d-3 under the Exchange Act, of our ordinary shares, as of the date of this annual report for:

- each person known to us to own beneficially more than 5% of our ordinary shares; and

- each of our directors and executive officers who beneficially own our ordinary shares.

Beneficial ownership includes voting or investment power with respect to the securities. Except as indicated below, and subject to applicable community property laws, the persons named in the table have or share the voting and investment power with respect to all ordinary shares shown as beneficially owned by them. The number of our ordinary shares used in calculating the percentage for each listed person includes any options exercisable by such person within 60 days after the date of this annual report. Percentage of beneficial ownership is based on 13,062,500 ordinary shares outstanding as of December 31, 2006.

| | Shares Beneficially Owned | |
| --- | --- | --- |
| | Number | Percent |
| **Executive Officers and Directors:** | | |
| Xiaoan He | — | — |
| Cindy Lu(1) | — | — |
| Xiuyong Zhang(2) | — | — |
| Tee Chuang Khoo | — | — |
| Changrong Ji | — | — |
| Yudong Huang | — | — |
| Bin Sun | — | — |
| Xiaoming Wang | — | — |
| Hanyong Lee(3) | — | — |
| All directors and executive officers as a group ( 9 persons) | — | — |
| **5% Shareholders:** | | |
| Apex Glory Holdings Limited(4) | 6,912,503 | 52.9% |
| Easebright Investments Limited(5) | 1,637,497 | 12.5% |

(1) Ms. Lu resigned as a director and Chief Financial Officer of the Company, effective March 31, 2008.

(2) Mr. Zhang was appointed to serve as Chief Financial Officer of the Company on April 11, 2008.

(3) Mr. Hanyong Lee has been Vice President of Research and Development of Shandong Fuwei since January 8, 2008.

(4) Apex Glory Holdings Limited is a wholly-owned subsidiary of Eastfaith Holdings Limited, a British Virgin Islands corporation. Mr. Jun Yin is the sole shareholder of Eastfaith Holdings Limited.

(5) Easebright Investments Limited is a wholly-owned subsidiary of Goodsuccess Enterprises Ltd. Mr. Tongju Zhou and Mr. Duo Wang each indirectly own 50% of Goodsuccess Enterprises Ltd.

Except as disclosed below, there were no related party transactions with major shareholders during the period commencing January 1, 2004 and ending December 31, 2007.

## B.    *Related party transactions.*

### Our Related-Party Transaction Policies

We have conducted our related-party transactions on normal commercial terms that we believe are fair and reasonable and in the interests of our shareholders as a whole. We believe that the terms of our related-party transactions are comparable to the terms we could obtain from independent third parties. Our related-party transactions are subject to the review and approval of the audit committee of our board of directors.

The transactions and balances with related parties are analyzed as follows:

### (a) Transactions with related parties

### Shareholders' Loan Agreements

For the purpose of financing the acquisition of Shandong Fuwei, our wholly-owned PRC operating subsidiary, in October 2004, we borrowed from each of our principal shareholders Apex Glory Holdings Limited ("Apex") and Easebright Investments Limited ("Easebright") HK$67,830,000 and HK$18,020,000, respectively. These borrowings did not bear any interest. We then loaned HK$85,850,000, interest free, to our wholly-owned subsidiary Fuwei (BVI) and Fuwei (BVI) entered into a sale and purchase agreement with Shenghong Group Co., Ltd. and Shandong Baorui Investment Co., Ltd ("Shandong Baorui"), pursuant to which Fuwei (BVI) acquired the respective equity interest of Shenghong Group and Shandong Baorui in Shandong Fuwei for an aggregate consideration of RMB 91 million. Shandong Fuwei thereafter became a wholly-owned subsidiary of Fuwei (BVI) and was converted into a wholly-foreign owned enterprise pursuant to PRC law. Tongju Zhou, a director, and Duo Wang each indirectly own 50% of Easebright and are both also officers and directors of Shandong Baorui. Jun Yin, the indirect sole shareholder of Apex, and Duo Wang own 17.5% and 4.6%, respectively, of Shandong Baorui. Apex and Easebright converted all outstanding shareholder loans into an aggregate of 8,749,229 ordinary shares on November 23, 2006.

