EXHIBIT D
PART 3

We may, by special resolution, subject to any confirmation or consent required by the Companies Law, reduce our share capital or any capital redemption reserve in any manner authorized by law.

**Transfer of Shares**

Subject to any applicable restrictions set forth in our amended and restated memorandum and articles of association, any of our shareholders may transfer all or any of his or her shares by an instrument of transfer in the usual or common form or in any form prescribed by the NASDAQ Global Market or in any other form which our directors may approve. You should note that, under Cayman Islands law, a person whose name is entered on the register of members will be deemed to be a member or shareholder of our company. We have designated Continental Stock Transfer and Trust Company as our share registrar. Under Cayman Islands law, a share certificate constitutes admissible evidence as proof of title of its holder to the shares specified on such certificate.

Our directors may decline to register any transfer of any share which is not paid up or on which we have a lien. Our directors may also decline to register any transfer of any share unless:

- the instrument of transfer is lodged with us accompanied by the certificate for the shares to which it relates and such other evidence as our directors may reasonably require to show the right of the transferor to make the transfer;

- the instrument of transfer is in respect of only one class of shares;

- the instrument of transfer is properly stamped (in circumstances where stamping is required);

- in the case of a transfer to joint holders, the number of joint holders to whom the share is to be transferred does not exceed four; and

- a fee of such maximum sum as the NASDAQ Global Market may at any time determine to be payable or such lesser sum as our directors may from time to time require is paid to us in respect thereof.

If our directors refuse to register a transfer, they shall, within two months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal.

The registration of transfers may, on notice being given by advertisement in such one or more newspapers or by any other means in accordance with any requirements of the NASDAQ Global Market, be suspended and the register closed at such times and for such periods as our directors may from time to time determine; provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 days in any year as our directors may determine.

**Share Repurchase**

We are empowered by the Companies Law and our amended and restated memorandum and articles of association to purchase our own shares, subject to certain restrictions. Our directors may only exercise this power on our behalf, subject to the Companies Law, our amended and restated memorandum and articles of association and to any applicable requirements imposed from time to time by the U.S. Securities and Exchange Commission, the NASDAQ Global Market, or by any recognized stock exchange on which our securities are listed.

**Dividends**

Subject to the Companies Law, we may declare dividends in any currency to be paid to our shareholders. Dividends may be declared and paid out of our profits, realized or unrealized, or from any reserve set aside from profits which our directors determine is no longer needed. Our board of directors may also declare and pay dividends out of the share premium account or any other fund or account which can be authorized for this purpose in accordance with the Companies Law.

Except in so far as the rights attaching to, or the terms of issue of, any share otherwise provides (1) all dividends shall be declared and paid according to the amounts paid up on the shares in respect of which the dividend is paid, but no amount paid up on a share in advance of calls shall be treated for this purpose as paid up on that share and (2) all dividends shall be apportioned and paid pro rata according to the amounts paid upon the shares during any portion or portions of the period in respect of which the dividend is paid.

Our directors may also pay any dividend that is payable on any shares semi-annually or on any other dates, whenever our financial position, in the opinion of our directors, justifies such payment.

Our directors may deduct from any dividend or other moneys payable to any shareholder all sums of money (if any) presently payable by such shareholder to us on account of calls or otherwise.

No dividend or other money payable by us on or in respect of any share shall bear interest against us.

In respect of any dividend proposed to be paid or declared on our share capital, our directors may resolve and direct that (1) such dividend be satisfied wholly or in part in the form of an allotment of shares credited as fully paid up, provided that our shareholders entitled thereto will be entitled to elect to receive such dividend (or part thereof if our directors so determine) in cash in lieu of such allotment or (2) the shareholders entitled to such dividend will be entitled to elect to receive an allotment of shares credited as fully paid up in lieu of the whole or such part of the dividend as our directors may think fit. We may also, on the recommendation of our directors, resolve in respect of any particular dividend that, notwithstanding the foregoing, it may be satisfied wholly in the form of an allotment of shares credited as fully paid up without offering any right of shareholders to elect to receive such dividend in cash in lieu of such allotment.

Any dividend, interest or other sum payable in cash to any shareholder may be paid by check or warrant sent by mail addressed to the shareholder at his registered address, or addressed to such person and at such addresses as the shareholder may direct. Every check or warrant shall, unless the shareholder or joint shareholders otherwise direct, be made payable to the order of the shareholder or, in the case of joint shareholders, to the order of the shareholder whose name stands first on the register in respect of such shares, and shall be sent at their risk and payment of the check or warrant by the bank on which it is drawn shall constitute a good discharge to us.

All dividends unclaimed by shareholders for one year after having been declared may be invested or otherwise made use of by our board of directors for the benefit of our company until claimed. Any dividend unclaimed by shareholders after a period of six years from the date of declaration of such dividend may be forfeited and, if so forfeited, shall revert to us.

Whenever our directors have resolved that a dividend be paid or declared, our directors may further resolve that such dividend be satisfied wholly or in part by the distribution of specific assets of any kind, and in particular of paid up shares, debentures or warrants to subscribe for our securities or securities of any other company. Where any difficulty arises with regard to such distribution, our directors may settle it as they think expedient. In particular, our directors may issue fractional certificates, ignore fractions altogether or round the same up or down, fix the value for distribution purposes of any such specific assets, determine that cash payments shall be made to any of our shareholders upon the footing of the value so fixed in order to adjust the rights of the parties, vest any such specific assets in trustees as may seem expedient to our directors, and appoint any person to sign any requisite instruments of transfer and other documents on behalf of a person entitled to the dividend, which appointment shall be effective and binding on our shareholders.

## Untraceable Shareholders

We are entitled to sell any shares of a shareholder who is untraceable, provided that:

- all checks or warrants in respect of dividends of such shares, not being less than three in number, for any sums payable in cash to the holder of such shares have remained uncashed for a period of twelve years prior to the publication of the advertisement and during the three months referred to in the third bullet point below;

- we have not during that time received any indication of the whereabouts or existence of the shareholder or person entitled to such shares by death, bankruptcy or operation of law; and

- we have caused an advertisement to be published in newspapers in the manner stipulated by our amended and restated memorandum and articles of association, giving notice of our intention to sell these shares, and a period of three months has elapsed since such advertisement and the NASDAQ Global Market has been notified of such intention.

The net proceeds of any such sale shall belong to us, and when we receive these net proceeds we shall become indebted to the former shareholder for an amount equal to such net proceeds.

**Issuance of Additional Ordinary Shares or Preference Shares**

Subject to the Companies Law and the rules of the NASDAQ Global Market and without prejudice to any special rights or restrictions for the time being attached to any shares or any class of shares, our board of directors may issue additional ordinary shares from time to time as our board of directors determines, to the extent of available authorized but unissued shares and establish from time to time one or more series of preference shares and to determine, with respect to any series of preference shares, the terms and rights of that series, including:

- the designation of the series;

- the number of shares of the series;

- the dividend rights, conversion rights, voting rights; and

- the rights and terms of redemption and liquidation preferences.

Subject to the foregoing, our board of directors may issue series of preference shares without action by our shareholders to the extent authorized but unissued. Accordingly, the issuance of preference shares may adversely affect the rights of the holders of the ordinary shares. In addition, the issuance of preference shares may be used as an anti-takeover device without further action on the part of the shareholders. Issuance of preference shares may dilute the voting power of holders of ordinary shares.

Subject to applicable regulatory requirements, our board of directors may issue additional ordinary shares without action by our shareholders to the extent of available authorized but unissued shares. The issuance of additional ordinary shares may be used as an anti-takeover device without further action on the part of the shareholders. Such issuance may dilute the voting power of existing holders of ordinary shares.

