UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X  :
                                                           :   Case no. 07-CV-9416 (RJS)
                                                           :
IN RE FUWEI FILMS SECURITIES                               :
LITIGATION                                                 :
                                                           :   ECF Case
                                                           :
                                                           :
                                                           :
                                                           :
--------------------------------------------------------X  :


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS
THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen, Esq.  (LR 5733)
  Email: lrosen@rosenlegal.com
Phillip Kim, Esq. (PK 9384)
  Email: pkim@rosenlegal.com
Timothy W. Brown, Esq. (TB 1008)
  Email: tbrown@rosenlegal.com
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... iii

I.     STATEMENT OF FACTS ........................................................................................... 1

II.    LEGAL ARGUMENT…………………….................................................................. 10

    A.     Pleading Requirements Under §11 and §12 of Securities Act of 1933 ................. 10

        1.     The Elements of a §11 and §12 Claim ...................................................... 10

        2.     Rule 9(b) Does Not Apply Because the Complaint Does Not Sound
             in Fraud ...................................................................................................... 11

        3.     Even if Rule 9(b) Is Applicable, the Complaint Is Sufficiently
             Particularized .......................................................................................... 13

        4.     Even if Rule 9(b) Is Applicable to Fuwei, Rule 9(b) Is Satisfied
             Because the Knowledge of Defendants Yin, Wang and Zhou Is
             Imputed to Fuwei ...................................................................................... 15

    B.     Statements in the Registration Statement Were False and Misleading .................. 17

        1.     Summary of Misrepresentations and Omissions in the CAC ................... 17

        2.     Bespeaks Caution Doctrine Applies Only to Forward Looking
             Statements ................................................................................................. 18

        3.     The PSLRA Safe Harbor Doesn't Apply to Initial Public Offerings ......... 18

    C.     The Existence of a Present Challenge to the Acquisition of the Production
       Lines ...................................................................................................................... 19

    D.     Fuwei Was Required to Disclose the Investigation of Yin and Wang
       Whether or Not It Directly Concerned Fuwei ....................................................... 25

    E.     Defendants Caused PRC Counsel to Issue an Inaccurate Legal Opinion
       That the Transfers Were Legal .............................................................................. 26

    F.     Failing to Disclose Yin and Wang Controlled Neo-Luck Group Misled
       Investors ................................................................................................................ 32

    G.     Defendants Misrepresented the Absence of Any Pending or Threatened
       Litigation ............................................................................................................... 34

H.      Defendants' "Truth-on-the-Market" Defense Must Fail..........................................39

I.       Defendants' Affirmative Defense of Negative Causation Falls Short..................42

      (i)     Consideration of the Affirmative Defense of Negative Loss Causation Is Improper on a Motion to Dismiss ..........................................43

      (ii)    The Complaint Pleads Disclosure of Adverse News Followed by Price Declines Related to the Alleged Fraud ...............................................45

      (iii)   The Stock Price Rises Followed by Declines Upon Additional Disclosures of Adverse News Related to the Fraud Do Not Vitiate Loss Causation .............................................................................................47

J.       Plaintiffs Have Standing to Pursue a Claim Under §12(a)(2)...............................48

III.   CONCLUSION...........................................................................................................48

# **TABLE OF AUTHORITIES**

**Page(s)**

## **FEDERAL CASES**

*Acme Propane, Inc. v. Tenexco, Inc.,*
 844 F.2d 1317 (7th Cir.1988) .......................................................................40

*Adair v. Bristol Technology Systems, Inc.,*
 179 F.R.D. 126 (S.D.N.Y. 1998) .................................................................43

*Adair v. Kaye Kotts Associates, Inc.,*
 1998 WL 142353 (S.D.N.Y. March 27, 1998) ........................................44, 47

*In re Adams Golf, Inc. Sec. Litig.,*
 381 F.3d 267 (3rd Cir. 2004) ......................................................10, 40, 41, 43

*Akerman v. Oryx Comm'ns, Inc.,*
 810 F.2d 336 (2d Cir. 1987)..........................................................................43

*In re APAC Teleservice, Inc. Sec. Litig.,*
 1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999).................................................12

*ATSI Communications, Inc. v. Shaar Fund, Ltd.,*
 493 F.3d 87 (2nd Cir. 2007)...........................................................................43

*Avnet, Inc. v. Scope Industries,*
 499 F.Supp. 1121 (S.D.N.Y.  1980).........................................................29, 30

*Basic Inc. v. Levinson,*
 485 U.S. 224 (1988) .......................................................................................38

*Bell Atlantic Corp. v. Twombly,*
 127 S.Ct. 1955 (U.S. 2007) ...........................................................................11

*Bond Opportunity Fund II, LLC, v. Heffernan,*
 340 F.Supp.2d 146 (D.R.I. 2004)...................................................................26

*Calderon v. Tower Associates Intern., Inc.,*
 1989 WL 29916 (D. Or. Mar. 28, 1989).........................................................37

*Carlon v. Thaman,*
 130 F.3d 309 (8th Cir. 1997) .........................................................................10

*In re Chambers Dev. Sec. Litig.,*
 848 F.Supp. 602 (W.D. Pa. 1994) .................................................................27

*Dalicandro v. Legalgard, Inc.*,
   2004 WL 250546 (E.D. Pa. Jan. 21, 2004) ....................................................16

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) ......................................................................14

*Dura Pharmaceuticals., Inc. v. Broudo*,
   544 U.S. 336 (2005).......................................................................................45

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3rd Cir. 1985)..........................................................................27

*Escott v. BarChris Const. Corp.*,
   283 F.Supp. 643 (S.D.N.Y. 1968)..................................................................29

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
   375 F.3d 168 (2nd Cir. 2004) ........................................................................14

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
   469 F.Supp.2d 88 (S.D.N.Y. 2006)................................................................20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   411 F. Supp. 2d 377 (S.D.N.Y. 2006)......................................................43, 45

*Fortson v. Winstead, McGuire, Sechrest & Minick*,
   961 F.2d 469 (4th Cir. 1992) ........................................................................28

*Freedman v. Value Health, Inc.*,
   2002 WL 825982, 34 Fed.Appx. 408 (2d Cir. May 1, 2002) ..........................11

*G & M, Inc. v. Newbern*,
   488 F.2d 742 (9th Cir. 1973) ........................................................................28

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000)......................................................................38, 40

*Garber v. Legg Mason, Inc.*,
   537 F.Supp.2d 597 (S.D.N.Y. 2008) ....................................................11, 12, 41

*Greenapple v. Detroit Edison Co.*,
   468 F. Supp. 702 (S.D. N.Y. 1979), *aff'd*, - F. 2d -, No. 79-7352 (2d Cir. Mar. 17,
   1980) ............................................................................................................37

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir.1996)..............................................................................14

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)......................................................................................10, 11

*In re Home Health Corp. of America, Inc. Sec. Litig.*,
  1999 WL 79057 (E.D. Pa. Jan. 29, 1999) .......................................................38

*Howing Co. v. Nationwide Corp.*,
  826 F.2d 1470 (6th Cir. 1987) ........................................................................29

*In re Kidder Peabody Sec. Litig.*,
  10 F.Supp.2d 398 (S.D. N.Y. 1998).................................................................38

*I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir.1991).............................................................................10

*In re IAC/InterActiveCorp Securities Litigation*,
  478 F.Supp.2d 574 (S.D.N.Y. 2007) .........................................................10, 12

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  154 F. Supp. 2d 741 (S.D.N.Y.  2001)........................................................18, 21

*In re Initial Public Offering Sec. Litig.*,
  241 F.Supp.2d 281 (S.D.N.Y. 2003)...............................................................43

*In re Initial Pub. Offering Sec. Litig.*,
  358 F.Supp.2d 189 (S.D.N.Y. 2004) ...............................................................26

*In re Initial Public Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)...............................................................................41

*Kalin v. Xanboo, Inc.*,
  526 F.Supp.2d 392 (S.D.N.Y. 2007)................................................................14

*Kline v. First Western Gov't. Securities, Inc.*,
  24 F.3d 480 (3d Cir.1994)................................................................................27

*Klein v. General Nutrition Co.*,
  186 F.3d 338 (3d Cir.1999).........................................................................40, 42

*Kronfeld v. Trans World Airlines, Inc.*,
  832 F.2d 726 (2d Cir.1987).............................................................................10

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).........................................................................45, 46

*Levine v. AtriCure, Inc.*,
    508 F.Supp.2d 268 (S.D.N.Y. 2007)......................................................................44

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    65 F.3d 1044 (2d Cir. 1995)........................................................................43, 45

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)............................................................................19

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)........................................................42, 44

*Milman v. Box Hill Systems Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999)..................................................................18

*Nemo v. Allen*,
    466 F.Supp. 192 (S.D.N.Y. 1979).....................................................................30

*Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
    322 F.3d 147 (2d Cir. 2003)............................................................................16

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2nd Cir. 2004)............................................................................18

*Panther Partners, Inc. v. Ikanos Com, Inc.*,
    538 F.Supp.2d 662 (S.D.N.Y. 2008)..................................................................26

*Patane v. Clark*,
    508 F.3d 106 (2d Cir.2007) ............................................................................11

*Pinter v. Dahl*,
    486 U.S. 622, 108 S.Ct. 2063 (1988)..................................................................48

*In re Pfizer, Inc. Sec. Litig.*,
    2008 WL 540120 (S.D.N.Y. Feb. 28, 2008) ................................................41, 42

*In re Prestige Brands Holding, Inc.*,
    2006 WL 2147719 (S.D.N.Y. July 10, 2006) ............................................12, 13

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F.Supp. 68 (S.D.N.Y.1996)........................................................................21

*Ranger Oil Ltd. v. Petrobank Ener. and Res. Ltd.*,
    2000 WL 33115906 (S.D.N.Y. 2000)..................................................................30

*In re Refco, Inc. Sec. Litig.,*
    503 F.Supp.2d 611 (S.D.N.Y. 2007)............................................................12

*Rodman v. Grant Found.,*
    608 F.2d 64 (2d Cir.1979)...........................................................................40

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)..........................................................11, 12, 13

*Ronson Corp. v. Liquifin Aktiengesellschaft,*
    370 F.Supp. 597 (D.N.J. 1974) ...........................................................29, 30

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir.2000).......................................................................2, 15

*Sable v. Southmark/Envicon Capital Corp.,*
    819 F.Supp. 324 (S.D.N.Y. 1993)...............................................................28

*Schoenbaum v. Firstbrook,*
    405 F.2d 200 (2d Cir.1968).........................................................................16

*S.E.C. v. Carriba Air, Inc.,*
    681 F.2d 1318 (11th Cir. 1982) ...........................................................33, 34

*S.E.C. v. Enterprises Solutions, Inc.,*
    142 F.Supp.2d 561 (S.D.N.Y. 2001)....................................................25, 34

*S.E.C. v. Merchant Capital,* LLC,
    483 F.3d 747 (11th Cir. 2007) ....................................................................34

*S.E.C. v. Spectrum, Ltd,*
    489 F.2d 535 (2d Cir.1973).........................................................................27

*Seibert v. Sperry Rand Corp.,*
    586 F.2d 949 (2d Cir.1978).........................................................................40

*Sharp v. Coopers & Lybrand,*
    649 F.2d 175 (3d Cir. 1981),
    *cert. denied,* 455 U.S. 938 (1982)...............................................................27

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
    441 F.Supp.2d 579 (S.D.N.Y. 2006)...........................................................44

*Suez Equity Investors, L.P. v. Toronto Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001)..........................................................................16

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)..............................................................................37

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
    202 F.Supp.2d 8 (S.D.N.Y. 2001)...........................................................10

*In re Ultrafem Inc. Sec. Litig.*,
    91 F.Supp.2d 678 (S.D.N.Y. 2000)........................................................12

*U.S. Fire Ins. Co. v. Smith Barney, Harris Upham & Co.*,
    724 F.2d 650 (8th Cir. 1983) .................................................................27

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)............................................................................27

*Wielgos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) .................................................................42

*Wigand v. Flo-Tek, Inc.*,
    609 F.2d 1028 (2d Cir.1979)..................................................................11

*Wilson v. Saintine Explor. and Drill. Corp.*,
    872 F.2d 1124 (2d Cir. 1989).................................................................11

*In re WorldCom, Inc. Securities Litigation*,
    294 F.Supp.2d 392 (S.D.N.Y. 2003).................................................43, 48

*In re WRT Energy Securities Litigation*,
    2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005)................................43, 44, 45

## FEDERAL STATUTES

17 C.F.R. § 229.103...................................................................................37

17 CFR § 229.401......................................................................................25

17 C.F.R. § 240.12b-2................................................................................25

Fed. R. Evid. 201 ......................................................................................36

15 U.S.C.A. § 77l.......................................................................................11

15 U.S.C.A. § 78u-5...................................................................................19

15 U.S.C.A. § 78u-5(b)(2)(D).....................................................................19

15 U.S.C.A. § 78u-5(i)(1)(A)-(F) ...............................................................19

## MISCELLANEOUS

House Committee on Interstate and Foreign Commerce, Report of the Advisory Committee on
   Corporate Disclosure to the Securities and Exchange Commission, 95th Cong., 1st Sess.,
   327 (Comm. Print 1977) ................................................................................................38

*Merritt v. Merrill Lynch & Co.*,
   No. 03-7978, (2d June 2004) .........................................................................................41

Rules of Arbitration of the ICC International Court of Arbitration...............................................35

Thomas Lee Hazen, *Treatise on Law of Securities Regulation* § 9.4[1]-[2] (4th ed. 2002).........26

<u>Wikipedia</u> (visited June 23, 2008)
   <http://en.wikipedia.org/wiki/China_Banking_Regulatory_Commission>. .......................5

<u>Wikipedia</u> (visited June 23, 2008)
   <http://en.wikipedia.org/wiki/Ministry_of_Public_Security_of_the_People%27s_Republi
   c_of_China>....................................................................................................................5

Plaintiffs respectfully submit this combined memorandum of law in opposition to the two motions to dismiss filed by defendants Fuwei Films (Holdings) Co. Ltd. ("Fuwei" or the "Company"), Xiaoan He, Mark Stulga, Jun Yin, Duo Wang, Tongju Zhou, Maxim Group LLC, WR Hambrecht + Co, and Chardan Capital Markets.

