**As filed with the Securities and Exchange Commission December 15, 2006**

**Registration No. 333-138948**

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

**AMENDMENT NO. 2**
**to**
**FORM F-1**

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

———————————

# FUWEI FILMS (HOLDINGS) CO., LTD
(Exact Name of Registrant as Specified in Its Charter)

———————————

| **Cayman Islands** | **3081** | **Not Applicable** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**No. 387 Dongming Road**
**Weifang Shandong**
**People's Republic of China, Postal Code: 261061**
**0536-8884280**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

———————————

**CT Corporation System**
**111 Eighth Avenue**
**New York, New York 10011**
**(212) 894-8940**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent for Service)

Copies to:

| | |
|---|---|
| **Mitchell S. Nussbaum, Esq.** | **Jody R. Samuels, Esq.** |
| **Loeb & Loeb LLP** | **Richardson & Patel LLP** |
| **345 Park Avenue** | **The Chrysler Building** |
| **New York, New York 10154** | **405 Lexington Avenue, 26th Floor** |
| **(212) 407-4000** | **New York, New York 10174** |
| **(212) 407-4990 – Facsimile** | **(212) 907-6686** |
| | **(212) 907-6687 – Facsimile** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this Registration Statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

*A significant portion of our revenue is derived from the flexible packaging industry in the PRC relating to the packaging of processed food*

A significant portion of our revenue is currently derived from the production and sale of BOPET film. Our BOPET film is largely used for the packaging of processed food and to a lesser extent, packaging for pharmaceutical products, cosmetics, tobacco and alcohol. The demand for our BOPET film is therefore indirectly affected by the demand for processed food packaging.

Any decrease in the demand for our BOPET film will significantly affect our financial performance. Although demand for our BOPET film for packaging of pharmaceutical products, cosmetics, tobacco and alcohol has gradually been increasing, any significant fall in the consumption of processed food, in particular, whether as a result of contamination, food scares, health concerns or otherwise, could result in a decline in the sales of our products and adversely impact our financial condition, business and operation.

*We rely on key managerial and technical personnel and failure to attract or retain such personnel may compromise our ability to develop new products and to effectively carry on our research and development and other efforts*

Our success to date has been largely attributable to the contributions of key management and experienced personnel, particularly Xiaoan He, our Chairman and Chief Executive Officer, Xiaoming Wang, our Deputy General Manager for Production, Yongping Bai, our Deputy General Manager for Research and Development, and Xiuyong Zhang, our Deputy General Manager for Finance. We have entered into service agreements with these individuals. The service agreements have an initial term of three years. The loss of the services of Messrs. He, Wang, Bai or Zhang, might impede the achievements of our development objectives and might damage the close business relationship we currently enjoy with some of our larger customers. Our continued success is dependent, to a large extent, on our ability to attract or retain the services of these key personnel. We do not currently maintain key man insurance for any of our directors or officers.

*Marketability of any of our new products are uncertain and low acceptance levels of any of our new products will adversely affect our revenue and profitability*

The development of our products is based upon a complex technology, and requires significant time and expertise in order to meet industry standards and customers' specifications. Although we have developed products that meet customers' requirements in the past, there is no assurance that any of our research and development efforts will necessarily lead to any new or enhanced products or generate sufficient market share to justify commercialization. We must continually improve our current products and develop and introduce new or enhanced products that address the requirements of our customers and are competitive in terms of functionality, performance, quality and price in order to maintain and increase our market share. If our new products are unable to gain market acceptance, we would be forced to write-off the related inventory and would not be able to generate future revenue from our investment in research and development. In such event, we would be unable to increase our market share and achieve and sustain profitability. Our failure to further refine our technology and develop and introduce new products attractive to the market could cause our products to become uncompetitive or obsolete, which could reduce our market share and cause our sales to decline.

*The circumstances under which we acquired ownership of our main productive assets may jeopardize our ability to continue as an operating business*