On October 28, 2005, Shandong Baorui guaranteed a one year loan to us by the Agricultural Bank of China in the principal amount of RMB 6,800,000. This loan bears interest at the rate of 7.254% per annum.

On October 27, 2004, Weifang Neo-Luck (Group) Co., Ltd. ("Weifang Neo-Luck"), an entity for which our director Tongju Zhou was the General Manager, collectively with two of its subsidiaries, guaranteed two one-year loans at 5.841% interest per annum from China Construction Bank and Agricultural Bank of China to the Shandong Fuwei totaling RMB 23,200,000. Also on October 27, 2004, Weifang Fuwah Hotel Co. Ltd. ("Fuwei Hotel"), an entity owned by Weifang Neo-Luck, guaranteed a one-year loan at 5.841% interest per annum to Shandong Fuwei from China Construction Bank totaling RMB 1,300,000.

**Acquisition of Assets**

In October of 2003, Shandong Fuwei acquired the assets relating to the Brückner production line through a public auction as a result of a default on several loans extended to affiliates of Shandong Neo-Luck Plastic Co., Ltd ("Shandong Neo-Luck") by the Bank of China, Weifang city branch. Our current executive officers Xiamong Wang and Yongping Bai both acted as executive officers for Shandong Neo-Luck.

Due to ongoing financial difficulties, Shandong Neo-Luck was declared bankrupt by the Weifang Municipal People's Court in the PRC in September 2004. The assets of Shandong Neo-Luck, consisting primarily of assets related to the DMT production line, were put up for public auction in accordance with the insolvency laws of the PRC on September 27, 2004. Beijing Baorui Guarantee Co., Ltd. ("Beijing Baorui"), purchased these assets for approximately RMB 34 million. Three months later, Beijing Baorui put these assets up for sale at public auction and Shandong Fuwei acquired them for approximately RMB 119 million. At the time of the acquisition by Beijing Baorui, Beijing Baorui held a 10% ownership in Shandong Fuwei and owned 80% of Beijing Baorui and at the time of the sale to Shandong Fuwei, Mr. Zhou and Mr. Wang indirectly controlled Shandong Fuwei through Easebright.

**Other Related Party Transactions**

During the periods/years ended 2005, 2006 and 2007, we respectively paid approximately RMB 201,000, RMB 151,000 and RMB 143,047 (USD$ 18,807) to Fuhua Industrial Material Management Co., Ltd. as rental payments in connection with living quarters for our staff. Fuhua Industrial Material Management Co., Ltd. is an entity that is owned and controlled by Weifang Neo-Luck.

In 2004, we paid RMB 400,000 as a deposit for expenses relating to a conference we hosted at the facilities of Fuwah Hotel. Weifang Neo-Luck is the owner of Fuhua Hotel.

Prior to the acquisition of the DMT production line through auction as described above, Shandong Fuwei paid Shandong Neo-Luck a sub-contracting fee at a rate of RMB 871.46 per ton for the use of the DMT production line.

**C. Interests of experts and counsel.**

Not Applicable.

**Item 8. Financial Information**

**A. Consolidated Statements and Other Financial Information.**

Our consolidated financial statements are included herein under Item 18.

We have not paid any dividends on our ordinary shares. The payment of dividends in the future, if any, is within the discretion of our Board of Directors and will depend upon our earnings, its capital requirements and financial condition and other relevant factors. We do not anticipate declaring or paying any dividends in the foreseeable future.

*Legal Proceedings*

**DMT Arbitration**

In April 2006, we received a request for arbitration and related papers in an arbitration proceeding between DMT S. A. ("DMT") and Shandong Neoluck Plastics Co. Ltd. ("Neoluck"). The arbitration was filed in the ICC International Court of Arbitration and seeks monetary damages against Neoluck of approximately $1,250,000, plus interest. The claim relates to Neoluck's purchase of certain equipment from DMT pursuant to a November 20, 2001 Contract, and seeks to recover the remaining purchase price due under the Contract and payment for certain spare parts. (The subject equipment is the DMT production line we acquired from Beijing Baroui in 2005 in Neoluck's bankruptcy).