We have applied to NASDAQ to have our ordinary shares listed on the NASDAQ Global Market. Although we believe that, upon completion of this offering, our ordinary shares will trade on NASDAQ Global Market, we cannot guaranty that we will be able to satisfy the NASDAQ criteria for listing or that we will be able to satisfy the listing maintenance requirements, in which case our ordinary shares could be subject to delisting.

**Committees of Board of Directors**

Pursuant to our amended and restated articles of association, our board of directors, we have established an audit committee, a compensation committee and a corporate governance and nominating committee.

**Differences in Corporate Law**

The Companies Law is modeled after similar laws in the United Kingdom but does not follow recent changes in United Kingdom laws. In addition, the Companies Law differs from laws applicable to United States corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Law applicable to us and the laws applicable to companies incorporated in the United States, such as in the State of Delaware.

*Duties and Directors*

Under Cayman Islands law, at common law, members of a board of directors owe a fiduciary duty to the company to act in good faith in their dealings with or on behalf of the company and exercise their powers and fulfill the duties of their office honestly. This duty has four essential elements:

- a duty to act in good faith in the best interests of the company;

- a duty not to personally profit from opportunities that arise from the office of director;

- a duty to avoid conflicts of interest; and

- a duty to exercise powers for the purpose for which such powers were intended.

In general, the Companies Law imposes various duties on officers of a company with respect to certain matters of management and administration of the company. The Companies Law contains provisions, which impose default fines on persons who fail to satisfy those requirements. However, in many circumstances, an individual is only liable if he knowingly is guilty of the default or knowingly and willfully authorizes or permits the default.

In comparison, under Delaware law, the business and affairs of a corporation are managed by or under the direction of its board of directors. In exercising their powers, directors are charged with a fiduciary duty of care to protect the interests of the corporation and a fiduciary duty of loyalty to act in the best interests of its shareholders. The duty of care requires that directors act in an informed and deliberative manner and inform themselves, prior to making a business decision, of all material information reasonably available to them. The duty of care also requires that directors exercise care in overseeing and investigating the conduct of the corporation's employees. The duty of loyalty may be summarized as the duty to act in good faith, not out of self-interest, and in a manner which the director reasonably believes to be in the best interests of the shareholders.

Under Delaware law, a party challenging the propriety of a decision of a board of directors bears the burden of rebutting the applicability of the presumptions afforded to directors by the "business judgment rule." If the presumption is not rebutted, the business judgment rule protects the directors and their decisions, and their business judgments will not be second guessed. Where, however, the presumption is rebutted, the directors bear the burden of demonstrating the entire fairness of the relevant transaction. Notwithstanding the foregoing, Delaware courts subject directors' conduct to enhanced scrutiny in respect of defensive actions taken in response to a threat to corporate control and approval of a transaction resulting in a sale of control of the corporation.

### Interested Directors

There are no provisions under the Companies Law that require a director who is interested in a transaction entered into by a Cayman Islands company to disclose his interest. However, under our amended and restated memorandum and articles of association, our directors are required to do so, and in the event that they do not do so it may render such director liable to such company for any profit realized pursuant to such transaction.

In comparison, under Delaware law, such a transaction would not be voidable if (a) the material facts as to such interested director's relationship or interests are disclosed or are known to the board of directors and the board in good faith authorizes the transaction by the affirmative vote of a majority of the disinterested directors, even though the disinterested directors are less than a quorum, (b) such material facts are disclosed or are known to the shareholders entitled to vote on such transaction and the transaction is specifically approved in good faith by vote of the shareholders, or (c) the transaction is fair as to the corporation as of the time it is authorized, approved or ratified. Under Delaware law, a director could be held liable for any transaction in which such director derived an improper personal benefit.

### Voting Rights and Quorum Requirements

Under Cayman Islands law, the voting rights of shareholders are regulated by the company's articles of association and, in certain circumstances, the Companies Law. The articles of association will govern matters such as quorum for the transaction of business, rights of shares, and majority votes required to approve any action or resolution at a meeting of the shareholders or board of directors. Under Cayman Islands law, certain matters must be approved by a special resolution which is defined as two-thirds of the votes cast by shareholders present at a meeting and entitled to vote or such higher majority as is specified in the articles of association; otherwise, unless the articles of association otherwise provide, the majority is usually a simple majority of votes cast.

In comparison, under Delaware law, unless otherwise provided in the corporation's certificate of incorporation, each shareholder is entitled to one vote for each share of stock held by the shareholder. Unless otherwise provided in the corporation's certificate of incorporation or bylaws, a majority of the shares entitled to vote, present in person or represented by proxy, constitutes a quorum at a meeting of shareholders. In matters other than the election of directors, with the exception of special voting requirements related to extraordinary transactions, the affirmative vote of a majority of shares present in person or represented by proxy at the meeting and entitled to vote is required for shareholder action, and the affirmative vote of a plurality of shares is required for the election of directors.

### Mergers and Similar Arrangements

Cayman Islands law does not provide for mergers as that expression is understood under United States corporate law. However, there are statutory provisions that facilitate the reconstruction and amalgamation of companies, provided that the arrangement in question is approved by a majority in number of each class of shareholders and creditors with whom the arrangement is to be made, and who must in addition represent three fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings convened for that purpose.

The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder would have the right to express to the court the view that the transaction should not be approved, the court can be expected to approve the arrangement if it satisfies itself that:

- the company is not proposing to act illegally or ultra vires and the statutory provisions as to majority vote have been complied with;

- the shareholders have been fairly represented at the meeting in question;

- the arrangement is such as a businessman would reasonably approve; and

- the arrangement is not one that would more properly be sanctioned under some other provision of the Companies Law or that would amount to a "fraud on the minority."

When a takeover offer is made and accepted by holders of 90% of the shares within four months, the offerer may, within a two-month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. An objection may be made to the Grand Court of the Cayman Islands but is unlikely to succeed unless there is evidence of fraud, bad faith or collusion.

Cayman Islands laws do not require that shareholders approve sales of all or substantially all of a company's assets as is commonly adopted by U.S. corporations.

If the arrangement and reconstruction are thus approved, any dissenting shareholders would have no rights comparable to appraisal rights, which would otherwise ordinarily be available to dissenting shareholders of United States corporations, providing rights to receive payment in cash for the judicially determined value of the shares.

*Shareholders' Suits*

Derivative actions have been brought under Cayman Islands law but were unsuccessful for technical reasons. In principle, we will normally be the proper plaintiff and a derivative action may not be brought by a minority shareholder. However, based on English authorities, which would in all likelihood be of persuasive authority in the Cayman Islands, exceptions to the foregoing principle apply in circumstances in which:

- a company is acting or proposing to act illegally or beyond the scope of its authority;

- the act complained of, although not beyond the scope of its authority, could be effected duly if authorized by more than a simple majority vote which has not been obtained; and

- those who control the company are perpetrating a "fraud on the minority."

Class actions and derivative actions generally are available to shareholders under Delaware law for, among other things, breach of fiduciary duty, corporate waste and actions not taken in accordance with applicable law. In such actions, the court generally has discretion to permit the winning party to recover attorneys' fees incurred in connection with such action.

*Corporate Governance*

Cayman Islands laws do not restrict transactions with directors, requiring only that directors exercise a duty of care and owe a fiduciary duty to the companies for which they serve. Under our amended and restated memorandum and articles of association, subject to any separate requirement for audit committee approval under the applicable rules of The Nasdaq Stock Market, Inc. or unless disqualified by the chairman of the relevant board meeting, so long as a director discloses the nature of his interest in any contract or arrangement which he is interested in, such a director may vote in respect of any contract or proposed contract or arrangement in which such director is interested and may be counted in the quorum at such meeting.