## I.    STATEMENT OF FACTS

This securities class action alleges material misrepresentations and omissions of fact in connection with Fuwei's December 19, 2006 initial public offering of common stock (the "IPO"). Fuwei is a Cayman Islands Corporation with its principal place of business in the People's Republic of China. *See* Consolidated Amended Complaint (the "Complaint" or "CAC")[1] ¶ 19. Fuwei, through its wholly owned subsidiaries, develops, manufactures, and distributes plastic films using the biaxial-oriented, stretch technique. ¶ 19. Fuwei's primary operating assets are two factory production lines for the manufacture of plastic films: the "DMT Line" and the "Bruckner Line" (collectively the "Production Lines"). ¶ 21. At the time of the IPO, these two production lines were the source of all of Fuwei's manufacturing output, and, hence, revenue. ¶ 21. Defendant Jun Yin ("Yin") was a 79% owner of the Company at the time of the Company's IPO. ¶ 25. Though Yin formally resigned as Chairman in 2003, he secretly retained active control over Weifang Neo-Luck Group ("Neo-Luck Group") and its subsidiary Weifang Neo-Luck Plastics ("Neo-Luck Plastics"), the entity that owned the Production Lines when they were sold at auction to entities that he and defendants Wang and Zhou controlled. ¶¶ 25, 28; Declaration of Laurence Rosen[2] ("Rosen Decl."), Exhibit 3, pg. 1, ¶ 2; Ex. 5, pg. 5, ¶ 3.[3] Yin resigned as Neo-Luck Group's Chairman on September

---

[1]    Citations to the Consolidated Amended Complaint will be referred to herein as "¶" followed by the numeral corresponding to the specific paragraph(s) cited therein.

[2]    Citations to exhibits herein refer to exhibits attached to the Declaration of Laurence Rosen, Esq. unless otherwise noted.

[3]    Attached to the Rosen Declaration are translations of five Chinese news articles that serve as the basis for many of the facts alleged in the Complaint. The Court may consider these articles on a

26, 2003, the day he formed the predecessor of Fuwei, Shandong Baorui. ¶¶ 28, 39; Rosen Decl.,

Ex. 5, pg. 5, ¶ 3. Defendant Duo Wang ("Wang") became Chairman of Neo-Luck Group upon

Yin's resignation. ¶¶ 28, 39; Rosen Decl., Ex. 5, pg. 5, ¶ 3, Ex. 3, pg. 1, ¶ 2. Wang and Defendant

Tongju Zhou ("Zhou") collectively owned 21% of Fuwei's shares at the time of the Company's

IPO. ¶ 26. Zhou was at all relevant times herein a Company Director and was also the General

Manager and a control person of Neo-Luck Group and its subsidiary, Neo-Luck Plastics. ¶ 26;

Rosen Decl., Ex. 1, pg. 2, ¶ 3.  Shandong Baorui was one of the intermediate owners of the

Production Lines after Neo-Luck Plastics sold them at auction. ¶ 57; Rosen Decl., Ex.. 4, pg. 4, ¶¶

2-3.  Even after Yin resigned as Chairman of Neo-Luck Group, he continued to control Neo-Luck

Group secretly through Wang. ¶ 28; Rosen Decl., Ex. 5, pg. 3, ¶ 3. At the time of the IPO, Yin,

Wang, and Zhou (collectively the "transferees"), through their ownership and control of 100% of

the stock of Fuwei, were each control persons of Fuwei within the meaning of the Securities Act.

¶¶ 25-27.

Defendant Stulga was a director, and Defendant He was Chief Executive Officer of Fuwei

at the time of the IPO. ¶¶ 23-24. Each of Defendants Stulga, He, and Zhou signed the Registration

Statement. ¶ 30.

Defendant Maxim Group LLC ("Maxim") acted as the lead underwriter, and Defendants

WR Hambrecht + Co ("WR Hambrecht") and Chardan Capital Markets, LLC ("Chardan"), served

as secondary underwriters of the Company's shares in the IPO. ¶¶ 31-33. Maxim, WR Hambrecht

and Chardan are collectively referred to herein as the "Underwriters." The Underwriters earned

fees and non-accountable expenses of approximately $3.35 million in selling the shares to Class

members in the IPO. ¶ 35.

---

motion to dismiss since they were relied on in drafting the Complaint. *Rothman v. Gregor,* 220
F.3d 81, 88-89 (2d Cir.2000).

On December 15, 2006, the Company filed with the Securities and Exchange Commission ("SEC") an amended registration statement on Form F-1/A. ¶ 36. The Registration Statement contained, *inter alia*, a Prospectus.[4] ¶ 36. On December 19, 2006, the Company filed its Prospectus with the SEC and commenced its IPO, selling shares at a price of $8.28 per share. ¶ 38. On December 22, 2006, the Company announced that it had sold 4,312,500 shares of its stock at $8.28 per share—a figure that included 562,500 additional shares issued to cover over-allotments. ¶ 38. Total gross proceeds from the offering were $35,708,500. ¶ 38.

The Registration Statement was false and misleading because it erroneously stated that Fuwei had acquired its primary operating assets, the Production lines, lawfully. ¶¶ 39-40. In truth, the acquisition of the Production Lines violated Chinese law because defendant Yin, the former Chairman of Neo-Luck Group, with the assistance of defendants Wang, Neo-Luck Group's current Chairman, and Zhou, Neo-Luck Group's General Manager, illegally put the Neo-Luck Plastics subsidiary into bankruptcy and caused the Production Lines to be sold at auction for much less than fair value to intermediaries owned and controlled by Yin, Wang, and Zhou, who then caused the Production Lines to be transferred to Fuwei. ¶¶ 41-42. Rosen Decl., Ex. 4, pg. 1, ¶¶ 2-3, Ex. 3, pg. 1, ¶ 2. The Transferees violated, among other applicable Chinese laws, Article 52 of Contract Law of the People's Republic of China, which states:

> A contract shall be null and void under any of the following circumstances:
> (1) A contract is concluded through the use of fraud or coercion by one party to damage the interests of the State;
> (2) Malicious collusion is conducted to damage the interests of the State, a collective or a third party;
> (3) An illegitimate purpose is concealed under the guise of legitimate acts;
> (4) Damaging the public interests;

---

[4]   The contents of the Prospectus were essentially the same as those of the Registration Statement for the purposes of the Complaint and the claims made therein. This memorandum will reference exclusively the Registration Statement, which is attached as Exhibit 1 to the Complaint, (Docket No. 28). For easy reference, relevant pages of the Registration Statement are filed herewith as Exhibit 12 to the Rosen Declaration.

(5)  Violating the compulsory provisions of the laws and administrative regulations.

¶ 42. The Registration Statement did not disclose that Yin and Wang, control persons of the state-owned Neo-Luck Group, transferred the Production Lines, which were the assets of Neo-Luck Group's subsidiary, Neo-Luck Plastics, to *themselves* at an exceedingly low price, while simultaneously arranging for Neo-Luck Plastics to go into bankruptcy, stripping various creditors of their claims, and depriving the state of its assets. ¶ 49; Rosen Decl., Ex. 4, pg. 1, ¶¶ 2-3. The Registration Statement never disclosed that Yin and Wang, who collectively owned 90% of Fuwei at the time of the IPO, were the Chairmen (former and current, respectively) and control persons of Neo-Luck Group at the time the Production Lines were sold at auction and transferred to Fuwei. ¶ 53; Rosen Decl., Ex. 3, pg. 1, ¶ 2.  That Yin and Wang simultaneously controlled both Neo-Luck and the purchaser of Neo-Luck's assets at auction was critical information without which investors would be unable to assess the legality of those auction sales and the risks that those sales might be successfully challenged by Neo-Luck's creditors or the Chinese authorities. ¶¶ 58-59, 115.

The success of the scheme to loot Neo-Luck Plastics's assets through the false bankruptcy was facilitated by the Transferees' concealment of their respective identities as being both the ultimate controllers of the transferor, Neo-Luck Plastics, and the owners of the transferee, Fuwei. ¶¶ 50, 58, 60; Rosen Decl., Ex. 2, pg. 4, ¶ 3, Ex. 1, pg. 7, ¶ 5. The Transferees arranged multiple transactions involving many entities of their creation, such that, in the end, the Production Lines became the property of Shandong Fuwei, which was a subsidiary in a chain of five subsidiaries, all of which were owned entirely by the Transferees collectively. ¶ 51; Rosen Decl., Ex. 4, pg. 2, ¶¶ 2-4, 7, pg. 3, ¶¶ 1, 4-5, pg. 4, ¶¶ 2-4.

On or about October 2005, Great Wall Asset Management Co. ("Great Wall"), a State-owned entity charged with recovering the bad debts of State-owned banks, purchased approximately RMB 1.9 billion of non-performing debt owed by Neo-Luck Group to the Bank of

4

China.[5] ¶ 116; Rosen Decl., Ex. 1, pg. 5, ¶ 1. Great Wall began negotiations with Neo-Luck Group to receive payment on this debt in late 2005 and continued these negotiations throughout 2006. ¶ 116; Rosen Decl., Ex. 2, pg. 2, ¶¶ 2-3. Subsequent to the failure of Great Wall's negotiations to get paid by Neo-Luck Group, which was controlled by the Transferees at all times, in or about April or May of 2006 -- approximately seven or eight months prior to the effective date of the Registration Statement and Prospectus -- Great Wall reported to the Chinese media that the executive management of Neo-Luck Group (which included Yin and Wang) had caused certain of Neo-Luck Group's subsidiaries, including Neo-Luck Plastics, to sell illegally their state-owned assets to private companies owned by the executive managers and control persons of Neo-Luck Group, in particular Yin and Wang. ¶ 117; Rosen Decl., Ex. 2, pg. 2, ¶¶ 2-3. Because Great Wall was unable to recover its debt, and because Great Wall deemed the transfers of the Production Lines to be illegal, in mid-2006 Great Wall requested that the Ministry of Public Security, through China Banking Regulatory Commission, commence legal proceedings and an investigation into the Transferees' misconduct in causing Neo-Luck Plastics to sell the Production Lines at below-market value to entities owned by Yin and Wang. [6] ¶ 125; Rosen Decl., Ex. 3, pg. 4, ¶ 3; Ex. 2, pg. 3, ¶ 1. As a result of Great Wall's allegations, Chinese authorities led an investigation and proceedings

---

[5] One U.S. Dollar ($1.00) was equal to roughly RMB 8.00 at the time the Registration Statement was declared effective. ¶ 27, n.3, Exhibit 1, p 30.

[6] The Ministry of Public Security is the principal police authority in mainland China and the agency that is responsible for most of the day-to-day police work there. Wikipedia (visited June 23, 2008) <http://en.wikipedia.org/wiki/Ministry_of_Public_Security_of_the_People%27s_Republic_of_Chi na>. The China Banking Regulatory Commission is an agency of China authorized by the State Council to regulate the Chinese banking sector. Wikipedia (visited June 23, 2008) <http://en.wikipedia.org/wiki/China_Banking_Regulatory_Commission>. The procedure by which an asset management company, such as Great Wall, may make a complaint about another party to the Chinese government is to report to the China Banking Regulatory Commission, which then makes a "request" to the Ministry of Public Security. Hereinafter, references to Great Wall's request to the Ministry of Public Authority should be understood to have been made through the China Banking Regulatory Commission.

initiated by the Ministry of Public Security against the Transferees concerning the fraudulent bankruptcy of Neo-Luck Plastics and the illegal purchases of the Production Lines, state-owned assets, at below fair-market values. ¶¶ 125-27; Rosen Decl., Ex. 3, pg. 4, ¶ 3; Ex. 2, pg. 3, ¶ 1. As part of the legal proceedings, in November 2006, Chinese authorities ordered that the passports of Yin and Wang be confiscated and that they both be prohibited from traveling outside mainland China. ¶¶ 126-27; Rosen Decl., Ex. 3, pg. 4, ¶ 3; Ex. 2, pg. 3, ¶ 1. The Registration Statement failed to disclose the material fact that an investigation and proceedings were commenced by Chinese authorities against defendant Yin, a 79% controlling shareholder of Fuwei, and defendant Wang, a 10.5% controlling shareholder, at least one month prior to the date the Registration Statement and Prospectus were declared effective. ¶¶ 25, 27, 53, 127-28. On June 25, 2007, the Company revealed, for the first time, some of the details of the legal proceedings against and the investigation of Yin, Wang, and Zhou.[7] ¶161.

When Yin's and Wang's passports were confiscated in November 2006, their ability to engage in business outside of China was severely restricted. ¶131. Fuwei conducts significant business in the United States, Japan, and India. ¶131. This restriction of travel was a material fact required to be disclosed in the Registration Statement. ¶129. Additionally, according to Item 401 of Regulation SK, issuance of the legal order confiscating the Transferees' passports and restricting their ability to engage in international business was required to be disclosed. ¶¶130-31.