Substantially all of our operating assets were acquired through two auction proceedings under relevant PRC law. We acquired the Brückner production line in 2003 as a result of a foreclosure proceeding enforcing an effective court judgment and the DMT production in 2004 as a result of a commercial auction from a consigner who obtained such assets through a bankruptcy proceeding. In the opinion of our PRC counsel, Concord & Partners, these proceedings are both valid under Chinese auction and bankruptcy law based on certain factual assumptions. Our PRC counsel's opinion solely relates to the legal procedure of the auctions and is based upon certain factual assumptions, written representations of the Company and written reports of the auction company and other related parties. There can be no assurance that relevant authorities or creditors of the predecessor owner of these assets will not challenge the effectiveness of these asset transfers based upon the facts and circumstances of these transfers, despite the existence of independent appraisals, and other facts and circumstances of the auctions that cannot be verified by our PRC counsel. Taking into consideration the facts known by our PRC counsel related to the auction of

the Brückner production line and the significant difference in the price paid for the DMT production line at the two bankruptcy auctions involved in our purchase of that asset and, assuming the representations and reports received by our PRC counsel are true and correct in all material respects, our PRC counsel is of the opinion that the auctions of the Brückner and DMT production lines were valid under PRC law and the possibility of the creditors of Shandong Neo-Luck successfully exercising recourse or claiming repayment with respect to our assets purchased in the bankruptcy proceeding should be remote. However, should any such challenge be brought in China (or elsewhere) and prevail, we may incur substantial liabilities and be required to pay substantial damages as a result of acquiring these assets. Although we believe any such challenge is unlikely to lead to the forfeiture of the related assets, it could materially affect our ability to continue operations.

*We have, in the past, experienced and may, from time to time, experience negative working capital and we face risks associated with debt financing (including exposure to variation in interest rates)*

As of June 30, 2006, we had negative working capital as represented by net current liabilities of RMB 237.6 million (US$29.7 million). We had short-term bank loans of RMB 240 million (US$30 million) that are due at various times in the fourth quarter of 2006 and the first quarter of 2007. These short-term bank loans have been taken to finance capital expenditures as well as for general working capital requirements. We have actively negotiated with our lenders extensions of existing loan agreements coming due in 2006, and our principal lender has to date not required that we repay these loans upon their maturity and has confirmed its willingness to extend current lending commitments of approximately RMB200.0 million (US$25.0 million) through December 31, 2007, although such confirmation does not constitute a new or amended loan agreement. We expect to formalize such extension in a new loan agreement with our lender following the consummation of this offering.

As of June 30, 2006, we also had significant outstanding loans from our controlling shareholders Apex Glory Holdings Limited ("Apex Glory") and Easebright Investments Limited ("Easebright"). These loans did not require the payment of interest, nor did they have a fixed maturity and were therefore treated as short-term liabilities. In connection with this offering, Apex Glory and Easebright converted all outstanding shareholder loans into an aggregate of 1,135,231 ordinary shares on November 23, 2006. The conversion of the shareholder loans was effected at the rate of US$10.00 of outstanding indebtedness for each newly-issued ordinary share.

Our total outstanding indebtedness, entirely comprising of short-term loans, as at June 30, 2006 was RMB 240 million (US$30 million). We have pledged property, plant and equipment of RMB 180.6 million and lease prepayments of RMB 52.6 million as security for RMB 233.2 million of outstanding indebtedness. In the event that we default on all or any portion of this indebtedness, our lenders could foreclose on our assets. In the event that our assets are foreclosed upon, we will not be able to continue to operate our business.

Our obligations under our existing loans have been mainly met through the cash flow from our operations and our financing activities. We are subject to risks normally associated with debt financing, including the risk of significant increases in interest rates and the risk that our cash flow will be insufficient to meet required payment of principal and interest. In the past, cash flow from operations has been sufficient to meet payment obligations and/or we have been able to extend our borrowings. There is however, no assurance that we will be able to continue to do so in the future. We may also underestimate our capital requirements and other expenditures or overestimate our future cash flows. In such event, we may consider additional bank loans, issuing bonds, or other forms of financing to satisfy our capital requirements. If any of the aforesaid events occur and we are unable for any reason to raise additional capital, debt or other financing to meet our working capital requirements, our business, operating results, liquidity and financial position will be adversely affected.

*We may lose our competitive advantage and our operations may suffer if we fail to prevent the loss or misappropriation of, or disputes over, our intellectual property*

We have applied for patents in respect of some of our processes, technologies and systems used in our business and these are pending approvals from the relevant PRC authorities. We may not be able to successfully obtain the approvals of the PRC authorities for our patent applications. Furthermore, third parties may assert claims to our proprietary processes, technologies and systems. These proprietary processes, technologies and systems are important to our business as they allow us to maintain our competitive edge over our competitors.

Our ability to compete in our markets and to achieve future revenue growth will depend, in significant part, on our ability to protect our proprietary technology and operate without infringing upon the intellectual property rights

**Legal Proceedings**

We are not currently a party to any material litigation and are not aware of any pending or threatened material litigation.