At the invitation of Weifang Neoluck (Group) Co., Ltd ("Neoluck Group"), the original majority shareholder of Neoluck, the Neoluck Group and DMT engaged in efforts to achieve a settlement of the pending arbitration on January 18, 2008. Fuwei joined these discussions later as an interested party and in order to support a resolution of the pending dispute and to achieve resolution of certain outstanding service and spare part issues.

After several weeks of negotiations among the parties, we entered into a Service and Technical Assistance Agreement (the "Service Agreement"), dated March 5, 2008, providing for the payment of $180,000 in two installments in order to commence receiving service and spare parts with respect to the equipment that had been originally sold by DMT. On March 12, 2008, the Neoluck Group entered into a Settlement Agreement (the "Settlement Agreement") with DMT, pursuant to which Neoluck Group will make a payment of $900,000 through an irrevocable bank draft delivered to DMT to be drawn upon within sixty days. In accordance with the provisions of the Settlement Agreement, upon DMT's collection of moneys to be paid under the Settlement Agreement and the Service Agreement, the pending dispute in arbitration will be withdrawn and DMT will release the Neoluck Group and Fuwei from any claims relating to the original sale of the equipment.

In accordance with the Settlement Agreement, a letter, signed by counsel to DMT and Fuwei, has been transmitted to the ICC International Court of Arbitration requesting a suspension of any further proceeding pending the performance of the payment obligations under the Settlement Agreement and the Service Agreement. Once such payment obligations are performed, the arbitration proceeding will be withdrawn as settled between the parties.

**HKG Arbitration**

At December 31, 2007, this matter was a threatened arbitration by Hampden Kent Group LLC. for the amount of USD 3,800,000, relating to a claim for a penalty fee in connection with services allegedly performed by HKG in connection with attempting to provide financing to Fuwei pursuant to a service agreement between the parties.

As regarding by the service agreement, any dispute between the parties would be arbitrated by the American Arbitration Association ("AAA") in accordance with its rules. Pursuant to these rules, a demand for arbitration must be filed with the AAA regional office together with a filing fee by the claiming party, in this case, HKG.

In December 2007, HKG filed a demand for arbitration with the International Dispute Center of the AAA, but without paying the requisite filing fee. As a result, the AAA advised us that it did not view the demand as being filed since the requisite fee was not paid. We confirmed that status as of December 31, 2007.

On January 28, 2008, the AAA informed us that HKG's filing fee had been paid and that an arbitration process would commence in accordance with its rules.

On February 18, 2008, HKG submitted an Amended Demand for Arbitration and Statement of Claim, correcting certain clerical errors in its original demand.

On March 14, 2008, the Company submitted its answering statement and counterclaim in response to HKG's Amended Demand for Arbitration and Statement of Claim. The Company denied HKG's claims for breach of contract and breach of the covenant of good faith and fair dealing as legally and factually without merit and asserted various defenses. The Company also asserted a counterclaim against HKG for breach of the August 19, 2006 Letter Agreement, seeking to recover the over $300,000 in fees and costs paid to HKG and other consequential damages.

On March 27, 2008, HKG submitted a letter in reply to the Company's counterclaim, generally denying the allegations and claims made by the Company.

At the request of HKG, the Company has agreed to attempt to resolve this dispute through mediation. A neutral mediator has been appointed by the AAA's International Centre for Dispute Resolution; however, the mediation has not yet been scheduled.

**Class Action**

On October 19, 2007, the Company became aware that a class action lawsuit had been filed on behalf of all purchasers of the Company's stock (collectively, the "Plaintiffs") from the date of the Company's Initial Public Offering on December 19,2006 through October 16, 2007. The case is pending in the United States District Court for the Southern District of New York. The Complaint alleges that the Company and certain of its present and former officers, directors and control persons (collectively, the "Defendants") violated the Securities Act of 1933.