Cayman Islands law does not limit the extent to which a company's articles of association may provide for indemnification of officers and directors, except to the extent any such provision may be held by the Cayman Islands courts to be contrary to public policy, such as to provide indemnification against civil fraud or the consequences of committing a crime. Our amended and restated memorandum and articles of association provide for the indemnification of our directors, auditors and officers against all losses or liabilities incurred or sustained by him or her as a director, auditor or officer of our company in defending any proceedings, whether civil or criminal, in which judgment is given in his or her favor, or in which he or she is acquitted provided that this indemnity may not extend to any matter in respect of any fraud or dishonesty which may attach to any of these persons.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us pursuant to the foregoing provisions, we have been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and therefore is unenforceable.

We are managed by our board of directors. Our amended and restated memorandum and articles of association provide that the number of our directors shall not be less than two and there shall be no maximum number of our directors unless our shareholders in general meeting otherwise determine a maximum number. Initially we have set our board of directors to have 4 directors. Any director on our board may be removed by way of an ordinary resolution of shareholders. At each annual general meeting, one-third of our directors for the time being (or, if their number is not a multiple of three, the number nearest to but not less than one-third) shall retire from office by rotation provided that every director shall be subject to retirement at least once every three years. Any vacancies on our board of directors or additions to the existing board of directors can be filled by an ordinary resolution of our shareholders or the affirmative vote of a majority of the remaining directors, although this may be less than a quorum where the number of remaining directors falls below the minimum number fixed by our board of directors. Our directors are not required to hold any of our shares to be qualified to serve on our board of directors.

Meetings of our board of directors may be convened at any time deemed necessary by any one of our directors. Advance notice of a meeting is not required if each director entitled to attend consents to the holding of such meeting.

A meeting of our board of directors shall be competent to make lawful and binding decisions if a majority of the members of our board of directors are present or represented. At any meeting of our directors, each director is entitled to one vote.

Questions arising at a meeting of our board of directors are required to be decided by simple majority votes of the members of our board of directors present or represented at the meeting. In the case of a tie vote, the chairman of the meeting shall have a second or deciding vote. Our board of directors may also pass resolutions without a meeting by unanimous written consent.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us pursuant to the foregoing provisions, we have been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and therefore is unenforceable.

### Inspection of Corporate Records

Shareholders of a Cayman Islands company have no general right under Cayman Islands law to inspect or obtain copies of a list of shareholders or other corporate records of the company. However, these rights may be provided in the articles of association.

In comparison, under Delaware law, shareholders of a Delaware corporation have the right during normal business hours to inspect for any proper purpose, and to obtain copies of list(s) of shareholders and other books and records of the corporation and its subsidiaries, if any, to the extent the books and records of such subsidiaries are available to the corporation.

### Shareholder Proposals

The Companies Law does not provide shareholders any right to bring business before a meeting or requisition a general meeting. However, these rights may be provided in the articles of association.

Unless provided in the corporation's certificate of incorporation or bylaws, Delaware law does not include a provision restricting the manner in which shareholders may bring business before a meeting.

*Approval of Corporate Matters by Written Consent*

The Companies Law allows a special resolution to be passed in writing if signed by all the shareholders and authorized by the articles of association.

In comparison, Delaware law permits shareholders to take action by written consent signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting of shareholders.

*Calling of Special Shareholders Meetings*

The Companies Law does not have provisions governing the proceedings of shareholders meetings which are usually provided in the articles of association.

In comparison, Delaware law permits the board of directors or any person who is authorized under a corporation's certificate of incorporation or bylaws to call a special meeting of shareholders.

*Staggered Board of Directors*

The Companies Law does not contain statutory provisions that require staggered board arrangements for a Cayman Islands company. Such provisions, however, may validly be provided for in the articles of association.

In comparison, Delaware law permits corporations to have a staggered board of directors.

*Anti-takeover Provisions*

Neither Cayman Islands nor Delaware law prevents companies from adopting a wide range of defensive measures, such as staggered boards, blank check preferred, removal of directors only for cause and provisions that restrict the rights of shareholders to call meetings, act by written consent and submit shareholder proposals.

*D. Exchange controls.*

China's government imposes control over the convertibility of Rmb into foreign currencies. Under the current unified floating exchange rate system, the People's Bank of China publishes a daily exchange rate for Rmb, or the PBOC Exchange Rate, based on the previous day's dealings in the inter-bank foreign exchange market. Financial institutions authorized to deal in foreign currency may enter into foreign exchange transactions at exchange rates within an authorized range above or below the PBOC Exchange Rate according to market conditions.

Pursuant to the Foreign Exchange Control Regulations issued by the State Council on January 29, 1996 and effective as of April 1, 1996 (and amended on January 14, 1997) and the Administration of Settlement, Sale and Payment of Foreign Exchange Regulations which came into effect on July 1, 1996 regarding foreign exchange control, or the Regulations, conversion of Renminbi into foreign exchange by foreign investment enterprises for current account items, including the distribution of dividends and profits to foreign investors of joint ventures, is permissible upon the proper production of qualified commercial vouchers or legal documents as required by the Regulations. Foreign investment enterprises are permitted to remit foreign exchange from their foreign exchange bank account in China upon the proper production of, inter alia, the board resolutions declaring the distribution of the dividend and payment of profits. Conversion of Rmb into foreign currencies and remittance of foreign currencies for capital account items, including direct investment, loans, security investment, is still subject to the approval of the State Administration of Foreign Exchange, or SAFE, in each such transaction. On January 14, 1997, the State Council amended the Foreign Exchange Control Regulations and added, among other things, an important provision, as Article 5 provides that the State shall not impose restrictions on recurring international payments and transfers.

Under the Regulations, foreign investment enterprises are required to open and maintain separate foreign exchange accounts for capital account items (but not for other items). In addition, foreign investment enterprises may only buy, sell and/or remit foreign currencies at those banks authorized to conduct foreign exchange business upon the production of valid commercial documents and, in the case of capital account item transactions, document approval from SAFE.

Currently, foreign investment enterprises are required to apply to SAFE for "foreign exchange registration certificates for foreign investment enterprises." With such foreign exchange registration certificates (which are granted to foreign investment enterprises, upon fulfilling specified conditions and which are subject to review and renewal by SAFE on an annual basis) or with the foreign exchange sales notices from the SAFE (which are obtained on a transaction-by-transaction basis), foreign-invested enterprises may enter into foreign exchange transactions at banks authorized to conduct foreign exchange business to obtain foreign exchange for their needs.

**E. Taxation.**

**United States Federal Income Taxation**

The following is a summary of the material U.S. federal income tax consequences of the acquisition, ownership, and disposition of our ordinary shares. The discussion below of the U.S. federal income tax consequences to "U.S. Holders" will apply if you are a beneficial owner of ordinary shares and you are for U.S. federal income tax purposes:

- an individual citizen or resident of the United States;

- a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income tax regardless of its source; or

- a trust if (i) a U.S. court can exercise primary supervision over the trust's administration and one or more U.S. persons are authorized to control all substantial decisions of the trust, or (ii) it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If you are not described as a U.S. Holder and are not an entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes, you will be considered a "Non-U.S. Holder." The U.S. federal income tax consequences applicable to Non-U.S. Holders is described below under the heading "Non-U.S. Holders."

This summary is based on the Internal Revenue Code of 1986, as amended, its legislative history, existing and proposed Treasury regulations promulgated thereunder, published rulings and court decisions, all as currently in effect. These authorities are subject to change, possibly on a retroactive basis.