On or about March 2007, during an audit of the Neo-Luck Group loans owned by Great Wall, the National Audit Office of China determined that Yin, Wang, and Zhou had potentially

---

[7]   Chinese news reports to do not state whether the initial investigation and travel restriction included Zhou.  These articles mention only Yin and Wang by name, but state that "other senior managers of Neo-Luck Group" were accused and subject to travel restrictions. Rosen Decl., Ex. 2, pg. 3, ¶ 1. Zhou may have been one of the "senior managers of Neo-Luck" subject to travel restrictions. Zhou was clearly identified in later reports as being a target of the proceedings and arrested for his misconduct.  ¶¶ 161, 163.

committed fraud in the bankruptcy proceedings of Neo-Luck Plastics in that the proceedings were used by the Transferees for the purpose of illegally escaping debt and selling state-owned assets to themselves for less than fair market value. ¶ 138; Rosen Decl., Ex. 3, pg. 5, ¶ 1; Ex. 2, pg. 3, ¶ 2. The National Audit Office proceeded to do a special on-site audit of Neo-Luck Plastics as well as of other subsidiaries of Neo-Luck Group. ¶ 139; Rosen Decl., Ex. 3, pg. 5, ¶ 2; Ex. 2, pg. 3, ¶ 2. In or about mid-April 2007, after completing the audit, the National Audit Office determined the case relating to the bankruptcy of Neo-Luck Plastics, and the sale of its assets at below fair-market value, to be very serious, and then reported the case to the State Council. ¶ 140; Rosen Decl., Ex. 3, pg. 5, ¶ 2; Ex. 2, pg. 3, ¶ 2.  On May 1, 2007, Yin, Wang and Zhou were detained and interrogated by Chinese authorities (put in "Shang' gui", a particular form of arrest employed by the Chinese Communist Party). Ex. 3, pg.1, ¶2.

The Registration Statement falsely stated that no creditors of Neo-Luck Plastics had sought to challenge the transfers of the Production Lines to Fuwei or seek repayment from Fuwei for the debts of Neo-Luck. ¶¶ 39, 46, 61. This statement was false because two such challenges had already been initiated, one by the Chinese authorities on behalf of Great Wall and another by the manufacturer of one of the Production Lines, DMT, SA. ¶¶ 62-63, 69. The Registration Statement also stated that, based on the opinion of Fuwei's counsel, the likelihood of any of Neo-Luck's creditors successfully seeking recourse or claiming repayment for the debts of Neo-Luck was "remote," when in reality the risk of just such an action was real and imminent. ¶¶ 39, 67, 136. Prior to the IPO, in November 2006, the Chinese Government commenced an investigation and legal proceedings, initiated at Great Wall's request through the China Banking Regulatory Commission to the Ministry of Public Security, against Yin and Wang (owners of 90% of Fuwei's stock) concerning Fuwei's acquisition of the Production Lines and questioning the legality of Fuwei's acquisition of its operating assets under Chinese laws and regulations. ¶¶ 125-27; Rosen

Decl., Ex. 4, pg. 5, ¶ 1, Ex. 3, pg. 4, ¶ 3, pg. 5, ¶¶ 1-2; Ex. 2, pg. 3, ¶¶ 1-2. Moreover, had Yin's and Wang's simultaneous control of Neo-Luck Group and ownership of Fuwei been disclosed, it is unlikely that Fuwei could have obtained a legal opinion that the acquisition of the Production Lines was lawful under Chinese law. ¶ 58.

On or about April 2006, DMT S.A. filed an arbitration proceeding against Fuwei, seeking recovery of money owed related to the purchase of the DMT Line by Fuwei in the ICC International Court of Arbitration ("ICC") and seeking monetary damages in the amount of $1,250,000 from Fuwei. ¶ 118. This challenge to the purchase of one of Fuwei's two primary assets was not disclosed in the Registration Statement, which was filed and declared effective approximately eight months later on December 18, 2006. ¶¶ 21, 119. The gist of DMT's claim was that Fuwei was responsible for payment of the debts of Neo-Luck Plastics on the basis that the bankruptcy transfer of the DMT Production Line was illegal. ¶ 69.

Shortly after the IPO, Defendants' scheme began to unravel. ¶¶ 158-60. As bits and pieces of the fraud were revealed, Fuwei's stock price declined, damaging investors. ¶¶ 158-60. During March 2007, Great Wall's complaint to the Ministry of Public Security, through China Banking Regulatory Commission, led the National Audit Office to perform an audit of the suspected fraudulent bankruptcies of the Neo-Luck Group subsidiaries, including Neo-Luck Plastics. ¶¶138-139. In Mid-April 2007, the National Audit Office determined that Neo-Luck Plastics's operating assets had been improperly transferred. ¶140. On April 30, 2007, Fuwei announced that it had dismissed KPMG, which had been its independent auditor since before the IPO, and retained Murrell, Hall, McIntosh & Co., PPLP as its new auditor. ¶¶ 141-42. This unexpected announcement caused Fuwei's stock price to drop approximately $1.07/share, or 10%, over two trading days. ¶159. On the morning of June 25, 2007, Fuwei disclosed for the first time the pendency of the criminal proceedings against Yin, Wang, and Zhou. ¶ 161. As a result of this

announcement, Fuwei's stock price fell $1.01/share, or 14%, from the previous trading day. ¶162. On October 16, 2007, Fuwei announced the Chinese authorities had formally arrested Yin, Wang, and Zhou for "suspicion of the crime of irregularities for favoritism and to sell state-owned assets at low prices." ¶163. This announcement caused Fuwei's stock price to drop $2.65/share, or 27.7%, over three trading days. ¶163. On November 6, 2007, Fuwei announced that its auditor, Murrell Hall, had resigned as a result of the arrest of Fuwei's three controlling shareholders. ¶164. This news caused the Company's stock price to drop $1.69, or 26.5%, over three trading days. ¶165. On November 12, 2007, Fuwei announced that its plan to commence operation of a third production line was delayed because it has been unable to obtain bank financing as a result of the charges against its three controlling shareholders. ¶166. This adverse announcement caused Fuwei's stock price to drop $1.57/share, or 33.5%, that day. ¶ 167. Then, on March 6, 2008, Fuwei's CFO resigned, causing the stock price to drop another $0.69/share, or 14.7%, that day. ¶168.

In summary, prior to the time of the IPO, Great Wall made a complaint to the China Banking and Regulatory Commission and Ministry of Public Security charging Yin and Wang with bankruptcy fraud in connection with the transfer of Neo-Luck Plastics' Production Lines to Fuwei, and Chinese authorities initiated legal proceedings against Yin and Wang, restricting their travel based on Great Wall's charges. Had the Underwriters undertaken even a cursory investigation, they would have discovered that Neo-Luck Plastics's creditors and the Chinese authorities had already commenced challenges to the transfer of Neo-Luck Plastics's assets and sought to hold Fuwei liable for Neo-Luck Plastics's debts. These facts directly contradicted assertions in the Registration Statement that no such challenge had been made. Additionally, these facts raised substantial doubt about the statements that the risk of a successful challenge to the asset transfers or demand for repayment of Neo-Luck Plastics's debts was remote, and that the acquisitions of the Production Lines were legal under Chinese law. Given that Great Wall had already challenged the transfers of

the Production Lines, the investigation by Chinese authorities had begun, the passports of Yin and Wang had been confiscated, and the arbitration proceeding against Fuwei had been initiated, the Registration Statement was materially misleading.

## II.    LEGAL ARGUMENT

### A.    <u>Pleading Requirements Under §11 and §12 of Securities Act of 1933</u>

#### (1)    The Elements of a §11 and §12 Claim

To state a claim under §11, a plaintiff "need only show a material misstatement or omission to establish his *prima facie* case." *Herman & MacLean v. Huddleston* 459 U.S. 375, 382 (U.S. 1983). Material facts include "those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 732 (2d Cir.1987). "A Section 11 violation is established when 'material facts have been omitted or presented in such a way as to obscure or distort their significance.'" *In re IAC/InterActiveCorp Securities Litigation*, 478 F.Supp.2d 574, 595 (S.D.N.Y. 2007), *quoting, I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991), *citing Herman & MacLean v. Huddleston*, 459 U.S. at 382. "Liability against the issuer of a security is virtually absolute, **<u>even for innocent misstatements</u>**." *Herman & MacLean,* 459 U.S. at 382 [emphasis added]. There is no requirement that the complaint plead that the defendants knew of the misleading statements or the undisclosed material risks at the time of the IPO. *In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 274 (3rd Cir. 2004), *citing, Herman & MacLean,* 459 U.S. at 382. Section 11 provides for a due diligence defense for defendants *other than the issuer*, but the burden of proof of the defense is on the defendants. *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.,* 202 F.Supp.2d 8, 12 (S.D.N.Y. 2001), *citing, Herman & MacLean,* 459 U.S. at 382. *See also*, *Carlon v. Thaman,* 130 F.3d 309, 315 (8th Cir. 1997)).

While §12(a)(2) does not hold issuers strictly liable, as §11 does, liability is premised on

10

negligent misrepresentation. *Wilson v. Saintine Explor. and Drill. Corp.* 872 F.2d 1124, 1126 (2nd Cir. 1989). "Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter [e.g. specific intent, recklessness or knowledge] or reliance elements of a fraud cause of action." *Rombach v. Chang* 355 F.3d 164, 169 (2d Cir. 2004); *Freedman v. Value Health, Inc.* 2002 WL 825982 * 1, 34 Fed.Appx. 408, 410 (2d Cir. May 1, 2002); *Wigand v. Flo-Tek, Inc.,* 609 F.2d 1028, 1034 (2d Cir.1979). Section 12, like §11, provides an affirmative defense if a defendant can "sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission." 15 U.S.C.A. § 77l (attached as Ex. 13). Unlike §11, the due diligence affirmative defense under §12 may be asserted by the issuer of the securities.

In contrast to a §10b claim, which is subject to Rule 9(b) and the PSLRA's heightened pleading standards, a complaint under §11 and §12 need allege only "'enough facts to state a claim for relief that is plausible on its face.'" *Garber v. Legg Mason, Inc.* 537 F.Supp.2d 597, 610 (S.D.N.Y. 2008) (*quoting*, *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir.2007) (*quoting Bell Atlantic Corp. v. Twombly* 127 S.Ct. 1955, 1974 (U.S. 2007))).

### (2)    Rule 9(b) Does Not Apply Because the Complaint Does Not Sound in Fraud

Defendants insist that even though the §11 and §12 claims in the CAC do not require proof of scienter or causation, the Court should apply the more stringent pleading standards of Rule 9(b) because the Second Circuit has ruled that "the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." *Rombach,* 355 F.3d at 1171. A careful reading of the CAC shows that there are no allegations of intentional or reckless misconduct against any Defendant. The bases Defendants adduce to show that the CAC is premised on fraud are that it uses the terms "misrepresented", "falsely stated," "misleadingly failed to disclose" and "materially false." Fuwei MTD at pg. 8. Misrepresentations can be made negligently or innocently. *Herman & MacLean,* 459 U.S. at 382 (even innocent

misrepresentations are actionable under §11). "Fraud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent." *In re Refco, Inc. Sec. Litig.,* 503 F.Supp.2d 611, 631-632 (S.D.N.Y. 2007). Judge Lynch, in thoughtfully considering the *Rombach* decision, made two important observations. Firstly, the Second Circuit did not intend that all allegations directly reproducing the language of § 11 ("false and misleading" or "misrepresentation) be subject to Rule 9(b). Secondly, "the Second Circuit did not intend *Rombach* as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard" as it held that the complaint in that case alleged fraud only as to certain defendants, but not as to the underwriters. *In re Refco* 503 F.Supp. 2d at 632.

Rombach and the other cases cited by Defendants alleged both §11 *and* §10b claims, which are fraud-based, indicating that the complaints *intended* to allege fraudulent acts. *In re Ultrafem Inc. Sec. Litig.*, 91 F.Supp.2d 678, 684 (S.D.N.Y. 2000) (10b and 20(a) claims); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F.Supp.2d 574, 584 (S.D.N.Y. 2007) (same). Here, the CAC alleges only violations of §11, §12 and §15, which do not require any proof of scienter. This difference alone renders *Rombach* and its progeny inapposite. Moreover, in *Ultrafem*, as in *Rombach*, the court found that Rule 9(b) did not apply to the underwriters as the complaints did not contain allegations of fraudulent conduct against them. *In re Ultrafem*, 91 F.Supp.2d at 691 (*citing, In re APAC Teleservice, Inc. Sec. Litig.*,1999 WL 1052004, at *10 (S.D.N.Y. Nov. 19, 1999) (allegations that underwriters did not exercise due diligence removed such allegations from penumbra of Rule 9(b))). The CAC affirmatively states that the claims asserted are not based on fraud. CAC ¶¶ 177, 188. "Because plaintiffs have specifically disclaimed any component of fraud in their Sections 11 and 12(a)(2) claims, there are no 'averments of fraud.'" *Garber.* 537 F.Supp.2d at 612 (*quoting, Rombach*, 355 F.3d at 171, 178); *In re Prestige Brands Holding, Inc.*,

2006 WL 2147719 at *8 (S.D.N.Y. July 10, 2006).

In an effort to suggest that the CAC sounds in fraud as to *all* Defendants, Defendants point to paragraphs 50, 58, and 60 in the CAC, which allege that Yin, Wang, and Zhou defrauded **Neo-Luck's creditors** by illegally transferring the Production Lines through a false bankruptcy. The CAC does not allege that any of the Defendants other than Yin, Wang, and Zhou had any knowledge of this misconduct. These allegations describe fraud towards Neo-Luck's creditors, not fraud toward purchasers of Fuwei stock in the IPO. Nonetheless, while Yin, Wang, and Zhou must have had knowledge of this scheme to defraud Neo-Luck and its creditors, there are absolutely no allegations in the CAC that Xiaoan He, Fuwei's CEO, and Mark Stulga, an outside director, who both have no ties to Neo-Luck, had any knowledge whatsoever of the illegal scheme to transfer the Production Lines to avoid paying Neo-Luck's creditors. Their liability is based solely on their having reviewed and signed the Registration Statement. The CAC alleges no other knowledge or conduct on their part. Similarly, the **only** allegations concerning the Underwriters are that they failed to conduct proper due diligence. *See Rombach* at 171, 178; *In re Prestige Brands* 2006 WL 2147719 at *8 ("The common law presumption of regularity is available; if conduct may be either fraudulent or negligent, the latter is presumed in absence of evidence to the contrary." *In re Prestige Brands* 2006 WL 2147719, *8. Thus, even if the Court were to find that the allegations against Yin, Wang, and Zhou sound in fraud, the claims against the Underwriters, Xiaoan He, and Mark Stulga are not premised on fraud and should not be subject to Rule 9(b).