**Government Regulations**

As June 30, 2006, our business operations in the PRC are not subject to any special legislation or regulatory controls other than those generally applicable to companies and businesses operating in the PRC. We believe that we have obtained all the necessary licenses and permits for our business operations in the PRC.

67

## MANAGEMENT

**Directors and Executive Officers**

| Name | Age | Position |
| --- | --- | --- |
| Xiaoan He | 44 | Chairman and Chief Executive Officer and director |
| Lin Tang | 35 | Director and Chief Financial Officer |
| Tongju Zhou | 49 | Director |
| Mark E. Stulga | 50 | Independent Director |
| Xiaoming Wang | 46 | Deputy General Manager (Production) |
| Yongping Bai | 38 | Deputy General Manager (Research and Development) |
| Xiuyong Zhang | 36 | Deputy General Manager (Finance) |
| Bo Xu | 43 | Secretary |

*Xiaoan He* has been the Chairman and Chief Executive Officer of our Company since 2005 and is responsible for the formulation and implementation of our business strategies and management of our business operations. Mr. He has gained more than ten years of management experience in the plastics and packaging industries in the PRC. From June 2004 to January 2005, Mr. He was our General Manager responsible for our daily operation and management. Prior to joining us as the General Manager in June 2004, Mr. He was the general manager of Suzhou Broadway Plastic Packaging Co., Ltd from 1996 to 2003. From 1990 to 1996, he was the vice general manager at Suzhou Xiangxuehai Freezer Co., Ltd and from 1983 to 1990, he was the vice general manager at Suzhou Marine Machinery Co., Ltd. Mr. He obtained his EMBA from the China Europe International Business School in 2003 and Bachelor in Engineering from the Shanghai Jiaotong University in 1983. Mr. He is also the Vice Chairman of the China Association of Manufacturers of Polyester Film (CANPEF).

*Lin Tang* has been our Chief Financial Officer and a director since May 2006. Prior to joining us as the CFO, Mrs. Tang was a partner of the Beijing Yongtuo CPA Firm from August 2000 to April 2006, and from January 1998 to July 2000, she was the Audit Mgr./Supervisor of Shandong Zhengyuan Hexin CPAs, Shandong. Mrs. Tang obtained her MBA from the Chinese University of Hong Kong and Tsinghua University.

*Tongju Zhou* has been director of our Company since April 2005. Prior to joining us as a Director in April, 2005, Mr. Zhou was the general manager of Weifang Neo-Luck (Group) Co., Ltd. during 2004 and prior to that he was the vice general manager from 1995 to 2004. Weifang Neo-Luck (Group) Co., Ltd. is a state-owned corporation. Weifang Neo-Luck owned 59% of Shandong Neo-Luck. Mr. Zhou obtained his Bachelor degree in Administration from PRC Central Party Learning Institute in 1995.

*Mark E. Stulga* has been a director of our Company since June 2006. Mr. Stulga has a broad range of diverse global experience with industrial products and performance materials, including packaging materials, paint coatings and resins, software and industrial equipment. Since January 2005, he has been the Chief Operating Officer of RPM Industries, Inc., a portfolio company of The Hillman Company, an industrial motor manufacturing and supply company that distributes pumps for proprietary applications for use in construction and mining equipment. Mr. Stulga has served as Managing Director for Six Sigma Capital, a company he formed to serve the private equity community with advisory and interim management services, from 2003-2005. From 2001 to 2003, Mr. Stulga was the Chief Executive Officer of GE ISIM, a division of General Electric Capital Corporation which manufactured vehicle simulators that were used for training emergency responders. From 1998 to 2001, Mr. Stulga worked for NLG Plastics, Inc., an affiliate of one of the Neo-Luck Group companies. Earlier in his career Mr. Stulga held senior positions at GE plastics and Illinois Tool Works. Mr. Stulga received his Bachelor degree from University of Pittsburgh in Political Science in 1980 and in 1987, he received his MBA in Finance from Wayne State University.

*Xiaoming Wang* has been our Deputy General Manager since January 2005 and is responsible for the management of our production facilities. Prior to joining us, Mr. Wang was the vice manager of Weifang Engine Manufacturing Co. from 1986 to 1998 and the deputy general manager of Shandong Neo-Luck from 1998 to 2003. Mr. Wang was certified as a professional economist by the Shandong Province Human Resources Committee in 2001 and obtained a certificate in Economics Management awarded by the PRC Central Party Learning Institute and obtained a certificate in Business Enterprises Operational Management from the Shandong Television University in 1986.