On November 21, 2007, the Company was given notice that a class action lawsuit had been filed on behalf of all purchasers of the Company's stock (collectively, the "Plaintiffs") pursuant or traceable to the Registration Statement and Prospectus issued in connection with the Company's Initial Public Offering on December 19,2006 through November 12,2007. The case is pending in the United States District Court for the Southern District of New York. The Complaint alleges that the Company, its underwriters and certain of its executives (collectively, the "Defendants") violated Sections 11,12(2) and 15 of the Securities Act of 1933. They also complaint alleges that the Defendants misrepresented or omitted material information regarding the Company and its business operations.

On January 24, 2008, the Court consolidated into a single action the putative securities class actions pending against the Company

and certain of its officers, directors and shareholders. The Court also appointed Fuwei as lead plaintiff and confirmed the Rosen Law Firm, P.A. as lead counsel, and granted plaintiffs leave to file a consolidated amended class action complaint. The consolidated action is styled In re Fuwei Films Securities Litigation, Case No. 07-CV-9416 (RJS).

On March 14, 2008, plaintiffs filed a consolidated amended class action complaint naming as defendants the Company, Xianoan He, Mark Stulga, Jun Yin, Tongju Zhou, Duo Wang, and the Company's IPO underwriters — Maxim Group LLC, WR Hambrecht + Co. and Chardan Capital Markets, LLC. The consolidated amended class action complaint asserts claims for violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. At this point, we believe that only the Company, Mr. Stulga, and the Underwriter Defendants have been properly served with the consolidated amended class action complaint.

Pursuant to a scheduling order entered by the Court on February 19, 2008, the parties named as defendants in the consolidated class action are required to answer or otherwise respond to the consolidated complaint on or before April 30, 2008.

**B. Significant Changes.**

Not Applicable

**Item 9. The Offer and Listing.**

**A. Offer and listing details.**

We have authorized capital of 20,000,000 ordinary shares, par value US$0.129752 each. As of March 28, 2008, 13,062,500 ordinary shares were issued and outstanding.

54

The annual high and low market prices of our ordinary shares for the five most recent full financial years and subsequent period are as set forth below:

| | Ordinary Shares | |
| --- | --- | --- |
| (Year Ending) | High | Low |
| December 31, 2006 (commencing December 19) | $ 18.43 | $ 8.30 |
| December 31, 2007 | $ 17.14 | $ 2.12 |

The high and low market prices of our ordinary shares for each financial quarter over the two most recent full financial years and subsequent period are as set forth below:

| | Ordinary Shares | |
| --- | --- | --- |
| (Quarter Ending) | High | Low |
| December 31, 2006 (commencing December 19) | $ 18.43 | $ 8.30 |
| March 29, 2007 | $ 17.14 | $ 8.00 |
| June 31, 2007 | $ 6.37 | $ 6.20 |
| September 28, 2007 | $ 9.00 | $ 8.32 |
| December 31, 2007 | $ 6.34 | $ 5.81 |

For the most recent six months, the high and low market prices of our ordinary shares are as set forth below:

| | Ordinary Shares | |
| --- | --- | --- |
| (Month Ending) | High | Low |
| July 2007 | $ 9.09 | $ 6.16 |
| August 2007 | $ 7.80 | $ 5.63 |
| September 2007 | $ 10.38 | $ 6.50 |
| October 2007 | $ 10.75 | $ 6.20 |
| November 2007 | $ 7.14 | $ 2.12 |
| December 2007 | $ 7.78 | $ 3.54 |

**B. *Plan of Distribution.***

Not Applicable.

**C. Markets.**

Our ordinary shares were included for quotation on the Nasdaq Global Market on December 18, 2006 under the symbol "FFHL".

**D. Selling Shareholders.**

Not applicable.

**E. Dilution.**

Not applicable.

*F. Expenses of the issue.*

Not Applicable.

**Item 10. Additional Information.**

**A. Share capital.**

Not Applicable.

**B. Memorandum and articles of association.**

We are a Cayman Islands company and our affairs are governed by our memorandum and articles of association and the Companies Law (2004 revision) of the Cayman Islands, or the Companies Law. We have filed copies of our complete Memorandum and Articles of Association as exhibits to our Annual Report on Form 20-F for the year ended 2006 filed with the SEC on April 2, 2007.