This summary does not purport to be a comprehensive description of all of the tax considerations that may be relevant to each person's decision to purchase ordinary shares. This discussion does not address all aspects of U.S. federal income taxation that may be relevant to any particular holder based on such holder's individual circumstances. In particular, this discussion considers only holders that will own ordinary shares as capital assets and does not address the potential application of the alternative minimum tax or the U.S. federal income tax consequences to holders that are subject to special rules, including:

- financial institutions or "financial services entities";

- broker-dealers;

- taxpayers who have elected mark-to-market accounting;

- tax-exempt entities;

- insurance companies;

- persons that actually or constructively own 10% or more of our voting shares;

- certain expatriates or former long-term residents of the United States;

- persons that hold our ordinary shares as part of a straddle, constructive sale, hedging, conversion or other integrated transaction; or

- persons whose functional currency is not the U.S. dollar

This discussion does not address any aspect of U.S. federal gift or estate tax, or state, local or non-U.S. tax laws. Additionally, the discussion does not consider the tax treatment of partnerships or other pass-through entities or persons who hold our ordinary shares through such entities. If a partnership (or other entity classified as a partnership for U.S. federal income tax purposes) is the beneficial owner of our ordinary shares, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.

We have not sought a ruling from the Internal Revenue Service ("IRS") or an opinion of counsel as to any U.S. federal income tax consequence described herein. The IRS may disagree with the description herein, and its determination may be upheld by a court.

BECAUSE OF THE COMPLEXITY OF THE TAX LAWS AND BECAUSE THE TAX CONSEQUENCES TO ANY PARTICULAR INVESTOR MAY BE AFFECTED BY MATTERS NOT DISCUSSED HEREIN, EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT WITH ITS TAX ADVISOR WITH RESPECT TO THE SPECIFIC TAX CONSEQUENCES OF THE ACQUISITION, OWNERSHIP AND DISPOSITION OF ORDINARY SHARES, INCLUDING THE APPLICABILITY AND EFFECT OF STATE, LOCAL AND NON-U.S. TAX LAWS, AS WELL AS U.S. FEDERAL TAX LAWS.

**U.S. Holders**

*Taxation of Distributions Paid on Ordinary Shares*

Subject to the passive foreign investment company ("PFIC") rules discussed below, a U.S. Holder will be required to include in gross income as ordinary income the amount of any distribution paid on our ordinary shares, to the extent the distribution is paid out of our current or accumulated earnings and profits (as determined for U.S. federal income tax purposes). Such dividend generally will constitute foreign source passive income for foreign tax credit purposes. Such dividend also will not be eligible for the dividends-received deduction generally allowed to U.S. corporations in respect of dividends received from other U.S. corporations. Distributions in excess of such earnings and profits will be applied against and reduce the U.S. Holder's basis in its ordinary shares and, to the extent in excess of such basis, will be treated as gain from the sale or exchange of such ordinary shares. We do not expect, however, to maintain calculations of earnings and profits in accordance with U.S. federal income tax principles. As a result, the entire amount of any distribution paid by us to a U.S. Holder generally will be treated as a dividend.

With respect to noncorporate U.S. Holders for taxable years beginning before January 1, 2011, dividends (to the extent paid out of our earnings and profits) may be taxed at the lower applicable long-term capital gains rate (see "Taxation of Disposition of Ordinary Shares" below) provided that (1) the ordinary shares are readily tradable on an established securities market in the United States, (2) we are not a PFIC, as discussed below, for either the taxable year in which the dividend was paid or the preceding taxable year, and (3) certain holding period requirements are met. Under recently published IRS authority, ordinary shares are considered for purposes of clause (1) above to be readily tradable on an established securities market in the United States if they are listed on, among others, the NASDAQ Global Market. While we expect that our shares will be listed on the NASDAQ Global Market, U.S. Holders should consult their own tax advisors regarding the availability of the lower rate for any dividends paid with respect to our ordinary shares.

Distributions of current or accumulated earnings and profits paid in foreign currency to a U.S. Holder generally will be includible in the income of a U.S. Holder in a U.S. dollar amount calculated by reference to the exchange rate on the date the distribution is included in income. A U.S. Holder that receives a foreign currency distribution and converts the foreign currency into U.S. dollars on such date generally will not recognize foreign currency exchange gain or loss. If the U.S. Holder converts the foreign currency to U.S. dollars on a date subsequent to such date, such U.S. Holder may have foreign currency exchange gain or loss based on any appreciation or depreciation in the value of the foreign currency against the U.S. dollar from the date of inclusion to the date of conversion, which will generally be U.S. source ordinary income or loss.

*Taxation upon Disposition of Ordinary Shares*

Upon a sale or other taxable disposition of our ordinary shares, and subject to the PFIC rules discussed below, a U.S. Holder generally will recognize capital gain or loss in an amount equal to the difference between the amount realized and the U.S. Holder's adjusted tax basis in the shares.

Under current law, capital gains realized by U.S. Holders generally are subject to U.S. federal income tax at the same rate as ordinary income, except that long-term capital gains realized by non-corporate U.S. Holders are subject to U.S. federal income tax at a maximum rate of 15% for taxable years beginning before January 1, 2011 (and 20% thereafter). Capital gain or loss will constitute long-term capital gain or loss if the U.S. Holder's holding period for the shares exceeds one year. The deductibility of capital losses is subject to limitations. Capital gain or loss realized by a U.S. Holder upon a disposition of shares generally will constitute income or loss from sources within the United States for foreign tax credit limitation purposes.

*Passive Foreign Investment Company Rules*

A foreign company is a passive foreign investment company, or PFIC, if at least 75% of its gross income in a taxable year, including its pro rata share of the gross income of any company in which it is considered to own at least 25% of the shares by value, is passive income. Alternatively, a foreign company will be a PFIC if at least 50% of its assets in a taxable year, ordinarily determined based on fair market value and averaged quarterly over the year, including its pro rata share of the assets of any company in which it is considered to own at least 25% of the shares by value, are held for the production of, or produce, passive income. Passive income generally includes dividends, interest, rents, royalties, and gains from the disposition of passive assets.

We do not expect to be treated as a PFIC for U.S. federal income tax purposes, but this conclusion is a factual determination that is made annually and thus may be subject to change. Our actual PFIC status for any taxable year will not be determinable until after the end of the taxable year, and accordingly there can be no assurance that we will not be considered a PFIC for our current or any future taxable year.

If we are a PFIC for any taxable year during which a U.S. Holder held our ordinary shares, the U.S. Holder that did not make a timely qualified electing fund ("QEF") election or a mark-to-market election, as described below, such holder will be subject to special rules with respect to:

- any gain recognized by the U.S. Holder you realize on the sale or other disposition of its ordinary shares, and

- any excess distribution made to the U.S. Holder (generally, any distributions to such holder during a taxable year that are greater than 125% of the average annual distributions received by such holder in respect of the ordinary shares during the three preceding taxable years or, if shorter, such holder's holding period for the ordinary shares).

Under these rules,

- the U.S. Holder's gain or excess distribution will be allocated ratably over its holding period for the ordinary shares,

- the amount allocated to the taxable year in which the U.S. Holder recognized the gain or excess distribution will be taxed as ordinary income,

- the amount allocated to each prior year, with certain exceptions, will be taxed at the highest tax rate in effect for that year, and

- the interest charge generally applicable to underpayments of tax will be imposed in respect of the tax attributable to each such year.

In general, a U.S. Holder may avoid the PFIC tax consequences described above in respect to our ordinary shares by making a QEF election to include in income its pro rata share of our net capital gain (as long-term capital gain) and other earnings and profits (as ordinary income), on a current basis, in each case whether or not distributed. However, a U.S. Holder may make a QEF election only if we agree to provide certain tax information to such holder annually. At this time, we do not intend to provide U.S. Holders with such information as may be required to make a QEF election effective.