### (3)    Even if Rule 9(b) Is Applicable, the Complaint Is Sufficiently Particularized

The CAC provides a very detailed description of the facts and circumstances constituting Defendants' securities laws violations. Rule 9(b) requires the complaint: (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or

omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.* 375 F.3d 168, 187 (2nd Cir. 2004), *citing, Harsco Corp. v. Segui,* 91 F.3d 337, 347 (2nd Cir.1996). The complaint must plead "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990), *quoted in*, *Kalin v. Xanboo, Inc* 526 F.Supp.2d 392, 401 (S.D.N.Y. 2007).

Defendants do not dispute, and thus implicitly concede, that the CAC provides the required facts describing the fraud in all necessary detail. The only lack of particularity raised by Defendants is that the CAC identifies the source for certain allegations as the "Chinese news media" without naming the specific publication, specifying the date published, or attaching a copy of the news article to the Complaint. Fuwei MTD at 9-10. There is no basis in any Second Circuit decision for imputing to Rule 9(b) an obligation that a specific source be named for each factual allegation.

Defendants ask the Court to apply the heightened pleading standards of the PSLRA, suggesting that the PSLRA pleading requirements are co-extensive with Rule 9(b).[8] If that were the case, then there would be no purpose behind enacting the legislation. Clearly, there are differences and the CAC should not be measured against the stringent pleading requirements of the PSLRA. Noticeably absent from the Second and Seventh Circuits' description of Rule 9(b) above is any inference that a complaint must plead in detail the sources of all facts pled upon information and belief. This is a requirement of the PSLRA, not Rule 9(b).

To simplify the Court's analysis, Plaintiffs have submitted the five news articles from which the disputed factual allegations in the CAC are sourced. This renders moot Defendants'

---

[8]   The PSLRA adopted a heightened pleading standard for section 10b claims under the Securities Exchange Act of 1934, but did not change the pleading requirements for claims under sections 11 and 12 of the Securities Act of 1933.

assertion that the CAC does not comply with Rule 9(b).[9] The news articles demonstrate that the Chinese news media reported in June 2006 that Great Wall had accused Neo-Luck Group of falsely putting certain of its subsidiaries into bankruptcy and fraudulently transferring the assets to avoid paying its creditors. Shandong Neo-Luck Plastics, the owner of the Production Lines, is specifically listed as one of the subsidiaries that were the subject of this accusation. Rosen Decl., Ex. 1, pg. 4, ¶ 2. Other articles state that in November 2006, Great Wall made a complaint against Yin and Wang to the Ministry of Public Security, which commenced an investigation and initiated proceedings that imposed travel restrictions on Yin and Wang. Rosen Decl., Ex. 3, pg. 4, ¶ 3; Ex. 2, pg. 3, ¶ 1. Later, articles confirm that a government audit, initiated in response to Great Wall's June 2006 allegations of fraud, discovered evidence that the Production Lines had been illegally transferred to Fuwei through a false bankruptcy. Rosen Decl., Ex. 3, pg. 5, ¶ 1; Ex. 2, pg. 3, ¶ 2. The articles also confirm that the detention of Yin, Wang, and Zhou is related to the bankruptcy transfer of Neo-Luck Plastics's assets to Fuwei.[10] Rosen Decl., Exs. 3, 4. The specific publication from which each factual allegation is drawn is cited in the Statement of Facts above. Thus, the Court should find that the CAC conforms to Rule 9(b).

> **(4)    Even if Rule 9(b) Is Applicable to Fuwei, Rule 9(b) Is Satisfied Because the Knowledge of Defendants Yin, Wang and Zhou Is Imputed to Fuwei**

Yin, Wang and Zhou's knowledge of the fraudulent bankruptcy, consequent illegal asset transfers, Great Wall's complaint and subsequent police investigation, and travel restrictions are imputed to Fuwei by virtue of these Defendants' complete control over Fuwei. Moreover, Yin and Wang, as the Chairmen and control persons of Neo-Luck Group, had full knowledge of the facts

---

[9]    On a motion to dismiss, the Court may consider documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit. *See Rothman v. Gregor*, 220 F.3d at 88.

[10]    The articles list a number of Neo-Luck Group's subsidiaries, including Neo-Luck Plastics, that are the subject of the investigation.

concerning the fraudulent bankruptcies, Great Wall's complaint to China Banking and Regulatory Commission concerning the asset transfers, and the Ministry of Public Security's imposition of travel restrictions. These five news articles confirm that Yin and Wang actively controlled Neo-Luck Group and are at the center of the allegations of misconduct concerning the fraudulent transfer of Neo-Luck Group's assets. Yin and Wang together owned 89.5% of Fuwei and thus had the ability to control every aspect of its operations. The knowledge of a corporation's controlling shareholders and agents can be imputed to the corporation. *See Dalicandro v. Legalgard, Inc.*, 2004 WL 250546, at *8 (E.D. Pa. Jan. 21, 2004) ("a corporation can only act through its controlling agents; generally, its officers, directors, or controlling shareholders); *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 101 (2[d] Cir. 2001). Indeed, the Second Circuit holds that when controlling shareholders of a company dominate it and are implicated in fraud to the extent that Yin and Wang dominated Fuwei and participated in the bankruptcy fraud at Neo-Luck Plastics, their knowledge must be imputed to the company such that even the adverse interest exception is negated.[11]  *See Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 165 (2d Cir. 2003).

According to Chinese news media, defendant Tongju Zhou continues to be a general manager of Neo-Luck Group to this day.[12] Rosen Decl., Ex. 1, pg. 2, ¶ 3. As general manager, Mr. Zhou surely was aware that Yin and Wang controlled Neo-Luck Group.  He also was in a position to learn of the bankruptcy fraud proceedings and imposition of travel restrictions since it affected "senior managers of Neo-Luck Group" of which he was one. Rosen Decl., Ex. 2, pg. 3, ¶ 1. Zhou was a director of Fuwei at the time of the IPO and signed the Registration Statement. His

---

[11]  In the instant matter the interests of Yin and Wang were not adverse to the interests of Fuwei, so the adverse interest exception would not apply.
[12]  The Registration Statement disclosed only that Zhou held such position until April 2005. Rosen Decl. Ex. 12, Reg. Stmt, pg. 68.

knowledge is also properly imputed to Fuwei. *Schoenbaum v. Firstbrook,* 405 F.2d 200, 211 (2d Cir.1968).

**B.    Statements in the Registration Statement Were False and Misleading**

**(1)    Summary of Misrepresentations and Omissions in the CAC**

The CAC alleges four categories of misrepresentations. Firstly, the Registration Statement misled investors to believe that no creditors of Neo-Luck Group had, as of the IPO date, challenged the transfer of the Production Lines or sought to hold Fuwei liable for the debts of Neo-Luck. Defendants characterize this as a forward looking statement, but the Registration Statement clearly implies that no present challenge had been initiated or threatened, when, in fact, an investigation and legal proceedings related to the transfer of the Production Lines had begun prior to the IPO, pursuant to which Yin and Wang were placed under strict travel restrictions.[13] Secondly, the opinion of Chinese counsel that the auction sales of the Production Lines were legal under Chinese law was inaccurate and appears to have been issued based on incomplete facts, as demonstrated by the later arrest of Yin, Wang, and Zhou for illegally transferring those assets and the concealment of Yin's and Wang's control over Neo-Luck Group. Thirdly, Defendants concealed that Yin and Wang were under investigation and that proceedings had been initiated against them for looting the assets of Neo-Luck Group. As the owners of 90% of Fuwei's common stock, the cloud of wrongdoing surrounding their illegal transfer of the Production Lines and other state-owned assets was a material fact. Fourthly, the Registration Statement omitted to disclose that Yin and Wang were not only 90% owners of Fuwei, but also the Chairmen and actual control persons of Neo-

---

[13]   The Registration Statement states in pertinent part: "There can be no assurance that relevant authorities or creditors of the predecessor owner of these assets will not challenge the effectiveness of these asset transfers . . . . However, should any such challenge be brought in China (or elsewhere) and prevail, we may incur substantial liabilities and be required to pay substantial damages as a result of acquiring these assets. Although we believe any such challenge is unlikely to lead to the forfeiture of the related assets, it could materially affect our ability to continue operations." Rosen Decl. Ex. 12, Reg. Stmt. pg. 11-12.

Luck Group. This information was material to understanding the legality of the transfer of the Production Lines and the likelihood that a challenge to the transfers would be successful. Lastly, the Registration Statement failed to disclose that the manufacturer of the DMT production line had filed a request for arbitration against Fuwei in April 2006, asserting a $1.25 million claim against Fuwei based on the transfer of the DMT line to Fuwei. This litigation was material from more than a purely financial-obligation perspective. The arbitration demand demonstrated that yet another Neo-Luck creditor was seeking to hold Fuwei liable for the debts of Neo-Luck Group based on the fraudulent transfer of the Production Lines to Fuwei. That both Great Wall and DMT had seen through the false bankruptcy transfers and sought to hold Fuwei liable for Neo-Luck's debts was material information that rendered statements in the Registration Statement related to the acquisition of the Production Lines false and misleading.

### (2)    Bespeaks Caution Doctrine Applies Only to Forward Looking Statements

The bespeaks caution doctrine applies only to forward-looking statements. The doctrine does not apply to misstatements or omissions of historical or present facts. *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2nd Cir. 2004). The bespeaks caution doctrine is irrelevant to this case because all of the alleged misrepresentations and omissions are of historical and current fact. Additionally, Yin and Wang are alleged to have had actual knowledge of Great Wall's challenge to the transfer of the Production Lines in June 2006 and subsequent initiation of proceedings leading to the imposition of travel restrictions. "No degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made." *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 756 (S.D.N.Y. 2001); *citing Milman v. Box Hill Systems Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999).

### (3)    The PSLRA Safe Harbor Doesn't Apply to Initial Public Offerings

Defendants' assertion of the PSLRA Safe Harbor is equally unavailing. The PSLRA safe

harbor specifically states that it does not apply to initial public offerings:

> b) Exclusions
> Except to the extent otherwise specifically provided by rule, regulation, or order of the Commission, this section shall not apply to a forward-looking statement—
> . . . .
>     (2) that is—
> . . . .
>     (D) made in connection with an initial public offering; . . . .

15 U.S.C.A. § 78u-5(b)(2)(D); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (safe harbor not applicable to statements in a registration statement). The statute is crystal clear that it does not apply to an IPO such as Fuwei's. Moreover, the safe harbor only applies to forward-looking statements. None of the alleged misrepresentations and omissions in the instant matter is a forward looking statement. The statute actually defines the types of statements deemed to be covered as forward looking. These are limited to: (A) projections of revenue, earnings and other financial statement items, (B) statements of the plans and objectives of management for future operations, (C) a statement of future economic performance, (D) statement of the assumptions underlying or relating to any of the foregoing types of statements, (E) any report issued by an outside reviewer retained by an issuer that assesses a forward-looking statement made by the issuer, and (F) other types of forward-looking statements specified by rule or regulation of the SEC. 15 U.S.C.A. § 78u-5(i)(1)(A)-(F). None of the alleged misrepresentations and omissions alleged in the CAC is of the type defined as a forward-looking statement covered by the PSLRA safe harbor. And of course, no forward-looking statement is protected if defendants had actual knowledge of its falsity. 15 U.S.C.A. § 78u-5.

    **C.**    <u>The Existence of a Present Challenge to the Acquisition of the Production Lines</u>

    The Registration Statement misled investors to believe that as of the IPO date, none of Neo-Luck Plastics's creditors or the authorities had threatened or initiated any challenge to the transfer of the Production Lines or sought to hold Fuwei responsible for the debts of Neo-Luck Plastics. For

19

example, the Registration Statement stated in pertinent part:

> There can be no assurance that relevant authorities or creditors of the predecessor owner of these assets will not challenge the effectiveness of these asset transfers based upon the facts and circumstances of these transfers . . . .

Rosen Decl. Ex. 1, Reg. Stmt. pgs. 11-12. This statement leads investors to believe that neither Neo-Luck Plastics's creditors nor the authorities have initiated any challenge to the transfer of the Production Lines. The clear and misleading implication of the statement, "[t]here can be no assurance" that a creditor or the authorities will not challenge the asset transfers, is that no challenge or threatened challenge has yet occurred.[14] Other statements in the Registration Statement convey the same false and misleading belief. For example,

> our PRC counsel is of the opinion that the auctions of the Brückner and DMT production lines were valid under PRC law and the possibility of the creditors of Shandong Neo-Luck successfully exercising recourse or claiming repayment with respect to our assets purchased in the bankruptcy proceeding should be remote. However, should any such challenge be brought in China (or elsewhere) and prevail, we may incur substantial liabilities and be required to pay substantial damages as a result of acquiring these assets. Although we believe any such challenge is unlikely to lead to the forfeiture of the related assets, it could materially affect our ability to continue operations.

CAC ¶ 39; Rosen Decl. Ex. 12, Reg. Stmt. pgs. 11-12 (emphasis added). Similarly, this paragraph provides the same misleading impression that while a risk exists that some unknown creditor might some day in the future decide to challenge the asset transfers, no such challenge had been initiated or even threatened as of the IPO date. *In re EVCI Colls. Holding Corp. Sec. Litig.,* 469 F.Supp.2d 88, 103 fn 2 (S.D.N.Y. 2006) (Defendants "… did not disclose those known facts-instead always couching the truth with "ifs," as though these things had not yet happened").