## RELATED PARTY TRANSACTIONS

**Our Related-Party Transaction Policies**

We have conducted our related-party transactions on normal commercial terms that we believe are fair and reasonable and in the interests of our shareholders as a whole. We believe that the terms of our related-party transactions are comparable to the terms we could obtain from independent third parties. Subsequent to this offering, we expect that our related-party transactions will continue to be conducted on the same basis. However, upon completion of this offering, our related-party transactions will be subject to the review and approval of the audit committee of our board of directors.

**Shareholders' Loan Agreements**

For the purpose of financing the acquisition of Shandong Fuwei, our wholly-owned PRC operating subsidiary, in October 2004, we borrowed from each of our principal shareholders Apex Glory Holdings Limited ("Apex") and Easebright Investments Limited ("Easebright") HK$67,830,000 and HK$18,020,000, respectively. These borrowings did not bear any interest. We then loaned HK$85,850,000, interest free, to our wholly-owned subsidiary Fuwei (BVI) and Fuwei (BVI) entered into a sale and purchase agreement with Shenghong Group Co., Ltd. and Shandong Baorui Investment Co., Ltd ("Shandong Baorui"), pursuant to which Fuwei (BVI) acquired the respective equity interest of Shenghong Group and Shandong Baorui in Shandong Fuwei for an aggregate consideration of RMB 91 million. Shandong Fuwei thereafter became a wholly-owned subsidiary of Fuwei (BVI) and was converted into a wholly-foreign owned enterprise pursuant to PRC law. Tongju Zhou, a director, and Duo Wang each indirectly own 50% of Easebright and are both also officers and directors of Shandong Baorui. Jun Yin, the indirect sole shareholder of Apex, and Duo Wang own 17.5% and 4.6%, respectively, of Shandong Baorui. In connection with this offering, Apex and Easebright converted all outstanding shareholder loans into an aggregate of 1,135,231 ordinary shares on November 23, 2006. At June 30, 2006, the outstanding loans received from Apex Glory Holdings Limited and Easebright Investments Limited amounted to RMB 70,596,000 and RMB 18,766,000 respectively.

On October 28, 2005, Shandong Baorui guaranteed a one year loan to us by the Agricultural Bank of China in the principal amount of RMB 6,800,000. This loan bears interest at the rate of 7.254% per annum.

On October 27, 2004, Weifang Neo-Luck (Group) Co., Ltd. ("Weifang Neo-Luck"), an entity for which our director Tongju Zhou was the General Manager, collectively with two of its subsidiaries, guaranteed two one-year loans at 5.841% interest per annum from China Construction Bank and Agricultural Bank of China to the Shandong Fuwei totaling RMB 23,200,000. Also on October 27, 2004, Weifang Fuwah Hotel Co. Ltd. ("Fuwei Hotel"), an entity owned by Weifang Neo-Luck, guaranteed a one-year loan at 5.841% interest per annum to Shandong Fuwei from China Construction Bank totaling RMB 1,300,000.

During 2003, 2004 and 2005, we loaned funds to Weifang Neo-Luck that bore interest at the rate of 5.49% per annum. The highest amount outstanding on these advances during 2003, 2004 and 2005 was RMB 8.5 million, RMB 9.1 million and RMB 17.2 million, respectively. These funds have been fully repaid as of December 31, 2005.

**Acquisition of Assets**

In October of 2003, Shandong Fuwei acquired the assets relating to the Brückner production line through a public auction as a result of a default on several loans extended to affiliates of Shandong Neo-Luck Plastic Co., Ltd ("Shandong Neo-Luck") by the Bank of China, Weifang city branch. Our current executive officers Xiamong Wang and Yongping Bai both acted as executive officers for Shandong Neo-Luck.

Due to ongoing financial difficulties, Shandong Neo-Luck was declared bankrupt by the Weifang Municipal People's Court in the PRC in September 2004. The assets of Shandong Neo-Luck, consisting primarily of assets related to the DMT production line, were put up for public auction in accordance with the insolvency laws of the PRC on September 27, 2004. Beijing Baorui Guarantee Co., Ltd. ("Beijing Baorui"), purchased these assets for approximately RMB 34 million. Three months later, Beijing Baorui put these assets up for sale at public auction and Shandong Fuwei acquired them for approximately RMB 119 million. At the time of the acquisition by Beijing Baorui, Shandong Baorui held a 10% ownership in Shandong Fuwei and owned 80% of Beijing Baorui and at the time of the sale to Shandong Fuwei, Mr. Zhou and Mr. Wang indirectly controlled Shandong Fuwei through Easebright.

74