As of the date of this Annual Report, our authorized share capital consisted of 20,000,000 ordinary shares, par value US$0.129752 per share. As of the date of this Annual Report, 13,062,500 ordinary shares were issued and outstanding, and no preference shares were issued and outstanding.

**Ordinary Shares**

We were incorporated under the laws of the Cayman Islands as an exempted company. A Cayman Islands exempted company:

- is a company that conducts its business outside the Cayman Islands;

- is exempted from certain requirements of the Companies Law, including the filing of any annual return of its shareholders with the Registrar of Companies or the Immigration Board;

- does not have to make its register of shareholders open to inspection; and

- may obtain an undertaking against the imposition of any future taxation.

The following summarizes the terms and provisions of our share capital, as well as the material applicable laws of the Cayman Islands. This summary is not complete, and you should read our amended and restated memorandum and articles of association, filed as exhibits to this Annual Report.

The following discussion primarily concerns ordinary shares and the rights of holders of ordinary shares.

**Protection of Minority Shareholders**

The Grand Court of the Cayman Islands may, on the application of shareholders holding not less than one fifth of our shares in issue, appoint an inspector to examine our affairs and report thereon in a manner as the Grand Court shall direct.

Any shareholder may petition the Grand Court of the Cayman Islands which may make a winding up order, if the court is of the opinion that it is just and equitable that we should be wound up.

Claims against us by our shareholders must, as a general rule, be based on the general laws of contract or tort applicable in the Cayman Islands or their individual rights as shareholders as established by our amended and restated memorandum and articles of association.

The Cayman Islands courts ordinarily would be expected to follow English case law precedents which permit a minority shareholder to commence a representative action against, or derivative actions in our name to challenge

- an act which is ultra vires or illegal;

- an act which constitutes a fraud against the minority shareholder and the wrongdoers are themselves in control of us; and

- an irregularity in the passing of a resolution which requires a qualified (or special) majority.

## Pre-emption Rights

There are no pre-emption rights applicable to the issue of new shares under either Cayman Islands law or our amended and restated memorandum and articles of association.

## Modification of Rights

Except with respect to share capital (as described below) alterations to our amended and restated memorandum and articles of association may only be made by special resolution of no less than two-thirds of votes cast at a meeting of the shareholders.

Subject to the Companies Law, all or any of the special rights attached to shares of any class (unless otherwise provided for by the terms of issue of the shares of that class) may be varied, modified or abrogated with the sanction of a special resolution passed at a separate general meeting of the holders of the shares of that class.

The provisions of our amended and restated articles of association relating to general meetings shall apply similarly to every such separate general meeting, but so that the quorum for the purposes of any such separate general meeting or at its adjourned meeting shall be a person or persons together holding (or represented by proxy) not less than one third in nominal value of the issued shares of that class, every holder of shares of the class shall be entitled on a poll to one vote for every such share held by such holder and that any holder of shares of that class present in person or by proxy may demand a poll.

The special rights conferred upon the holders of any class of shares shall not, unless otherwise expressly provided in the rights attaching to or the terms of issue of such shares, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

## Alteration of Capital

We may from time to time by ordinary resolution:

- increase our capital by such sum, to be divided into shares of such amounts, as the resolution shall prescribe;

- consolidate and divide all or any of our share capital into shares of larger amount than our existing shares;

- cancel any shares which at the date of the passing of the resolution have not been taken or agreed to be taken by any person, and diminish the amount of our share capital by the amount of the shares so cancelled subject to the provisions of the Companies Law;

- sub-divide our shares or any of them into shares of smaller amount than is fixed by our amended and restated memorandum and articles of association, subject nevertheless to the Companies Law, and so that the resolution whereby any share is subdivided may determine that, as between the holders of the share resulting from such subdivision, one or more of the shares may have any such preference or other special rights, over, or may have such deferred rights or be subject to any such restrictions as compared with, the others as we have power to attach to unissued or new shares; and

- divide shares into several classes and without prejudice to any special rights previously conferred on the holders of existing shares, attach to the shares respectively as preferential, deferred, qualified or special rights, privileges, conditions or such restrictions which, in the absence of any such determination in a general meeting, may be determined by our directors.