Alternatively, if a U.S. Holder owns ordinary shares in a PFIC that are treated as marketable stock, the U.S. Holder may make a mark-to-market election. If a U.S. Holder makes a mark-to-market election, such holder generally will not be subject to the PFIC rules described above. Instead, in general, such holder will include as ordinary income each year the excess, if any, of the fair market value of its ordinary shares at the end of its taxable year over the adjusted basis in its ordinary shares. The U.S. Holder also will be allowed to take an ordinary loss in respect of the excess, if any, of the adjusted basis of its ordinary shares over the fair market value of such shares at the end of its taxable year (but only to the extent of the net amount of previously included income as a result of the mark-to-market election). The U.S. Holder's basis in its ordinary shares will be adjusted to reflect any such income or loss amounts, and any further gain recognized on a sale or other taxable disposition of the ordinary shares will be treated as ordinary income.

The mark-to-market election is available only for stock that is regularly traded on a national securities exchange that is registered with the Securities and Exchange Commission or on NASDAQ, or on a foreign exchange or market that the IRS determines has rules sufficient to ensure that the market price represents a legitimate and sound fair market value. While we expect that our ordinary shares will be listed on the NASDAQ Global Market, U.S. Holders nonetheless should consult their own tax advisors regarding the availability and tax consequences of a mark-to-market election in respect to our shares under their particular circumstances.

If a U.S. Holder owns (or is deemed to own) shares during any year in a PFIC, such holder may have to file an IRS Form 8621.

The rules dealing with PFICs and with the QEF and mark-to-market elections are very complex and are affected by various factors in addition to those described above. Accordingly, U.S. Holders should consult their own tax advisors concerning the application of the PFIC rules to our ordinary shares under their particular circumstances.

**Non-U.S. Holders**

Dividends paid to a Non-U.S. Holder in respect to its ordinary shares generally will not be subject to U.S. federal income tax, unless the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if an income tax treaty applies, are attributable to a permanent establishment or fixed base that such holder maintains in the United States).

In addition, a Non-U.S. Holder generally will not be subject to U.S. federal income tax on any gain attributable to a sale or other disposition of our ordinary shares unless such gain is effectively connected with its conduct of a trade or business in the United States (and, if an income tax treaty applies, is attributable to a permanent establishment or fixed base that such holder maintains in the United States) or the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of sale or other disposition and certain other conditions are met (in which case such gain may be subject to tax at a 30% rate or a lower applicable tax treaty rate).

Dividends and gains that are effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States (and, if applicable, attributable to a permanent establishment or fixed base in the United States) generally will be subject to tax in the same manner as for a U.S. Holder. Effectively connected dividends and gains received by a corporate Non-U.S. Holder may also be subject to an additional branch profits tax at a 30% rate or a lower applicable tax treaty rate.

**Backup Withholding and Information Reporting**

In general, information reporting for United States federal income tax purposes will apply to distributions made on the shares within the United States to a non-corporate U.S. Holder and to the proceeds from sales or other dispositions of our ordinary shares to or through a U.S. office of a broker by a non-corporate U.S. Holder. Payments made (and sales and other dispositions effected at an office) outside the United States will be subject to information reporting in limited circumstances.

In addition, backup withholding of U.S. federal income tax, currently at a rate of 28%, generally will apply to such distributions made on our ordinary shares to a non-corporate U.S. Holder and the proceeds from such sales and other dispositions of shares by a non-corporate U.S. Holder who:

- fails to provide an accurate taxpayer identification number,

- is notified by the IRS that backup withholding will be required, or

- in certain circumstances, fails to comply with applicable certification requirements.

A Non-U.S. Holder generally may eliminate the requirement for information reporting and backup withholding by providing certification of its foreign status to the payor, under penalties of perjury, on a duly executed applicable IRS Form W-8 or by otherwise establishing an exemption.

Back-up withholding is not an additional tax. Rather, the amount of any back-up withholding will be allowed as a credit against a U.S. Holder's or a Non-U.S. Holder's U.S. federal income tax liability and may entitle such holder to a refund, provided that certain required information is timely furnished to the IRS.

**Other Non-United States Taxation Treatment**

The following discussion is a summary of certain anticipated Cayman Islands and PRC tax consequences of an investment in our ordinary shares. The discussion does not deal with all possible tax consequences relating to an investment in our ordinary shares and does not purport to deal with the tax consequences applicable to all categories of investors, some of which (such as dealers in securities, insurance companies and tax-exempt entities) may be subject to special rules. In particular, the discussion does not address the tax consequences under state, local and other national tax laws. Accordingly, each prospective investor should consult its own tax advisor regarding the particular tax consequences to it of an investment in the our ordinary shares. The following discussion is based upon laws and relevant interpretations there of in effect as of the date of this Annual Report, all of which are subject to change.

**China Taxation**

There are no material China tax consequences to holders of ordinary shares solely as a result of the purchase, ownership and disposition of such ordinary shares. There is an income tax treaty in effect between the United States and China.

**Cayman Island Taxation**

The Cayman Islands currently has no exchange control restrictions and no income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax applicable to the Company or any holder of our ordinary shares. Accordingly, payment of dividends on, and any transfer of, the shares will not be subject to taxation in the Cayman Islands, no Cayman Islands withholding tax will be required on such payments to any holder of a share and gains derived from the sale of shares will not be subject to Cayman Islands income or corporation tax. The Cayman Islands is not party to any double taxation treaties.

*F. Dividends and paying agents.*

Not Applicable

*G. Statement by experts.*

Not Applicable

*H. Documents on display*

We are subject to the periodic reporting and other informational requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the Securities and Exchange Commission. Specially, we are required to file annually a Form 20-F no later than six month after the close of each fiscal year, which is December 31. Copies of reports and other information, when so filed, may be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the Securities and Exchange Commission at Judiciary Plaza, 100 F. Street, N.E., Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the Commission at 1-800-SEC-0330. The SEC also maintains a Web site at www.sec.gov that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system.

As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting requirements pursuant to Section 16 of the Exchange Act.

Documents concerning the Company that are referred to in this document may also be inspected at our office, which is at No. 387 Dongming Road, Weifang Shandong, People's Republic of China, 261061.

*Subsidiary Information.*

Not applicable.

**Item 11. Quantitative and Qualitative Disclosures About Market Risk.**

### Foreign exchange risk

We are exposed to the risk of foreign currency exchange rate fluctuation. We have never used derivative instruments to hedge our exchange rate risks, do not plan to do so, and may not be successful should we attempt to do so in the future. Nevertheless, we believe such risk is low as no foreign currency liabilities are incurred and the principal operations are limited mainly to the China market.

Renminbi is our operating subsidiary, Shandong Fuwei's functional currency while our functional currency is Hong Kong Dollars. Transactions in other currencies are recorded in Renminbi at the rates of exchange prevailing when the transactions occur. Monetary assets and liabilities denominated in other currencies are converted into Renminbi at rates of exchange in effect at the balance sheet dates. Exchange gains and losses are recorded in our statements of operations as a component of current period earnings.

The China State Administration for Foreign Exchange, under the authority of the People's Bank of China, controls the conversion of Renminbi into foreign currencies. The principal regulation governing foreign currency exchange in China is the Foreign Currency Administration Rules (1996), as amended. Under the Rules, once various procedural requirements are met, Renminbi is convertible for current account transactions, including trade and services, but not for capital account transactions, including direct investment, loan or investment in securities outside China, unless the prior approval of the State Administration of Foreign Exchange of China is obtained. Although the Chinese government regulations now allow greater convertibility of Renminbi for current account transactions, significant restrictions still remain. Currently, we are not involved in foreign exchange transactions as all transactions are conducted in China are in Renminbi and all exporting business is completed in U.S. dollars.