---

[14]   Given that Fuwei was aware that Great Wall had complained of the asset transfers and a criminal investigation was underway, an accurate and proper disclosure would be something like: "Neo-Luck Plastics's creditors have made a complaint to the Ministry of Public Security. An investigation is currently pending to assess the lawfulness of the asset transfers and whether any violations of Chinese law have occurred."

The bespeaks caution does not apply to these misleading statements because whether a challenge had already been made or threatened is an historic or present fact, not an opinion and not a forward-looking statement. As of the IPO date, Great Wall had initiated legal proceedings against Yin and Wang with the Ministry of Public Security, which confiscated their passports and restricted their travel, while Great Wall's complaint of illegal asset transfers was under investigation. Rosen Decl., Ex. 3, pg. 4, ¶ 3; Ex. 2, pg. 3, ¶ 1. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already happened is deceit." *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996). Additionally, the bespeaks caution doctrine is inapplicable to Yin and Wang because they undoubtedly possessed actual knowledge that Great Wall had initiated legal proceedings against them and that their travel had been restricted by the Ministry of Public Security. *In re Indep. Energy Holdings*, 154 F. Supp. 2d at 756 (bespeaks caution not available if defendant knows statement was false when made).

Defendants protest that notwithstanding the specific allegations in the CAC (¶¶ 61-67), there is no evidence that the proceedings led by the Ministry of Public Security against Yin, Wang, and other senior Neo-Luck Group managers are related to Neo-Luck Plastics, but rather must be related to the other Neo-Luck Group subsidiaries that were placed in bankruptcy. The news articles relied on by Plaintiffs in drafting the CAC and submitted herewith demonstrate that Neo-Luck Plastics was definitely one of the Neo-Luck Group subsidiaries that Great Wall had accused Yin and Wang of looting and defrauding. For example, the June 13, 2006 article in 21st Century Economic Report describing Great Wall's efforts to collect its large debt from Neo-Luck Group mentions the bankruptcy of more than ten subsidiaries of Neo-Luck Group, which included "a joint venture company

21

producing plastics that had an annual revenue of around RMB 200 million Yuan, a net profit of RMB 30 million Yuan, and which is still in operation to this day."[15] Rosen Decl., Ex.1, pg. 4, ¶ 2. Citing this, a creditor condemned it as "'Premeditated large-scale bankruptcy to escape debt.'" Rosen Decl., Ex. 1, pg. 4, ¶2. The next paragraph specifically names Neo-Luck Plastics as one of several of Neo-Luck's subsidiaries that entered bankruptcy. Rosen Decl., Ex. 1, pg. 4, ¶ 2. The article goes on to state "[w]hile subsidiaries of Neo-Luck were going bankrupt one after another and the Group found itself in dangerous waters, senior executives of Neo-Luck came to own more and more companies." Rosen Decl., Ex. 1, pg. 7, ¶ 5. The article also mentions that Fuwei is one of the new companies started by Yin. Rosen Decl., Ex. 1, pg. 8, ¶ 4.

An article from the website of the Economic Investigation/Detective Branch of Shandong Public Security Department entitled "Suspected of Embezzling State-owned Assets Top Executives of Weifang Neo-Luck Group Put in 'Shuang'gui' [Detained and Interrogated]," corroborates that Neo-Luck Plastics was one of the subsidiaries whose asset transfers were the focus of the investigation of and proceedings against Yin and Wang. Rosen Decl., Ex. 3. The article states that Yin, the "actual controlling person" of Neo-Luck Group, and Wang, its current Chairman, were detained and interrogated on suspicion of embezzling state-owned assets and committing fraud. Rosen Decl., Ex. 3, pg. 1, ¶ 2. Notably, the investigation was being led by, among others, the China Banking Regulatory Commissions and the Ministry of Public Security, the authorities Great Wall had initially filed proceedings with against Yin and Wang. Rosen Decl., Ex. 3, pg. 1, ¶ 2.

---

[15]   The mention of a "plastics company" discussed in the 21st Century article definitely refers to Neo-Luck Plastics, because a June 11, 2007 article confirms that Neo-Luck Plastics had annual revenue of RMB 200 million Yuan and income of RMB 30 million Yuan. Rosen Decl., Ex. 4, pg. 2, ¶ 1.

The article on the Ministry of Public Security's website makes clear, as follows, that the bankruptcy and transfer of assets of the Neo-Luck Plastics subsidiary, among others, were a main focus of the investigation initiated by the Ministry of Public Security in November 2006:

> "Everybody has been talking about it (this issue) in private for the last few days and the general consensus is that something like this was bound to happen" said a manager unwilling to reveal his name. Following the bankruptcies and subsequent privatization of Neo-Luck subsidiaries in recent years, many employees feel insecure and have lost confidence in the Group, even though the employees, as well as the managers, kept their jobs. "Profits of the Fuhua Grand Hotel over the last few years have been transferred to Beijing Yayue Hotel Management Co., Ltd, and not the New–Luck Group. At the same time, the actual controller of those bankrupted companies is Yin Jun, but every company's name has been changed, for instance Neo-Luck Plastic has been changed to Fuwei Plastic. Why? (I think) it is to escape debts". The manager further commented that they had become suspicious of certain senior executives in Neo–Luck for a long time.

Rosen Decl., Ex. 3, pg. 2, ¶ 1 (emphasis added). The foregoing article is particularly telling. In the minds of its employees, Neo-Luck Plastics simply changed its name to Fuwei Plastics. The operating business itself remained unchanged. The article lists Neo-Luck Plastics among other Neo-Luck Group subsidiaries that went bankrupt under suspicious circumstances and that are the subject of an investigation by the National Audit Office that led to the suspension of Yin's and Wang's travel and to their detention and interrogation. Rosen Decl., Ex. 3, pgs. 3-5. Another news article in Caijing Magazine on June 11, 2007 states that "[t]he way that Weifang Neo-Luck Plastics . . . transformed into Fuwei Films . . . is a classic example of how the Weifang Neo-Luck Group escaped its debts through the abuse of bankruptcy and the transferral of its assets to private ownership." Rosen Decl., Ex. 4, pg. 1, ¶ 2. The article states that, contrary to the information in the Registration Statement, Fuwei's predecessor did not simply purchase the assets of Neo-Luck Plastics; rather, in 2003 Fuwei's predecessor leased the Production Lines from Neo-Luck Plastics,

23

and Neo-Luck Plastics sent its managers to run Fuwei's business. Rosen Decl., Ex. 4, pg. 2, ¶ 5. Essentially, Fuwei secretly acquired the business of Neo-Luck Plastics informally before it actually purchased the Production Lines at auction. Rosen Decl., Ex. 4, pg. 2, ¶¶ 4-7. The article also states that on November 30, 2006, after the media exposed Neo-Luck Plastics for escaping debt through a false bankruptcy and the Ministry of Public Security ordered Yin and Wang not to leave China, Fuwei Films went public. Rosen Decl., Ex. 4, pg. 4, ¶ 5, pg. 5 ¶ 1. The focal point of Article 4 is how Neo-Luck Plastics was illegally transformed into Fuwei. The article shows that the focus of the investigation that led to Yin's and Wang's arrest was their orchestration of the transfer of the Production Lines from Neo-Luck Plastics, which they controlled, to Fuwei, of which they owned ninety percent. Rosen Decl., Ex. 4. This demonstrates that had Fuwei or the Underwriters made any effort to conduct due diligence on Yin and Wang, who owned 90% of the Company, they would have discovered the investigation led by the Ministry of Public Security and the order barring Yin's and Wang's travel.

Defendants also contend that Great Wall could not possibly have a claim against Fuwei for the transfer of the Production Lines because Great Wall purchased the loans while aware that Neo-Luck Plastics had already transferred its assets. This assertion is contradicted by Chinese media reports stating that Great Wall purchased the debt with the intention to recover money lost from the fraudulent transfer: "In 2005, Great Wall bought a RMB 6 billion Yuan asset package from the Bank of China – including a *near-defaulting* loan to Neo-Luck with principal and interests totaling 1.913 billion." Rosen Decl., Ex. 1, pg. 5, ¶ 1 (emphasis added). Great Wall's mandate is to maximize the recovery of non-performing loans to state-owned banks and preserve state-owned

assets.[16] As a bona-fide purchaser for value of the loans, Great Wall stood in the same position, and is permitted to pursue payment in the same manner, as the original owners of the loans. In any event, that Neo-Luck's creditor, Great Wall, had made a claim related to the illegal transfer of Neo-Luck's assets is a material fact regardless of the likely outcome of the claim.

### D.    Fuwei Was Required to Disclose the Investigation of Yin and Wang Whether or Not It Directly Concerned Fuwei

The criminal investigation of Yin and Wang that the Ministry of Public Security commenced in November 2006, which resulted in placement of restrictions on their travel privileges, was independently a material fact that defendants were required to disclose in the Registration Statement. Yin owned 79% and Wang 10.5% of Fuwei. Each controlled the intermediate entities from which Fuwei acquired the business and assets of Neo-Luck Plastics. ¶¶ 75-115. As such each was a promoter of Fuwei. *S.E.C. v. Enterprises Solutions, Inc.* 142 F.Supp.2d 561, 574 (S.D.N.Y. 2001) ("A promoter, as defined by SEC Regulation 12B, means "[a]ny person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer.") (*citing*, 17 C.F.R. § 240.12b-2).

Regulation S-K Item 401(g) requires an issuer to disclose any pending criminal proceedings to which a promoter is subject. 17 CFR § 229.401. In addition, any bankruptcies, whether personal or of corporations of which the promoter was an executive officer, must be disclosed. *Id.* (Issuer

---

[16]   Great Wall's website states in relevant part:  "The company specializes in acquiring, managing and disposing non-performing assets originating from state-owned commercial banks, in the pursuit of minimizing financial risks, deepening the reform of the financial system and sharpening the competitive edge of state-owned commercial banks in the international market. Taking full advantage of its legal privileges and professional expertise, CGWAMC will be committed in maximizing the recovery value of non-performing loans and the preservation of the state-owned assets through various methods, including debt collection, asset exchange and leasing, asset assignment and sale, debt restructuring & enterprises reorganization, debt-equity swap and asset securitization."  (emphasis added) Rosen Decl. Ex. 8.

"must describe with respect to any promoter, any of the events enumerated in paragraphs (f)(1) through (f)(6) of this Item that occurred during the past five years.") Yin and Wang were the subject of pending criminal proceedings for bankruptcy fraud, as evidenced by the Ministry of Public Security's investigation and by its confiscation of Yin's and Wangs' passports and placement of restrictions on their travel prior to the IPO. Such restrictions by a national police department indicate a criminal, rather than civil, proceeding. This is further evidenced by the fact that on May 1, 2007, Yin and Wang were formally "apprehended" in "shuang'gui." Rosen Decl., Ex. 2, pg. 2, ¶1, pg. 3, ¶2. Eventually, on October 16, 2007, Fuwei announced that Chinese authorities had arrested Yin, Wang, and Zhou for embezzling state-owned assets. ¶163. Certainly investors would find it important in deciding whether to invest in Fuwei that the Company's two controlling shareholder's owning 90% of the Company were under investigation and the subject of pending criminal proceedings for suspicion of bankruptcy fraud and theft of state-owned assets. "Failure to make the requisite disclosures under Regulation S-K will generally produce liability under the Securities Act." *Panther Partners, Inc. v. Ikanos Com, Inc.* 538 F.Supp.2d 662, 668-69 (S.D.N.Y. 2008); *citing, In re Initial Pub. Offering,* 358 F.Supp.2d at 211. *See also*, *Bond Opportunity Fund II, LLC, v. Heffernan*, 340 F.Supp.2d 146, 157 (D.R.I. 2004) (Reg S-K was designed "to help define what information is material and when and how it should be disclosed."), *citing,* Thomas Lee Hazen, *Treatise on Law of Securities Regulation* § 9.4[1]-[2] (4th ed. 2002).

### E.    Defendants Caused PRC Counsel to Issue an Inaccurate Legal Opinion That the Transfers Were Legal

The Registration Statement stated that Fuwei's PRC counsel believed that Fuwei's acquisitions of the Production Lines were valid under Chinese law. Statements of opinion or belief may give rise to liability under the securities laws in the same way as statements of fact. Opinions and beliefs are "characteristically matters of corporate record subject to documentation, to be

supported or attacked by evidence of historical fact." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092, 111 S.Ct. 2749, 2758 (1991). A legal opinion can serve as the basis of a securities fraud claim. *Kline v. First Western Gov't. Securities, Inc.* 24 F.3d 480, 484 (3rd Cir.1994); *S.E.C. v. Spectrum, Ltd*, 489 F.2d 535 (2d Cir.1973) (holding lawyer liable under Rule 10b-5 because he signed an opinion letter). *See also*, *U.S. Fire Ins. Co. v. Smith Barney, Harris Upham & Co.,* 724 F.2d 650, 652 (8th Cir. 1983) (allegations that offering memorandum and accompanying legal opinion of counsel used by underwriters to sell securities were false and misleading); *Eisenberg v. Gagnon* 766 F.2d 770, 775-76 (3rd Cir. 1985) (tax attorney liable under section 10(b) where he knowingly or recklessly rendered an opinion in offering memorandum as to tax consequences of investment designed to influence investment decisions, without a genuine belief or reasonable basis to believe opinion was accurate or complete).