The value of the Renminbi is subject to changes in China's central government policies and to international economic and political developments affecting supply and demand in the China Foreign Exchange Trading System market. Since 1994, the conversion of Renminbi into foreign currencies, including U.S. dollars, has been based on rates set by the People's Bank of China, which are set daily based on the previous day's interbank foreign exchange market rates and current exchange rates on the world financial markets. Since 1994, the official exchange rate generally has been stable. The official exchange rate for the conversion of Renminbi into U.S. dollars remained stable until Renminbi was revalued in July 2005 and allowed to fluctuate by reference to a basket of foreign currencies, including the U.S. dollar. Under the new policy, Renminbi is permitted to fluctuate within a band against a basket of foreign currencies.

We conduct substantially all of our operations through Shandong Fuwei, and its financial performance and position are measured in terms of Renminbi. Any appreciation of the Rmb against the United States dollar would consequently have an adverse effect on our financial performance and asset values when measured in terms of United States dollar. Our solutions are primarily procured, sold and delivered in China for Renminbi. The majority of our revenues are denominated in Renminbi. Should the Renminbi appreciate against United States dollar, such appreciation could have a material adverse effect on our profits and the foreign currency equivalent of such profits repatriated by the Chinese entities to us.

### Interest rate risk

We are exposed to interest rate risk arising from having short-term variable rate borrowings from time to time. Our future interest expense would fluctuate in line with any change in our borrowing rates. We do not have any derivative financial instruments and believe our exposure to interest rate risk and other relevant market risks is not material.

### Inflation

In recent years, China has not experienced significant inflation, and thus inflation has not had a material impact on our results of operations in recent years. According to the National Bureau of Statistics of China, the change in Consumer Price Index in China was 1.8% and 1.5% and 4.8% in 2005, 2006 and 2007 respectively.

### Credit and liquidity risks

We adopt a risk assessment model to our customer credit management system, and we offer different credit terms to our customers based on criteria such as working relationship, payment history, creditworthiness and their financial position. All credit terms are to be approved by our finance department, in consultation with our sales and marketing department. For extension of larger credit limits, approvals have to be sought from our credit committee which is made up of members from our finance department, sales department and the General Manager. Our finance department and sales and marketing department review our outstanding debtor balances on a monthly basis and follow up with customers when payments are due. We believe that there would not material impact risk to the Company's operation in our credit and liquidity risk from sales and customers and other relevant market risks.

**Item 12. Description of Securities Other than Equity Securities**

Not Applicable.

PART II

### Item 13. Default, Dividend Arrearages and Delinquencies

None.

### Item 14. Material Modifications to the Rights of Security Holders and Use of Proceeds

We completed our initial public offering of 4,312,500 ordinary shares on December 22, 2006. The shares sold in the initial public offering were registered on a Registration Statement on Form F-1 (file number: 333-138948) declared effective on December 18, 2006. Maxim Group LLC was the sole book running manager for the offering of our ordinary shares. After the payment of underwriting fees, proceeds from the initial public offering were $33,207,975, of which $3,269,846 were used to pay legal, accounting and professional fees and other related printing and filing fees.

The use of the net proceeds during the year ended of December 31, 2007 and estimated remaining net proceeds as of December 31, 2007 from the offering are as follows:

|  | Approximate Allocation of Net Proceeds | Approximate Percentage of Net Proceeds |
|---|---|---|
| **Net proceeds from IPO** | $    29,938,129 | **100.00%** |
| Investment in new production line equipment | 15,502,482 | 51.78 |
| Buildings and property for new production line | 8,997,711 | 30.05 |
| Sales and marketing | 300,000 | 1.00 |
| General corporate purpose, including working capital | 4,500,000 | 15.03 |
| **Net proceeds remaining** | $    637,935 | **2.13%** |

None of the proceeds were paid, directly or indirectly, to our directors, officers or their associates or to any person owning ten percent or more of our ordinary shares or to our affiliates.

### Item 15. Controls and Procedures

Under the supervision and with the participation of our management, including the principal executive officer and the principal accounting officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as of the end of the period covered by this report (the "Evaluation Date"). Based on this evaluation, our principal executive officer and principal accounting officer concluded as of the Evaluation Date that our disclosure controls and procedures were effective such that the material information required to be included in our Securities and Exchange Commission ("SEC") reports is accumulated and communicated to management (including such officers) as appropriate to allow timely decisions regarding required disclosure and recorded, processed, summarized and reported within the time periods specified in SEC rules and forms relating to the Company, including our consolidated subsidiaries. Additionally, there were no changes in our internal control over financial reporting that during the period covered by this Annual Report on Form 20-F has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

71

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting. Based on our evaluation, our principal executive officer and principal financial officer have concluded that during the period covered by this report, our internal controls over financial reporting were effective.

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can only provide reasonable assurances with respect to financial statement preparation and presentation. In addition, any evaluation of effectiveness for future periods is subject to the risk that controls may become inadequate because of changes in conditions in the future.

### Item 16A. Audit Committee Financial Expert

The Board has nominated Tee Chuang Khoo, Changrong Ji, and Yudong Huang as members of the Audit Committee, and Tee Chuang Khoo as the financial expert as defined under the applicable rules of the SEC issued pursuant to Section 407 of the Sarbanes-Oxley Act of 2002.

### Item 16B. Code of Ethics

The Code of Ethics for the members of the Company's Board of Directors and Officers was approved by the Board of Directors on March 27, 2007 and is filed as Exhibit 14.1 hereto.

### Item 16C. Principal Accountant Fees and Services

#### Audit Fees

The audit fees paid to KPMG in 2007, our prior independent registered public accounting firm, in connection with our 2006 annual audit is HK$ 2 million. The audit fees paid to MHM, our prior independent registered public accounting firm, in connection with quarterly review in 2007 was USD$30,000. The audit fees of Kabani, our independent registered public accounting firm, in connection with 2007 Q3 review and our audit of annual financial statements for the fiscal years ended December 31, 2007, amounted to USD$ 27,500 and USD$ 115,000 respectively.

#### Audit-Related Fees

The audit-related fee of MHM, amounted to USD$ 7,683.75 for the fiscal year ended December 31, 2007. The audit-related fee of Kabani amounted to USD$ 847.84 for the fiscal year ended December 31, 2007.

#### All Other Fees

Not Applicable

#### Policy on Pre-Approval of Audit and Permissible Non-Audit Services of Independent Auditors

The policy of our directors who perform the functions customarily performed by an audit committee is to pre-approve all audit and permissible non-audit services provided by the independent auditors. These services may include audit services and other services.

#### Audit of Financial Statements

KPMG was our principal independent registered public accounting firm for annual audit financial statements of the years ended December 31, 2006 and 2005. MHM was our independent auditor from April 1, 2007 till November 1, 2007, responsible for quarterly review of 2007 Q1 and Q2. Kabani is our independent auditor since Oct 22, 2007, responsible for Q3 review and annual audit financial statements of the fiscal year of 2007.

### Item 16D. Exemptions from the Listing Standards for Audit Committee

Not applicable.

**Item 16E. Purchase of Equity Securities by the Issuer and Affiliated Purchasers**

None.

**Item 17. Financial Statements**

The Company has elected to provide Financial Statements pursuant to Item 18 (see below).

**Item 18. Financial Statements**

The following documents are filed as Attachment A hereto and are included as part of this Annual report on Form 20-F.

**Audited Consolidated Financial Statements of Fuwei Films (Holdings) Co., Ltd and Subsidiaries**

Report of Independent Registered Public Accounting Firm.