In *Klein*, the legal opinion stated that certain transactions were lawful, but failed to disclose that the SEC and other administrative agencies were actively investigating the issuer in connection with these transactions. The Third Circuit held that not only the issuer, but also the attorneys, might be held liable for both misrepresentations and omissions where the result of either is to render an opinion letter materially inaccurate or incomplete. *Klein*, 24 F.3d at 484-85, 491. *Klein*'s facts mirror Fuwei's insofar as both issuers stated that the relevant material transactions were lawful, while failing to disclose that the government was actively investigating the lawfulness of those transactions. Fuwei had an affirmative duty to disclose in the Registration Statement all facts indicating that its PRC counsel's legal opinion was doubtful. *See also, In re Chambers Dev. Sec. Litig.,* 848 F.Supp. 602, 621 (W.D. Pa. 1994) (*citing, Sharp v. Coopers & Lybrand,* 649 F.2d 175, 183-84 (3d Cir. 1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982) (accounting firm liable under Section 10(b) for misrepresentations made as to tax consequences of investment in tax opinion letter designed to influence the investing public)).The Court must

distinguish cases in which investors seek to hold the issuer liable for false legal opinions, from those in which investors attempt to hold the law firm liable. While law firms may be liable for issuing false legal opinions, they are often insulated from liability because they specifically rely on the issuer to provide accurate factual predicate for the opinion – as was the case with Fuwei. *See*, *e.g., Fortson v. Winstead, McGuire, Sechrest & Minick,* 961 F.2d 469, 475 (4th Cir. 1992) (law firm properly relied upon accountants' representations as to financial disclosures for purposes of drafting opinion letter; law firm had no independent duty to verify); *Sable v. Southmark/Envicon Capital Corp.*, 819 F.Supp. 324, 335 (S.D.N.Y. 1993) (law firm had no independent duty to verify representations of client accepted as assumptions for opinion letter).

Here, the CAC alleges that Fuwei failed to provide critical facts to its PRC counsel necessary for the accurate rendering of an opinion. ¶¶ 45, 58, 115, 136. The Registration Statement made clear that the Company's PRC counsel was relying on the factual representations provided by Fuwei and that PRC counsel did not make any independent investigation of the facts.[17]   The allegedly concealed facts include: (a) that Great Wall had made a complaint through the China Banking Regulatory Commission to the Ministry of Public Security against Yin and Wang; (b) that the Ministry of Public Security had imposed travel restrictions against Yin and Wang as a result of the investigation; and (c) that Yin and Wang simultaneously exercised full control over both Neo-Luck Group and Fuwei at all times. ¶¶ 58, 115, 125-26. Fuwei must be held liable for providing incomplete facts to PRC counsel, which resulted in the latter's issuance of an inaccurate or misleading legal opinion – particularly given that the Registration Statement misrepresented and concealed other material facts related to the misleading legal opinion, such as that no creditor had yet sought to challenge the asset transfers. *See G & M, Inc. v. Newbern,* 488 F.2d 742, 745 -746 (9th

---

[17]   "Our PRC counsel's opinion solely relates to the legal procedure of the auctions and is based upon certain factual assumptions, written representations of the Company and written reports of the auction company and other related parties." ¶ 39, Rosen Decl. Ex. 12, Reg. Stmt., pg. 11.

Cir. 1973) ("considering [defendant's] other misrepresentations and failures to disclose, which were relevant to the accuracy of his prediction, we have no difficulty in finding this 'prediction' to be actionable.").

Fuwei cannot hide from liability behind its PRC counsel's opinion. Fuwei drafted the Registration Statement and the description of its PRC counsel's legal opinion contained therein.  It was Fuwei's responsibility to ensure that all of the critical facts were provided to its PRC counsel and to investors. Fuwei is liable if its counsel's opinion is inaccurate, incomplete, or otherwise fails to meet the requirements for full disclosure under the securities laws. *Howing Co. v. Nationwide Corp.* 826 F.2d 1470, 1479 (6th Cir. 1987). *See also*, *Escott v. BarChris Const. Corp.* 283 F.Supp. 643, 685 (S.D.N.Y. 1968) (CFO who withheld facts from attorneys and accountants "could not shut his eyes to the facts and rely on" these experts for advice.).

The Underwriters cite several cases involving disclosure requirements in proxy statements (not registration statements) for the proposition that the Registration Statement need only bring the question of foreign law to the attention of investors without answering the question accurately. For example, in *Ronson Corp. v. Liquifin Aktiengesellschaft*, plaintiff sought a preliminary injunction of a tender offer on the basis that defendants failed "to disclose adequately or have misrepresented the foreign law or legal controls that may apply to the defendants in the event the tender offer is successfully consummated." 370 F.Supp. 597, 608 (D.N.J. 1974). In *Ronson*, plaintiffs and defendants each submitted legal opinions of foreign counsel in an attempt to convince the court that their view of how foreign law would affect the companies was correct. The court stated it need not decide the issue so long as shareholders are advised that the legal question is actively disputed by both sides and provided complete explanations of each side of the legal issue.

Similarly, in *Avnet, Inc. v. Scope Industries,* a shareholder asserted that a tender offer proxy must disclose that the acquiring company is an unregistered investment company, a fact disputed

by the acquirer. 499 F.Supp. 1121 (S.D.N.Y. 1980). The court held that the amended proxy was adequate because it disclosed the disputed fact that the acquirer was an unregistered investment company and the conflicting positions taken by the parties as to whether the disputed fact was true. *Id.* at 1125-26 ("By disclosing Avnet's allegations, in its amended Schedule 13D, Scope sufficiently informs Avnet's shareholders of that possibility and of the parties' positions on that point."), *accord*, *Ranger Oil Ltd. v. Petrobank Ener. and Res. Ltd.* 2000 WL 33115906, *12 (S.D.N.Y. 2000) (proxy adequately disclosed disputed allegations acquirer committed insider trading violations). Similarly, in *Nemo v. Allen* the court ruled that "the misconduct of [its CEO] was, in fact, revealed. There is simply no requirement in the Securities Laws, as plaintiff suggests, that [the CEO's] actions be characterized as criminal in nature. All that need be disclosed are the facts from which a stockholder may draw its own conclusion." 466 F.Supp. 192, 195 (S.D.N.Y. 1979).

Here, Fuwei never disclosed the *disputed* facts and it concealed completely the ongoing dispute with Great Wall concerning Neo-Luck Group's transfer of its assets to private companies controlled by Yin, Wang, and Zhou. Defendants omitted to state that Great Wall had accused Yin and Wang of bankruptcy fraud and embezzling the assets of Neo-Luck Plastics and the assets of other valuable Neo-Luck Group subsidiaries. The operative holding of *Ronson, Avnet, Ranger and Nemo* required Fuwei to disclose that Yin and Wang were the control persons of Neo-Luck Group and stood accused by Neo-Luck Plastics's creditor, Great Wall, of bankruptcy fraud and stealing the assets of Neo-Luck Plastics (a state owned company) by transferring its assets to Fuwei. Defendants not only concealed Great Wall's accusations of fraud, but also misled investors to believe that no creditors had yet challenged the asset transfers.[18] Defendants were further required

---

[18]    "There can be no assurance that relevant authorities or creditors of the predecessor owner of these assets will not challenge the effectiveness of these asset transfers. . . . However, should any

to disclose that the Ministry of Public Security had initiated an investigation of Yin and Wang and had restricted their travel pending the outcome of the investigation. Only if armed with these critical facts could investors have appreciated the seriousness of the allegations against Yin and Wang and the risk of an adverse outcome for Fuwei. IPO purchasers were told that "[t]here can be no assurance that relevant authorities or creditors of the predecessor owner of these assets will not challenge the effectiveness of these transfers . . ." and that "the auctions of the Brückner and DMT production lines were valid under PRC law and the possibility of the creditors of Shandong Neo-Luck successfully exercising recourse or claiming repayment with respect to our assets purchased in the bankruptcy proceeding should be remote." ¶ 39, Rosen Decl. Ex. 12, Reg. Stmt., pgs. 11-12. Knowledge that Chinese police and regulatory agencies were presently investigating the asset transfers because Great Wall, Neo-Luck Plastics's creditor, had already accused Yin and Wang of fraudulently transferring the assets would change a reasonable person's view of the potential risks surrounding the acquisition of the Production Lines. Moreover, knowledge of the previously concealed fact that Yin and Wang were not only the 90% shareholders of Fuwei, but also the top control persons of Neo-Luck Group during the time of the asset transfers, would also affect an investor's view of the risks that the asset transfer would be successfully challenged. Yin's and Wang's presence on both sides of the asset transfers looks inherently suspicious, particularly since the Bruckner Line was purchased for RMB 106 million, well below its book value of RMB 285 million, and the DMT Line was purchased for RMB 34 million, well below its appraised value of RMB 105 million and a fraction of its book value of RMB 171 million. ¶¶ 65-66, 87, Rosen Decl., Ex. 4, pg. 2, ¶ 7, pg. 3, ¶ 1, pg. 4, ¶¶ 2-3.

---

such challenge be brought in China (or elsewhere) and prevail, we may incur substantial liabilities and be required to pay substantial damages as a result of acquiring these assets." ¶ 39; Rosen Decl. Ex. 12, Reg. Stmt., pgs. 11-12).

The Underwriters contend that the transfer of the Production Lines even today appears to be lawful. This is a ludicrous suggestion given that Messrs. Yin, Wang, and Zhou have been arrested for embezzling the assets of Neo-Luck Plastics along with those of a host of Neo-Luck Group's other subsidiaries. ¶ 163. Given the detailed facts in the attached Chinese news articles outlining a well-planned scheme by Yin and Wang to transfer fraudulently the assets of Neo-Luck Group to private companies all under the control of Yin, Wang, and Zhou as part of the "Zenika" group of companies, Defendants' protestations that the asset transfers were lawful must be rejected at the pleading stage. Perhaps defendants may revisit the issue on a motion for summary judgment if and when Yin, Wang, and Zhou are released from custody.

### F.    Failing to Disclose Yin and Wang Controlled Neo-Luck Group Misled Investors

While the registration statement discloses that Zhou is a 10.5% owner of Fuwei and had previously served as general manager of Neo-Luck Group from 1995 to April 2005, it omits that Yin and Wang were the top control persons of Neo-Luck Group at all relevant times. The only related disclosure is that Yin owns 79% and Wang 10.5% of Fuwei and that Yin, Wang, and Zhou had controlling interests in the entities that *purchased* the Production Lines from Neo-Luck Plastics in the bankruptcy auctions. Rosen Decl. Ex. 12, Reg. Stmt., pgs. 68, 74. Investors had no idea that Yin and Wang controlled *both* sides of the auction sales of the Production Lines.

According to Chinese media reports, on the day Yin established Fuwei, he resigned as Chairman of Neo-Luck Group. Shortly thereafter, Wang became Chairman. Yin, however, continued secretly to control Neo-Luck Group after his resignation. According to news reports, Yin continued to be the "actual controlling person" of Neo-Luck Group even after he formed Fuwei. ¶¶ 53-58, Rosen Decl., Ex. 1,pg. 3, ¶ 1, Ex. 2, pg. 2, ¶ 1, Ex. 3, pg. 1, ¶ 2, Ex. 5, pg. 3, ¶ 3. Yin and Wang controlled Neo-Luck Group at the time Neo-Luck Plastics was placed into bankruptcy and its assets were sold to intermediate entities also controlled by Yin and Wang. This is a material fact

for three reasons: (1) it bears on the evaluation of the legality of the acquisitions of the Production Lines and of the risk the transfer would be voided or that Fuwei would be ordered to pay damages (*See* point II-C *supra* and II-G *infra*); (2) without knowledge of it, investors are unable to appreciate the risks of Fuwei's underlying business since Fuwei essentially took over the operating business of Neo-Luck Plastics that was previously bankrupted; and (3) without knowledge of it, investors are unable to gain a full understanding of the business track record of Fuwei's promoters and control persons.

According to Neo-Luck's employees interviewed by Chinese media, Fuwei essentially took over the operating business of Neo-Luck Plastics and changed its name to Fuwei Plastics.[19] Putting aside whether the machinations leading to Fuwei's acquisition of Neo-Luck Plastics's business were lawful, that Fuwei did not simply acquire machinery from Neo-Luck Plastics, but essentially its entire operating business, is material because Neo-Luck Plastics's operating business went bankrupt and the same persons controlling Neo-Luck Plastics now control 100% of Fuwei. In an analogous case, a group of promoters organized an airline, Carriba Air, just one month after a venture in which they were all principals, Air Caribbean, went bankrupt. *S.E.C. v. Carriba Air, Inc.,* 681 F.2d 1318, 1323-24 (11th Cir. 1982). The new venture was to fly the same routes and employ the same employees as the bankrupt venture. *Id.* The new entity, Carriba Air, commenced a stock offering without disclosing in the prospectus that the current principals had previously

---

[19]    *See, e.g.,* Rosen Decl., Ex. 1, pg. 2, ¶ 1 ("Following the bankruptcies and subsequent privatization of Neo-Luck subsidiaries in recent years, many employees feel insecure and lack confidence, even though they along with the managers kept their jobs. . . . At the same time, the actual controller of those bankrupted companies is Yin Jun, but every company's name has been changed, for instance Neo-Luck Plastic has been changed to Fuwei Plastic. Why? (I think) it is to escape debts"); Rosen Decl., Ex. 4, pg. 1, ¶¶ 4, 6-7 ("The first thing Shandong Fuwei did after being established was to acquire Neo-Luck Plastics. . . . With equipment and personnel from a state-owned company, Shandong Fuwei kicked off its production and started to make preparations for the takeover [of Neo-Luck Plastics]. Shandong Fuwei then acquired the core assets of Neo-Luck Plastics.")

controlled a similar entity that recently went bankrupt. *Id.* The SEC obtained an order enjoining the stock offering. *Id.* On appeal, the Eleventh Circuit held that the omissions concerning the principals' role in the prior bankruptcy of what was essentially a similar predecessor entity was material. *Id.* Similarly, here, the fact that Neo-Luck Plastics's business failed and that the same persons behind Neo-Luck Plastics control 100% of Fuwei is material information for evaluating the chances for success of Fuwei based on its underlying business, as well as the track record of its controlling shareholders. Notwithstanding that Fuwei is the successor in interest to Neo-Luck Plastics's business, the recent bankruptcies of a controlling person of the issuer is material information required to be disclosed in a registration statement. *S.E.C. v. Enterprises Solutions, Inc.,* 142 F.Supp.2d 561, 576 (S.D.N.Y. 2001); *S.E.C. v. Merchant Capital*, LLC, 483 F.3d 747, 770 (11th Cir. 2007).