Consolidated Statements of Income and Comprehensive Income for the year ended December 31, 2005, 2006 and 2007.

Consolidated Balance Sheets as of December 31, 2006 and 2007

Consolidated Statements of Cash Flows for the year ended December 31, 2005, 2006 and 2007

Consolidated Statements of Shareholders' Equity for the year ended December 31, 2005, 2006 and 2007

Notes to Consolidated Financial Statements.

**Item 19. Exhibits.**

The following exhibits are filed as part of this Annual Report:

| No. | Description |
| --- | --- |
| 1.1 | Form of Underwriting Agreement. * |
| 3.1 | Form of Amended Memorandum of Association of Fuwei Films (Holdings) Co., Ltd. ** |
| 3.2 | Articles of Association Fuwei Films (Holdings) Co., Ltd. *** |
| 10.1 | Loan Agreement between Communication Bank of China of Fuwei Films (Shandong) Co., Ltd. dated January 15, 2007*** |
| 10.2 | Loan Agreement between Communication Bank of China of Fuwei Films (Shandong) Co., Ltd. dated January 15, 2007*** |
| 10.3 | Asset Purchase Agreement between Fuwei Plastics and Shandong Weifang Auction Firm dated October 9, 2003 ** |
| 10.4 | Purchase Agreement between Beijing Baorui and Weifang Jing Cheng Auction Co., Ltd. dated December 17, 2004 ** |
| 10.5 | Service Agreement between Fuwei Films (Holdings) Co., Ltd. and Xiaoan He** |
| 10.6 | Employment Agreement between Fuwei Films (Holdings) Co., Ltd. and Xiaoan He ** |
| 10.7 | Employment Agreement between Fuwei Films (Holdings) Co., Ltd. and Xiaoming Wang ** |
| 10.8 | Employment Agreement between Fuwei Films (Holdings) Co., Ltd. and Xiuyong Zhang ** |

| 10.9 | Equipment Contract between Fuwei Films (Holdings) Co., Ltd. and Brükner dated as of June 2005 ** |
|---|---|
| 10.10 | Credit Letter from Communication Bank of China dated May 8, 2006 ** |
| 14.1 | Code of Ethics for CEO and Senior Financial Officers. *** |
| 21.1 | List of the company's significant subsidiaries, their jurisdiction of incorporation and the names under which they operate business, if different from their name. *** |
| 31.1 | Certification of Chief Executive Officer required by Section 302 of the Sarbanes-Oxley Act of 2002. **** |
| 31.2 | Certification of Chief Financial Officer required by Section 302 of the Sarbanes-Oxley Act of 2002. **** |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer required by Section 906 of the Sarbanes-Oxley Act of 2002. **** |

* Filed with the Company's amendment to Registration Statement on Form F-1/A filed with the SEC on December 12, 2006.

** Filed with the Company's Registration Statement on Form F-1 filed with the SEC on November 24, 2006.

*** Filed with the Company's Annual Report on Form 20-F for the year ended December 31, 2006 filed with the SEC on April 2, 2007.

**** Filed herewith.

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing Form 20-F and has duly caused and authorized the undersigned to sign this Annual Report on its behalf.

**Fuwei Films (Holdings) Co., Ltd**

By:    /s/ Xiaoan He
_____

Name: Xiaoan He

Title: Chairman, Chief Executive Officer


By:    /s/ Xiuyong Zhang
_____

Name: Xiuyong Zhang

Title: Chief Financial Officer

Dated: April 14, 2008

75

### INDEX TO FINANCIAL STATEMENTS

| Audited Consolidated Financial Statements of Fuwei Films (Holdings) Co., Ltd. and subsidiaries | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm — Kabani & Company, Inc. | F-2 |
| Report of Independent Registered Public Accounting Firm — KPMG | F-3 |
| Consolidated Balance Sheets as of December 31, 2006 and 2007 | F-4 |
| Consolidated Statements of Income and Comprehensive Income for the years ended December 31, 2005, 2006 and 2007 | F-5 |
| Consolidated Statements of Shareholders' Equity for the years ended December 31, 2005, 2006 and 2007 | F-6 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2005, 2006 and 2007 | F-7 - F-8 |
| Notes to the Consolidated Financial Statements for the years ended December 31, 2005, 2006 and 2007 | F-9 - F-38 |

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders of
Fuwei Films (Holdings) Co., Ltd. and Subsidiaries

We have audited the accompanying consolidated balance sheet of Fuwei Films (Holdings) Co., Ltd. and Subsidiaries as of December 31, 2007, and the related consolidated statement of income and comprehensive income, stockholders' equity, and cash flow for the year ended December 31, 2007. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Fuwei Films (Holdings) Co., Ltd. and Subsidiaries as of December 31, 2007, and the consolidated income statement and their consolidated cash flow for the year ended December 31, 2007, in conformity with U.S. generally accepted accounting principles.

Kabani & Company, Inc.

March 20, 2008

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Shareholders of
Fuwei Films (Holdings) Co., Ltd:

We have audited the accompanying consolidated balance sheet of Fuwei Films (Holdings) Co., Ltd (the "Company") and its subsidiaries (collectively, the "Group") as of December 31, 2006, and the related consolidated statements of income and comprehensive income, shareholders' equity and cash flows for the years ended December 31, 2006 and 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Fuwei Films (Holdings) Co., Ltd and its subsidiaries as of December 31, 2006, and the results of their operations and their cash flows for the years ended December 31, 2006 and 2005, in conformity with U.S. generally accepted accounting principles.

/s/ KPMG
Hong Kong, China


April 2, 2007

F-3

**FUWEI FILMS (HOLDINGS) CO., LTD and SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
As of December 31, 2006 and 2007
(amounts in thousands, except share and per share data)

| | Note | 2006 | 2007 | |
| --- | --- | --- | --- | --- |
| | | RMB | RMB | US$ |
| **Assets** | | | | |
| *Current assets* | | | | |
| Cash | | 249,939 | 30,909 | 4,237 |
| Restricted cash | | 3,311 | 64,909 | 8,898 |
| Accounts receivable, net | 5 | 75,530 | 58,195 | 7,978 |
| Inventories | 6 | 23,783 | 41,670 | 5,712 |
| Prepayments and other receivables | 7 | 19,438 | 16,160 | 2,215 |
| Total current assets | | 372,001 | 211,842 | 29,041 |
| | | | | |
| Property, plant and equipment, net | 8 | 317,690 | 493,562 | 67,661 |
| Lease prepayments | 9 | 23,059 | 22,290 | 3,056 |
| Deposits for purchase of property, plant and equipment | | 13,900 | - | - |
| Intangible asset, net | 10 | 109 | 36 | 5 |
| Goodwill | 11 | 10,276 | 10,276 | 1,409 |
| Deferred income tax assets | 19 | 1,047 | 969 | 133 |
| | | | | |
| Total assets | | 738,082 | 738,975 | 101,304 |
| | | | | |
| **Liabilities** | | | | |
| *Current liabilities* | | | | |
| Short-term bank loans | 12 | 239,678 | 188,027 | 25,776 |
| Accounts payable | | 12,809 | 19,609 | 2,688 |
| Accrued expenses and other payables | 13 | 19,497 | 18,544 | 2,542 |
| Deferred income tax liabilities | 19 | 191 | 265 | 36 |
| | | | | |
| Total liabilities | | 272,175 | 226,445 | 31,043 |
| | | | | |
| **Shareholders' equity** | 14 | | | |
| | | | | |
| Ordinary shares of US$0.129752 par value; 20,000,000 shares authorized; and 13,062,500 issued and outstanding as of December 31, 2006 and 2007, respectively | | 13,323 | 13,323 | 1,826 |
| Additional paid-in capital | | 311,907 | 311,907 | 42,759 |
| Accumulated other comprehensive income | | 1,785 | 1,148 | 157 |
| Retained earnings | | 138,892 | 186,152 | 25,519 |
| | | | | |
| Total shareholders' equity | | 465,907 | 512,530 | 70,262 |
| Total liabilities and shareholders' equity | | 738,082 | 739,975 | 101,304 |

See accompanying notes to the consolidated financial statements.