### G.    Defendants Misrepresented the Absence of Any Pending or Threatened Litigation

The Registration Statement misstated that Fuwei was not a party to any pending or threatened litigation. ¶39, Rosen Decl. Ex. 12, Reg. Stmt., pg. 67. In April 2006, eight months prior to the IPO, Fuwei received a request for arbitration commenced by DMT S.A. in the ICC International Court of Arbitration. Fuwei, at that time, became a respondent in the arbitration proceeding. ¶¶ 118-120. The arbitration sought damages of $1,250,000, asserting that Fuwei was responsible for paying the debts of Neo-Luck Plastics on the basis that the bankruptcy transfer of the DMT Line to Fuwei was illegal. ¶ 69.

Fuwei first disclosed this material litigation on April 2, 2007 – four months after the IPO. ¶ 120. Fuwei now disingenuously contends that it did not become a respondent in the arbitration proceeding until January 2007, a month after the IPO, when the ICC International Court of Arbitration ruled that the arbitration proceeding against Fuwei could not be dismissed. Fuwei MTD

at pg. 20. The Rules of Arbitration of the ICC International Court of Arbitration state that when a

party receives a request for arbitration, that party is a respondent named in the proceeding. ¶¶ 69,

122. Rosen Decl., Ex. 10 (ICC Rules). Article 4 of the Rules of Arbitration of the ICC International

Court of Arbitration thus state:

> 1   A party wishing to have recourse to arbitration under these Rules shall submit its
> Request for Arbitration (the "Request") to the Secretariat, which shall notify the Claimant
> and Respondent of the receipt of the Request and the date of such receipt.
> 2   The date on which the Request is received by the Secretariat shall, for all purposes, be
> deemed to be the date of the commencement of the arbitral proceedings.
> . . . .
> 5   The Secretariat shall send a copy of the Request and the documents annexed thereto to
> the Respondent for its Answer to the Request once the Secretariat has sufficient copies
> of the Request and the required advance payment. . . .

¶¶ 69, 122, Rosen Decl., Ex. 10. Therefore, as soon as Fuwei received a request for arbitration in

April 2006, eight months prior to the IPO, it was, without any doubt, a respondent in the arbitration

proceeding. ¶ 120. Even assuming *arguendo* that Fuwei was not a respondent in the arbitration

proceeding when it received the request for arbitration in April 2006, nonetheless Fuwei was

required to disclose the arbitration proceeding in the Registration Statement under Regulation SK,

Item 103, which requires disclosure of any proceeding in which the *subject matter* of the claim is

owned by the registrant. ¶¶ 69-70, 123. Indeed, the property that was the subject of the claim,

namely the DMT Line, belonged to none other than Fuwei.

Defendants incorrectly assert that Fuwei was not a respondent until the ICC denied Fuwei's

request to dismiss the arbitration proceeding in January 2007, a month after the IPO. Fuwei was a

respondent when it was served with an arbitration demand in April 2006, not when the Court later

made its ruling on Fuwei's request to dismiss the demand. Fuwei's April 2, 2007 8-K states that

"Despite our arguments to the Court of Arbitration that we are not subject to arbitration, in January

2007 the ICC notified us that it would permit DMT's claim to proceed against us (rather than

Neoluck [Plastics], which is bankrupt)." ¶ 120. This shows that: (a) prior to the IPO, DMT filed an

arbitration demand against Fuwei, seeking to hold it liable for Neo-Luck Plastics' debt to DMT S.A.; and (b) Fuwei asked the ICC to have the arbitration dismissed on the basis that DMT S.A.'s contract was with Neo-Luck Plastics, not Fuwei. In January 2007, the ICC denied the request to dismiss and ruled that Fuwei must defend the arbitration and could be held liable for the debts of DMT. While the request to dismiss was denied in January 2007, DMT's claim was pending against Fuwei since April 2006 – well before the IPO.

In their Motion to Dismiss, the Underwriters present new evidence of Fuwei's later settlement of DMT's claim; under Fed. R. Evid. 201, this evidence may not be accepted as true on this motion to dismiss.[20] The Underwriters assert that because Neo-Luck Group paid most of the settlement funds, this indicates that Fuwei was somehow absolved from its responsibility to disclose in the Registration Statement the claim against it. Firstly, since Yin and Wang control both Neo-Luck Group and Fuwei, these defendants are able to manipulate the settlement in any manner they choose. Having seen the allegations against them in the CAC, Yin and Wang may simply have decided that for appearances' sake they would structure the settlement with DMT S.A. in this manner. Secondly, even if the claim was ultimately resolved without a material payment by Fuwei, the existence of the claim and its implications at the time of the IPO were material. The DMT arbitration claim asserted that Fuwei was liable for the debts of Neo-Luck Plastics because of the fraudulent bankruptcy transfer of the DMT Line. DMT S.A.'s attempt to hold Fuwei liable for the debts of Neo-Luck Plastics based on Fuwei's acquisition of the DMT Line directly contradicted the statements in the Registration Statement that none of Neo-Luck Plastics's creditors had challenged the transfer of the Production Lines or sought repayment of Neo-Luck Plastics's debts from Fuwei.

---

[20]    Under Fed. R. Evid. 201, this evidence may not be accepted by the Court for the truth of the matter asserted.   Thus, the amount of the settlement, the payees of the settlement, and other terms cannot be accepted as true and used to support Defendants' position on this motion to dismiss. *See* Underwriters MTD at 9 & n.33.

¶¶ 39, 120.

"A fact is material if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision." *Greenapple v. Detroit Edison Co.*, 468 F. Supp. 702, 708 (S.D. N.Y. 1979), *aff'd*, - F. 2d -, No. 79-7352 (2d Cir. Mar. 17, 1980) (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Defendants erroneously rely on Regulation S-K in their assertion that because the claim in the arbitration proceeding was for $1,250,000, "less than 10 percent of the current assets of the registrant," 17 C.F.R. § 229.103, it was an immaterial fact. Regulation S-K, Item 103, also states, "[h]owever, if any proceeding presents in large degree the same legal and factual issues as other proceedings pending or known to be contemplated, the amount involved in such other proceedings shall be included in computing such percentage." *Id.* DMT S.A.'s arbitration claim was based on Neo-Luck Plastics's fraudulent bankruptcy and transfer of the assets to Fuwei, and it sought to hold Fuwei liable for Neo-Luck Plastics's debts. ¶ 11. This claim was directly related to the proceedings initiated by Great Wall's complaint made to the Ministry of Public Security in November 2006, which resulted in travel restrictions on Yin and Wang, and ultimately resulted in their arrest for bankruptcy fraud in connection with the fraudulent transfer of the DMT Line, which was the same subject at issue in the arbitration proceeding. Since the subject matter of the bankruptcy fraud alleged in Great Wall's claim is for the entire value of the DMT Line, the amount of money at stake in both the arbitration proceeding and the proceedings initiated by the Ministry of Public Security exceeds the 10% materiality threshold under Regulation S-K. 17 C.F.R. § 229.103. Moreover, Regulation S-K guidelines are intended only to describe the minimum of what must be disclosed, and a registrant must add other information if there is a substantial likelihood that a reasonable investor would consider it important in making his or her decision. *Calderon v. Tower Associates Intern., Inc.*, 1989 WL 29916, at *3 (D. Or. Mar. 28, 1989) (quotation marks omitted).

Indeed, the Supreme Court declines to adopt a statistical bright line rule to determine what a reasonable investor would consider significant. *See Basic Inc. v. Levinson*, 485 U.S. 224, 236 & n.14 (1988) ("'Although . . . ideally it would be desirable to have absolute certainty in the application of the materiality concept . . . such a goal is illusory and unrealistic. The materiality concept is judgmental in nature and it is not possible to translate this into a numerical formula.'" (quoting House Committee on Interstate and Foreign Commerce, Report of the Advisory Committee on Corporate Disclosure to the Securities and Exchange Commission, 95th Cong., 1st Sess., 327 (Comm. Print 1977)). The Second Circuit has also "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2nd Cir. 2000). *See also In re Home Health Corp. of America, Inc. Sec. Litig.*, 1999 WL 79057, at *6-7 (E.D. Pa. Jan. 29, 1999) (declining to hold immaterial as a matter of law a failure to report loss of a *de minimis* percentage of total revenue where qualitative factor rendered the loss significant); *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 410 (S.D. N.Y. 1998) (relying on *Basic* and declining to hold as a matter of law that misstatements affecting profits by no more than 2.54% were immaterial).    Any reasonable investor would want to know that the Company's acquisitions of its two main operating assets, one of which was the DMT Line, were already being legally challenged – in both the arbitration proceeding and in the criminal investigation initiated by Great Wall.

Fuwei also had a specific duty to disclose the arbitration proceeding because Fuwei made affirmative statements in the Registration Statement that were belied by the commencement of the arbitration proceeding in the ICC International Court of Arbitration and the criminal investigation conducted by the Chinese government. Indeed, the Registration Statement states, "We are not currently a party to any material litigation and are not aware of any pending or threatened material litigation." ¶ 39, Rosen Decl. Ex. 12, Reg. Stmt., p. 67. The arbitration proceeding and the criminal

investigation of Yin's and Wang's fraudulent transfer of the Production Lines began prior to the IPO. Great Wall had clearly done more than "threatened litigation" when it complained to the Ministry of Public Security, causing the initiation of legal proceedings against Yin and Wang. At the very least, Fuwei should have informed investors of the various pending legal proceedings so that the investors could decide for themselves whether "the possibility of the creditors . . . successfully exercising recourse or claiming repayment with respect to . . . [Fuwei's] assets purchased in the bankruptcy proceeding should be remote." ¶ 39, Rosen Decl. Ex. 12, Reg. Stmt., pgs. 11-12. Fuwei was obligated to disclose that at the time of the IPO the Company was "party to… material litigation" and was "aware of… pending or threatened material litigation" concerning its two main operating assets. ¶ 39, Rosen Decl. Ex. 12, Reg. Stmt., p. 67.

### H.    Defendants' "Truth-on-the-Market" Defense Must Fail

Defendants assert that the allegedly false and misleading information was already disclosed publicly **prior to the IPO** and therefore that they had no duty to disclose it in the Registration Statement. The only pre-IPO news articles Defendants identify are written in Chinese language and were published in Chinese newspapers and only in China, approximately 6 and 8 months prior to the IPO. Plaintiffs have also submitted the five Chinese language news articles, written in Chinese language and published only in China, that they relied on in drafting the CAC. Only one of those, Article 1, was published prior to the IPO. This article, published on June 13, 2006, makes clear that Great Wall had accused Fuwei's controlling shareholders of illegally selling the assets of Neo-Luck's plastics business in a fraudulent bankruptcy. Rosen Decl. Ex. 1, pg. 2, ¶ 3, pg. 3, ¶¶ 1-3, p. 5, ¶ 4, pg. 7, ¶ 5.

Defendants take the position that retail investors in the Fuwei IPO either should have performed a news search of all Chinese language publications in China and located this one article that disclosed this material adverse information, or alternatively, that the "market" for Fuwei's

initial public offering was efficient and adequately informed of all publicly available information – even information written in Chinese and published only in China 6 months before the IPO.

Defendants are asserting a "truth-on-the-market" defense, which is simply not appropriate in the context of an initial public offering. The "truth-on-the-market" defense is the corollary to the "fraud-on-the-market" presumption of reliance (transaction causation). *Ganino*, 228 F.3d 167. The truth-on-the-market defense permits defendants to "rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known." *Id*. The Third Circuit addressed precisely this issue in *Adams Golf*, 381 F.3d 267 (3d Cir. 2004), where defendants argued that a pre-IPO press release adequately informed the public of alleged omissions of material fact, obviating the issuer's obligation to mention it in its offering materials. The Third Circuit examined a number of cases, some of which Fuwei has cited, and distinguished each and every one as inapplicable because the information publicly available included: relevant state laws, the "universal" motivations of corporate officers, and news that had been "reported countrywide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions." [21] *Adams Golf*, 381 F.3d at 277, fn 10. One case, *Klein v. General Nutrition Co.*, 186 F.3d 338 (3d Cir.1999), the circuit found "even further afield" because it involved securities traded on an efficient secondary market while "there is no indication that there was any such efficient market in Adams Golf shares prior to the IPO." *Adams Golf*, 381 F.3d at 277, fn 10.

---

[21]   A*cme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1323 (7th Cir.1988) (no obligation to disclose information on relevant state laws as statutes are in the public domain); *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir.1979) (no obligation to disclose motivation of corporate officers to maintain corporate control and prevent hostile takeovers as such intentions are "universal."); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978) (no obligation to disclose labor difficulties when those problems were "reported countrywide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions.").

Similarly, here there is currently no evidence in the record or allegations in the CAC that the market for the initial public offering of Fuwei's common stock was an efficient market. *See, In re Initial Public Offering Securities Litigation*, 471 F.3d 24, 42 (2nd Cir. 2006) ("the market for IPO shares is not efficient"). Moreover, in *Adams Golf* the issuer disseminated a press release to all major U.S. media outlets. Here, the news articles were in Chinese language and published only in China 6 months before the IPO, making it even less likely that the Nasdaq market could have possibly received and processed the information. As such, Fuwei's truth-on-the-market defense is untenable.

In an *Amicus Curiae* brief, the Securities and Exchange Commission strongly urged the Second Circuit to reject the truth-on-the-market defense with respect to Section 11 liability because permitting a defense of "public availability" would "be a serious disruption of the registration requirements of the Securities Act." Br. of the Amicus Curiae SEC, *Merritt v. Merrill Lynch & Co.*, No. 03-7978, pp. 22-29 (2d June 2004)[22]. The SEC's brief makes clear the fundamental flaw of applying the truth-on-the-market defense to Section 11 & 12 claims:

> Issuers and others who now have a duty to make disclosure in registered offerings could escape those obligations simply by showing that the omitted information could be found somewhere in the public domain. This result is plainly at odds with the Congressional purpose in enacting these requirements.