### FUWEI FILMS (HOLDINGS) CO., LTD and SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME
For the years ended December 31, 2005, 2006 and 2007
(amounts in thousands, except share and per share data)

| | Note | 2005 | 2006 | 2007 | |
|---|---|---|---|---|---|
| | | RMB | RMB | RMB | US$ |
| Revenues, net | 15 | 346,205 | 436,884 | 449,373 | 59,083 |
| Cost of goods sold | 16,17 | (259,090) | (334,341) | (349,531) | (45,956) |
| Gross profit | | 87,115 | 102,543 | 99,842 | 13,127 |
| Operating expenses | | | | | |
| - Distribution expenses | 16,17 | (10,517) | (16,483) | (15,061) | (1,980) |
| - Administrative expenses | 16 | (10,599) | (8,043) | (20,515) | (2,698) |
| Total operating expenses | | (21,116) | (24,526) | (35,576) | (4,678) |
| Operating income | | 65,999 | 78,017 | 64,266 | 8,450 |
| Other income/(expense) | | | | | |
| - Interest income | | 863 | 43 | 589 | 77 |
| - Interest expense | 18 | (13,747) | (12,884) | (13,233) | (1,739) |
| - Sales of scrap materials | | 3,596 | 3,639 | | |
| - Others, net | | 358 | (393) | 319 | 42 |
| Total other income/(expense) | | (8,930) | (9,595) | (12,325) | (1,620) |
| Income before income tax benefit/(expense) | | 57,069 | 68,422 | 51,941 | 6,829 |
| Income tax benefit/(expense) | 19 | 59 | (757) | (4,681) | (615) |
| Net income | | 57,128 | 67,665 | 47,260 | 6,214 |
| Other comprehensive income | | | | | |
| - Foreign currency translation adjustments | | 1,732 | 53 | (637) | - |
| Comprehensive income | | 58,860 | 67,718 | 46,623 | 6,214 |
| Earnings per share | 25 | | | | |
| - Basic | | 74,096 | 61.46 | 3.62 | 0.48 |
| - Diluted | | 74,096 | 61.37 | 3.62 | 0.48 |
| Weighted average number of ordinary shares | 25 | | | | |
| - Basic | | 771 | 1,101,031 | 13,062,500 | 13,062,500 |
| - Diluted | | 771 | 1,102,488 | 13,062,500 | 13,062,500 |

See accompanying notes to the consolidated financial statements.

## FUWEI FILMS (HOLDINGS) CO., LTD and SUBSIDIARIES

### CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
For the years ended December 31, 2005, 2006 and 2007
(amounts in thousands, except share data)

| | Note | Ordinary shares Number of shares | Amount RMB | Additional paid-in capital RMB | Accumulated other comprehensive income RMB | Retained earnings RMB | Total shareholders' equity RMB |
|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2005 | | 771 | 1 | - | - | 14,099 | 14,100 |
| Foreign currency translation adjustment | | - | - | - | 1,732 | - | 1,732 |
| Net income | | - | - | - | - | 57,128 | 57,128 |
| Balance as of December 31, 2005 | | 771 | 1 | - | 1,732 | 71,227 | 72,960 |
| Conversion of shareholders' loans | 14(a) | 8,749,229 | 8,936 | 80,426 | - | - | 89,362 |
| Issue of ordinary shares, net of expenses | 1 | 4,312,500 | 4,386 | 225,838 | - | - | 230,224 |
| Share-based payment transactions | 3(p) | - | - | 5,643 | - | - | 5,643 |
| Foreign currency translation adjustment | | - | - | - | 53 | - | 53 |
| Net income | | - | - | - | - | 67,665 | 67,665 |
| Balance as of December 31, 2006 | | 13,062,500 | 13,323 | 311,907 | 1,785 | 138,892 | 465,907 |
| Net income | | - | - | - | - | 47,260 | 47,260 |
| Foreign currency translation adjustment | | - | - | - | (637) | - | (637) |
| Balance as of December 31, 2007 | | 13,062,500 | 13,323 | 311,907 | 1,148 | 186,152 | 512,530 |
| Balance as of December 31, 2007 US$ | | 13,062,500 | 1,826 | 42,759 | 157 | 25,519 | 70,262 |

See accompanying notes to the consolidated financial statements.

**FUWEI FILMS (HOLDINGS) CO., LTD and SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
For the years ended December 31, 2005, 2006 and 2007
(amounts in thousands)

|  | 2005 | 2006 | 2007 | 2007 |
|---|---|---|---|---|
|  | RMB | RMB | RMB | US$ |
| *Cash flow from operating activities* |  |  |  |  |
| Net income | 57,128 | 67,665 | 47,260 | 6,214 |
| Adjustments to reconcile net income to net cash |  |  |  |  |
| (used in)/provided by operating activities |  |  |  |  |
| - Gain on disposal of property, plant and equipment | (32) | - | - | - |
| - Depreciation of property, plant and equipment | 23,337 | 23,425 | 23,217 | 3,053 |
| - Amortization of intangible assets | 73 | 72 | 73 | 10 |
| - Lease prepayments charged to expense | 392 | 724 | 741 | 97 |
| - Deferred income taxes | (59) | 757 | 152 | 20 |
| - Bad debt expense/(recovery) | 1,007 | (1,143) | 1,772 | 233 |
| - Foreign currency exchange loss | 1 | 53 | - | - |
| Changes in operating assets and liabilities- |  |  |  |  |
| - Accounts receivable | (21,676) | (28,258) | 17,335 | 2,279 |
| - Inventories | (6,855) | 1,104 | (19,659) | (2,585) |
| - Prepaid expenses and other current assets | 4,780 | (8,220) | 6,698 | 881 |
| - Accounts payable | (1,044) | 2,196 | 6,824 | 897 |
| - Accrued expenses and other payables | (13,880) | 117 | (1,557) | (205) |
| - Amounts due from related parties | 415 | - | - | - |
| Net cash provided by operating activities | 43,587 | 58,492 | 82,856 | 10,894 |
| *Cash flow from investing activities* |  |  |  |  |
| Purchases of property, plant and equipment | (22,411) | (37,526) | (590) | (78) |
| Restricted cash related to trade finance | - | (3,311) | (61,598) | (8,099) |
| Payment of land use rights | - | (2,649) |  |  |
| Deposits paid for purchase of property, plant and equipment | (13,900) | - | (184,600) | (24,271) |
| Proceeds from sale of property, plant and equipment | 111 | 7 | - | - |
| Collection of amounts due from related parties | 4,721 | - |  |  |
| Net cash used in investing activities | (31,479) | (43,479) | (246,787) | (32,447) |
| *Cash flow from financing activities* |  |  |  |  |
| Net proceeds from issuance of share capital | - | 235,867 | - | - |
| Principal payments of short-term bank loans | (252,600) | (18,368) | (51,650) | (6,791) |
| Proceeds from short-term bank loans | 300,056 | 10,000 |  |  |
| Repayments of loans payable to related parties | (29,989) | - |  |  |
| Payments of expenses relating to the proposed offering | (1,785) | - |  |  |
| Dividends paid | (26,265) | - |  |  |
| Net cash (used in)/provided by financing activities | (10,583) | 227,499 | (51,650) | (6,791) |