*Id*. at p.22.

The other cases cited by Fuwei are equally unavailing. *Garber v. Legg Mason,* 537 F.Supp.2d 597 involved the publication of information in the widely-read English language publication "Fortune Magazine." Unlike Fuwei, *Garber* involved a secondary offering of stock that had been trading in an efficient market covered extensively by research analysts. Defendants also rely on *In re Pfizer, Inc. Sec. Litig*. 2008 WL 540120, at *6 (S.D.N.Y. Feb. 28, 2008), which

---

[22] This brief is available on the internet from the SEC at
http://www.sec.gov/litigation/briefs/merritt.pdf

similarly involved a company whose stock was traded in an efficient market and covered extensively by research analysts who had addressed the very facts plaintiffs claimed were omitted.[23]

In *In re Merrill Lynch & Co. Research Reports Sec. Liti*g., 272 F. Supp. 2d 243, 249-51 (S.D.N.Y. 2003) plaintiffs alleged that a mutual fund affiliated with Merrill Lynch had failed to disclose that it invested in companies to which Merrill Lynch provided investment banking services. The Court found no duty to disclose because it was public knowledge that the fund's parent/affiliate, Merrill Lynch, provided investment banking services to many of the companies in which the mutual fund invested.[24] *In re Merrill Lynch,* 272 F. Supp. 2d at 249-250 ("[f]ederal securities laws do not require a company to state the obvious.") (quoting *Klein v. Gen. Nutrition Cos.*, 186 F.3d at 343). "[A]s one of the world's largest investment banks, MLPF & S provided investment banking services and issued research reports for many of the world's leading technology companies. That the companies overlap should come as no surprise." *In re Merrill Lynch,* 272 F. Supp. 2d at 253. Defendants cannot credibly suggest that any of the information in the Chinese language news articles published in China 6 months before Fuwei's IPO were obvious to anyone. The internal machinations of defendants Yin, Wang, and Zhou at Neo-Luck Group were not common knowledge to retail investors. It is unreasonable to impute such arcane information to each individual investor in the Fuwei IPO. This is particularly true given that the Underwriters claim to be equally surprised and victimized by the conduct alleged in the CAC. *See*, Ex.12, April 11, 2008 pre-motion conference letter to the Court, pg. 1.

---

[23]   Defendants also cite *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989) for the proposition: "It is pointless and costly to compel firms to reprint information already in the public domain." Fuwei MTD at 11. The Seventh Circuit was referring to the Code of Federal Regulations, not an obscure Chinese news article.

[24]   Besides finding the omitted information obvious to investors, the Court also noted a number of English language news articles published in the United States and Canada had been published identifying the precise conflict of interest.

**I.    Defendants' Affirmative Defense of Negative Causation Falls Short**

(i)    Consideration of the Affirmative Defense of Negative Loss
Causation Is Improper on a Motion to Dismiss

To demonstrate a *prima facie* claim under Sections 11 and 12, a plaintiff is not required to plead loss causation. *In re WRT Energy Securities Litigation*, 2005 WL 2088406, at *1 (S.D.N.Y. Aug. 30, 2005) (*citing, Adair v. Bristol Technology Systems, Inc.*, 179 F.R.D. 126, 135 (S.D.N.Y. 1998). Rather, any decline in value is **presumed** to be caused by the misrepresentation in the registration statement, and it is "the defendant [that] bears the burden of proving that the price decline was not related to the misrepresentations in the registration statement." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995) (emphasis added).[25]

The affirmative defense of negative causation, set forth in Section 11(e), provides defendants with the opportunity to **prove** that the decline in the value of the stock was the result of some factor other than the alleged misrepresentations in the registration statement. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377 (S.D.N.Y. 2006). Section 12 provides an essentially identical affirmative defense modeled after Section 11 of the Securities Act. *In re WorldCom, Inc. Securities Litigation*, 294 F.Supp.2d 392, 408 (S.D.N.Y. 2003). Defendants have a "heavy burden" of proving negative causation. *Akerman v. Oryx Comm'ns, Inc.*, 810 F.2d 336, 340-41 (2d Cir. 1987). "While a defendant may be able to prove this 'negative causation' theory [at the summary judgment stage or trial], an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." *In re Adams Golf*, 381 F.3d at 277; *In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 351 n. 80 (S.D.N.Y. 2003) ("[W]hether losses are attributable to other sources is necessarily a fact question" requiring expert testimony). By its

---

[25]    The Underwriters declare that a complaint must affirmatively plead loss causation, but the supporting case they cite was brought under § 10(b) of the Exchange Act. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*  493 F.3d 87, 98 (2nd Cir. 2007).

nature, the assertion of the negative causation defense invites extensive loss causation analysis, which is not suited for a motion to dismiss. *See, Adair v. Kaye Kotts Associates, Inc.,* 1998 WL 142353, 6 (S.D.N.Y. March 27, 1998) (successful Section 11(e) defenses have not only included expert testimony, but have provided and discussed evidence attributing the decline to factors other than their own disclosure of financial results); *accord, In re WRT Energy*, at *2-3 (dismissal on negative causation grounds would not provide plaintiffs the opportunity permitted by this Circuit to come forward with evidence suggesting that the price decline resulted from alleged misstatement).

The three mutual fund cases cited by defendants in which a negative causation defense supported dismissal at the pleading stage are easily distinguishable. The court granted a motion to dismiss on loss causation grounds in *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, because it was apparent from the face of the complaint that 100% of the decline in the value of plaintiffs' investment corresponded exactly with the general market decline of all technology stocks and was thus unrelated to the alleged fraud. 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003). Here, Defendants do not suggest that market generally suffered a similar fall following Fuwei's IPO. The other two cases alleged undisclosed compensation received for steering customers into particular mutual funds. In each case, the court found: (i) that the compensation arrangements were disclosed; and (ii) that the decline in the net asset value of the mutual funds had nothing to do with the fees being paid to brokers for steering customers to the funds. *In re Salomon Smith Barney Mut. Fund Fees Litig.,* 441 F.Supp.2d 579, 590 (S.D.N.Y. 2006). These cases are inapposite for analyzing the cause of Fuwei's stock price decline, which allegedly occurred as a result of adverse news specific to events affecting Fuwei's operations and future prospects. ¶¶158-68. See, *Levine v. AtriCure, Inc.*, 508 F.Supp.2d 268, 273 (S.D.N.Y. 2007) ("the decisions relied on were all distinguishable-either made on motions for summary judgment or after trial or involving claims where the burden of proving loss causation fell on the plaintiff.").

44

       (ii)     The Complaint Pleads Disclosure of Adverse News Followed by
                Price Declines Related to the Alleged Fraud

Even though Plaintiffs are not obligated to plead loss causation for a §11 or §12 claim in the complaint (*Levine v. AtriCure,* 508 F.Supp.2d at 273, n. 9), the CAC adequately pleads loss causation with the level of detail required for a §10(b) action.[26]  *Dura Pharmaceuticals., Inc. v. Broudo*, 544 U.S. 336 at 342; *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

The first adverse disclosure related to the alleged misrepresentations occurred on April 30, 2007, when the company replaced KPMG with Murrell Hall, causing a 10% stock price decline over two trading days. ¶¶ 158-59. The CAC alleges that the change in auditors occurred because KPMG learned that: (i) Fuwei had failed to disclose the DMT arbitration demand in April 2006, and (ii) Chinese authorities had recently commenced an investigation into Fuwei's acquisition of the Production Lines. ¶160. Defendants assert that Plaintiffs have not *proven* that KPMG's termination is related to the misrepresentations and omissions, but Plaintiffs have no obligation to do so. "[A]ny decline in value is presumed to be caused by the misrepresentation in the registration statement." *In re WRT Energy,* 2005 WL 2088406, at *1 (*quoting McMahan & Co.*, 65 F.3d at 1048. Defendants have failed to adduce any evidence that KMPG's departure was unrelated to the alleged misrepresentations. Defendants bear this heavy burden and fail to carry it. *Akerman,* 810 F.2d at 340-41.

On June 25, 2007, it was disclosed that that Yin, Wang, and Zhou were being investigated by the Chinese authorities in connection with the dispute between Neo-Luck and "a certain Chinese asset management company," namely, Great Wall. ¶ 161. This news caused Fuwei's stock price to drop $1.01, or 14%. ¶ 162. Defendants do not suggest that this stock price drop is unconnected

---

[26]  The concept of negative causation differs from loss causation. Negative causation is an affirmative defense to a § 11 Securities Act claim, whereas loss causation is an element of a § 10(b) Exchange Act claim. *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 411 F.Supp.2d 377, 383 (S.D.N.Y. 2006).

with the alleged failure to disclose this investigation in the Registration Statement.

On October 16, 2007, Fuwei announced that Chinese authorities had arrested Yin, Wang, and Zhou for embezzling state-owned assets. ¶163. This caused Fuwei's stock price to drop $2.65/share -- over 25% -- over two trading days. Defendants declare that the October 16th price decline is not recoverable because the facts of the arrest did not exist at time of IPO. Defendants' reasoning contradicts the Second Circuit's definition of loss causation in a securities action.

> [I]t cannot ordinarily be said that a drop in the value of a security is "caused" by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated. Put another way, a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.

*Lentell,* 396 F.3d at 173. Similarly, the October 16th price drop was not caused by the misleading statements in the Registration Statement. Rather, the arrest of Yin, Wang, and Zhou for embezzling state-owned assets (and the resulting stock price drop) was a foreseeable and likely result of the omitted facts concerning the investigation of Yin, Wang, and Zhou that had commenced prior to the IPO.

Similarly, on November 6, 2007, Fuwei announced that its auditor, Murrell Hall, had resigned "as a result of" the arrest of Fuwei's three controlling shareholders for embezzling state assets. ¶164. This news caused Fuwei's stock price to drop $1.69/share, or 25%, over two trading days. Again, the refusal of reputable auditors to do business with Fuwei – causing a loss of confidence among investors – was well within the "zone of risk" created by Defendants' concealment of the facts underlying the illegal transfer of the Production Lines.

On November 12, 2007, Fuwei revealed that its much touted third production line would not be deployed because of a capital shortfall caused by banks' refusal to lend to Fuwei because of the investigation of Yin, Wang, and Zhou for embezzling state assets. ¶ 166. This news caused

Fuwei's stock price to drop 33.5%, or $1.57/share. ¶ 167. Fuwei's inability to obtain financing to

expand its production lines resulted from the uncertainty and fear of further legal action against

Fuwei caused by the arrest of Yin, Wang, and Zhou, which was within the "zone of risk" of the

omitted facts of the investigation of the illegal transfer of the Production Lines.[27]

> (iii)    The Stock Price Rises Followed by Declines Upon Additional
>          Disclosures of Adverse News Related to the Fraud Do Not Vitiate
>          Loss Causation

Defendants assert that because Fuwei's stock price rebounded three months after the first

partial disclosure on June 25, 2007, of an investigation of Yin, Wang, and Zhou, this proves that

Plaintiffs have suffered no damages as a result of the fraud. Defendants offer no reasons as to *why*

the stock price bounced back. On the contrary, the most plausible inference is that the stock price

recovered for reasons unrelated to the fraud, such as general increases in the stock price of Chinese

stocks, positive earnings announcements or other positive market news. Moreover, the later

rebound in the stock price does not prove that Plaintiffs were not damaged when the stock price

dropped on June 25th. Those Class Members that sold their Fuwei shares after the June 25th

disclosure and before the stock price recovered suffered damages directly attributable to the

misleading Registration Statement. The presence or absence of price movement immediately after

disclosure is not, *per se*, dispositive under Section 11(e). *See*, *Adair v. Kaye Kotts Associates,* 1998

WL 142353, at *6 (discussing cases with similar holdings).

Lastly, when additional partial disclosures of information related to the arrests of Yin,

Wang, and Zhou were issued on October 16, November 6, and November 12, 2007, Fuwei's stock

---

[27]  Defendants assert that because the allegedly concealed facts were publicly available, the stock
price must have reflected these facts and hence no price inflation or damages exist. Plaintiffs have
addressed this argument in section II-H above showing that the truth-on-the-market defense does
not apply to Fuwei's IPO. Similarly, Defendants assert that the news items revealing the
investigation and arrests were not corrective disclosures because there were no misstatements or
omissions. Plaintiffs address this in sections I, II-B-1, and II-C above as to why the Registration
Statement was misleading.

price dropped and never recovered. The stock price recovery following the June 25th corrective disclosure has no bearing on the stock price drops following these subsequent corrective disclosures.

### J.      Plaintiffs Have Standing to Pursue a Claim Under §12(a)(2)

The Underwriters declare that purchasers of Fuwei stock in the aftermarket do not have standing to bring claims under §12(a)(2). Plaintiffs agree. The CAC's second cause of action under §12(a)(2) is asserted only on behalf of those Class Members that purchased Fuwei stock directly from the Underwriters in the IPO.  ¶ 189. Named Plaintiff Jerome Sahlman purchased Fuwei stock directly from the Underwriters in the IPO at the IPO price. ¶190. He has standing to bring these claims on behalf of other direct IPO purchasers. *Pinter v. Dahl,* 486 U.S. 622, 644, n.21 (1988); *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d at 409 & 423.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss the Consolidated Amended Complaint should be denied.

Respectfully submitted,

Dated: June 26, 2008                    **THE ROSEN LAW FIRM, P.A.**

_____/s/ Laurence Rosen_____
Laurence M. Rosen, Esq. (LR 5733)
Timothy W. Brown, Esq. (TB 1008)
Phillip Kim, Esq. (PK 9384)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email:  tbrown@rosenlegal.com

Lead Counsel for Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I hereby certify that on this on the 26th day of June, 2008, a true and correct copy of the foregoing LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.


/s/ Laurence Rosen