136 of 140 DOCUMENTS

MERIDIAN GLOBAL FUNDS MANAGEMENT ASIA LTD.

APPELLANT

AND

SECURITIES COMMISSION

RESPONDENT

[APPEAL FROM THE COURT OF APPEAL OF NEW ZEALAND]

[PRIVY COUNCIL]

*[1995] 2 AC 500*

**HEARING-DATES:** 9, 10, May 26 June 1995

26 June 1995

**CATCHWORDS:**

New Zealand - Company - Knowledge of company - Chief investment officer on behalf of company acquiring substantial security holding in public issuer - Managing director and board unaware of acquisition - Company failing to give prescribed notice - Whether investment officer's knowledge attributable to company - Whether company in breach of duty to give notice - Securities Amendment Act 1988 (No. 234 of 1988), ss. 20(3)(4)(e), 35

**HEADNOTE:**

K., the chief investment officer of an investment management company, and N., its senior portfolio manager, with the company's authority but unknown to the board of directors and managing director, used funds managed by the company to acquire shares in a public issuer. The company thus became for a short period a substantial security holder in that public issuer, but the company did not give notice thereof as required by section 20(3) of the Securities Amendment Act 1988. n1 The Securities Commission instituted proceedings in the High Court of New Zealand against the company for failing to comply with section 20. The judge made a declaration that the company was in breach of its duty to give notice under section 20(3), holding that for the purposes of section 20(4)(e) the knowledge of K. and N. should be attributed to the company. The Court of Appeal of New Zealand upheld that decision on the basis that K. was the directing mind and will of the company and so his knowledge was attributable to the company.

On the company's appeal to the Judicial Committee:-

Held, dismissing the appeal, (1) that a company's rights and obligations were determined by rules whereby the acts of natural persons were attributed to the company normally to be determined by reference to the primary rules of attribution generally contained in the company's constitution and implied by company law and or general rules of agency; but that, in an exceptional case, where application of those principles would defeat the intended application of a particular provision to companies, it was necessary to devise a special rule of attribution to determine whose act or knowledge or state of mind was for the purpose of that provision to be attributed to the company; that, although the description of such a person as the "directing mind and will" of a company did not have to be apposite in every case, knowledge of an act of a company's duly authorised servant or agent, or the

n1 Securities Amendment Act 1988, s. 20(3)(4): see post, p. 504F-G.

S. 35: see post, p.512B-C.

state of mind with which it was done, would be attributed to the company only where a true construction of the relevant substantive provision so required (post, pp. 506B-D, F, 507D-F, 511B-C, G-H)

Tesco Supermarkets Ltd. v. Nattrass [1972] A.C. 153, H.L.(E.) and In re Supply of Ready Mixed Concrete (No. 2) [1995] 1 A.C. 456, H.L.(E.) applied.

Admiralty v. Owners of the Steamship Divina (The Truculent) [1952] P. 1; H. L. Bolton (Engineering) Co. Ltd. v. T. J. Graham & Sons Ltd.[1957] 1 Q.B. 159, C.A. and The Lady Gwendolen [1965] P. 294, C.A. considered.

Dictum of Viscount Haldane L.C. in Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd. [1915] A.C. 705, 713, H.L.(E.) explained.

(2) That, having regard to the policy of section 20 of the Act of 1988, on the true construction of section 20(4)(e) the appropriate rule of attribution to be implied was that a corporate security holder knew that it was a substantial security holder in a public issuer when that was known to the person who had acquired the relevant interest with the company's authority, whereupon the company was obliged to give notice under section 20(3); and that, accordingly, K.'s knowledge of the transaction was attributable to the company irrespective of whether he could be described in a general sense as its directing mind and will, and so in failing to give notice the company had been in breach of its duty under section 20(3) (post, p. 511E-G).

Per curiam. Section 35 of the Securities Amendment Act 1988 would not assist the commission since, although the knowledge of K. and N. would have activated the presumption that the company knew, at the material time, of the existence of a relevant interest in voting securities in a public issuer, the company could rebut that presumption if the knowledge of K. and N. were not attributable to the company because the evidence clearly showed that neither the managing director nor the board knew about that relevant interest (post, p. 512D-F).

Decision of the Court of Appeal of New Zealand [1994] 2 N.Z.L.R. 291 affirmed.

**INTRODUCTION:**

APPEAL (No. 48 of 1994) with leave of the Court of Appeal of New Zealand by the company, Meridian Global Funds Management Asia Ltd. ("Meridian"), from the judgment of the Court of Appeal of New Zealand [1994] 2 N.Z.L.R. 291 (Cooke P., Hardie Boys J. and Sir Gordon Bisson) given on 17 December 1993 dismissing the company's appeal from the order of Heron J. in the High Court of New Zealand on 23 November 1992, the reasons for which were in judgments delivered on 10 December 1991 and 23 November 1992, whereby in an action brought by the Securities Commission against the company and others he had declared that the company had acquired a relevant interest in Euro-National Corporation Ltd. ("E.N.C.") and should have given notice of such relevant interest, and had ordered the company to pay $50,000 towards the commission's costs and $15,000 towards the costs of a minority shareholder in E.N.C.

The facts are stated in the judgment of their Lordships.

**COUNSEL:**

Michael Beloff Q.C., John Stevenson (of the New Zealand Bar) and Andrew Tabachnik for the company. There was no contravention of section 20(3) of the Securities Amendment Act 1988 by the company. At the material time the company had a "relevant interest" within the meaning of section 5, but it did not know that it had such interest because the knowledge of K., the chief investment officer employed by Meridian, could not be attributed to the company. In

order to engage liability under section 20 the commission has to establish acquisition of a relevant interest in a public issuer (section 20(3)), actual or constructive knowledge on the part of the acquirer of the fact that he has acquired a relevant interest (section 20(4)(e)), and non-disclosure to the relevant parties. While the existence of a relevant interest has to be established only to the extent of reasonable suspicion, the facts on which the suspicion is founded require proof on a balance of probabilities.

The doctrine of identification is conceptually distinct from vicarious liability. The start of any analysis as to whether or not a person is to be identified with a company is in the constitutional instruments of the company, i.e., its memorandum and articles of association, which show where the power to act on behalf of the company is located. Prima facie, the directing mind and will of a company will be found in its managing director and board of directors. In a particular context, however, a single director or other person may be the directing mind and will of the company. But, unless that person enjoys full independence from the board of directors, as distinct from a measure of discretion, he cannot be the company's directing mind and will. [Reference was made to Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd. [1915] A.C. 705; H. L. Bolton (Engineering) Co. Ltd. v. T. J. Graham & Sons Ltd. [1957] 1 Q.B. 159; Tesco Supermarkets Ltd. v. Nattrass [1972] A.C. 153 and El Ajou v. Dollar Land Holdings Plc. [1994] 2 All E.R. 685.]

The judge's finding that K. performed his duties in the field of investment activity under the managing director was fatal to the conclusion that K. was the company's directing mind and will. If he did not have the ultimate responsibility for the company's investment activities but only some measure of discretion, then the relevant functions of the board had, after the company's restructuring, not been delegated to him. The Court

of Appeal paid excessive attention to the state of affairs which prevailed prior to the appointment of the new managing director in place of K., and failed to appreciate the change to the company's internal structure which was thereby effected. The judge found that there was no evidence that the company's internal controls were lax, and so the managing director and the board cannot be criticised for failing to detect what K. was doing.

If, however, K. was the directing mind and will of the company and the advance of its moneys towards the scheme by means of fictitious share purchases was within his assigned managerial area, the question arises whether in view of the purposes for which K. acted the case falls outside the proper limits of the doctrine of identification. That doctrine does not apply where the acts sought to be attributed to the company are exclusively for the benefit of the individual concerned and contrary to the interests of the company. The doctrine is applied in civil and criminal law in the same way, and there is no reason to differentiate between its application in relation to the Act of 1988 and elsewhere. [Reference was made to Canadian Dredge & Dock Co. Ltd. v. The Queen (1985) 19 C.C.C. (3d) 1.]

The courts below correctly found that K. and N. in advancing the company's funds for the purposes of the scheme were intent on promoting their own interests and not those of the company. The possibility that, if the scheme proceeded towards completion, the company would be left with a notional profit, cannot, in view of (i) the considerable risks with which the company was faced by reason of the advance of its moneys towards the scheme, and (ii) the fact that the sole purpose of leaving a notional profit in the company was to ensure that the scheme would not be discovered at some future point, fairly be treated as a factor which in law makes the acts of K. the acts of the company.

R. A. Dobson and N. F. Miller (both of the New Zealand Bar), for the commission, were not called upon.

26 June. The judgment of their Lordships was delivered by

**PANEL:** Lord Keith of Kinkel, Lord Jauncey of Tullichettle, Lord Mustill, Lord Lloyd of Berwick and Lord Hoffmann

**JUDGMENTBY-1:** LORD HOFFMANN

**JUDGMENT-1:**

LORD HOFFMANN:

In 1990 a group of people in New Zealand, Malaysia and Hong Kong tried to gain control of a cash-rich publicly listed New Zealand company, Euro-National Corporation Ltd. ("E.N.C."), and use its assets for their own purposes. The predators included a New Zealand businessman called David Lee Sian Mun, two Hong Kong investment managers called Norman Koo Hai Ching ("Koo") and Norman Ng Wo Sui ("Ng"), who were employed by the appellant company, Meridian Global Funds Management Asia Ltd. ("Meridian"), and members of a Malaysian sharebroking firm called Hwang & Yusoff Securities Sdn. Bhd. ("Hwang & Yusoff"). Their scheme required the purchase, through apparently respectable New Zealand merchant bankers, of a 49 per cent. controlling holding in E.N.C. for N.Z.$18u2m. The intention was to fund this purchase out of E.N.C.'s own assets, but bridging finance was needed to fill the gap between buying the shares and gaining control of the company's money. This was provided by Koo and Ng out of funds managed by Meridian. Meridian is a substantial Hong Kong investment management company, a subsidiary of National Mutual Life Association of Australasia Ltd. Koo was its chief investment officer, Ng a senior portfolio manager. Their

Lordships do not know exactly how they were to receive their share of the spoils. But they funded the scheme by improperly using their authority to buy and sell Asian shares. They contracted on behalf of Meridian, through Hwang & Yusoff, to buy a parcel of shares in Malaysian and Indonesian companies from E.N.C. for $21m. and at the same time to resell the same shares to E.N.C. for a slightly greater price. Payment for the purchase was made to Hwang & Yusoff on 30 October and payment for the resale was to be made by E.N.C. on 19 November. E.N.C. did not own the shares in question and the persons who purported to sell on its behalf had at that stage no authority to do so, but Meridian paid the money and on 9 November Hwang & Yusoff used $18u2m. to buy the shares in E.N.C. But the scheme to pay Meridian back out of E.N.C.'s money on 19 November was frustrated by the independent directors of E.N.C., who imposed conditions on the use of the company's funds with which the predators could not comply. Unable to get their hands on the company's money, they had to unwind the scheme as best they could. It is unnecessary to go into the details of how the participants tried to extricate themselves except to notice two matters. First, that on 10 December 1990 Koo, on behalf of Meridian, agreed to release its rights under the original funding arrangements and accept instead a payment and undertakings from Hwang & Yusoff. Secondly, that the net result was that the funds under Meridian's management suffered a loss, which the Australian parent company had to make good to the beneficial owners of the funds when the affair was discovered some six or seven months later.

Stockmarket regulators have found that one way to help boards and investors to resist such raids is to require immediate disclosure to the target company and the stock exchange of the identity of anyone acquiring a substantial interest of any kind in the company's shares. This enables the board and the investors to know who is behind the respectable nominees. Part II of the New Zealand Securities Amendment Act 1988 was intended, among other things, to introduce such transparency into dealings in publicly quoted securities. The relevant duties of disclosure are contained in section 20(3) and (4):

"(3) Every person who, after the commencement of this section, becomes a substantial security holder in a public issuer shall give notice that the person is a substantial security holder in the public issuer to - (a) the public issuer; and (b) any stock exchange on which the securities of the public issuer are listed. (4) Every notice under subsection (3) of this section shall - (a) be in the prescribed form; and (b) contain the prescribed information; and (c) be accompanied by, or have annexed, such documents, certificates, and statements as may be prescribed; and (d) be given in the prescribed manner; and (e) be given as soon as the person knows, or ought to know, that the person is a substantial security holder in the public issuer."

A "public issuer" means a company listed on the New Zealand Stock Exchange and "substantial security holder" means a person who has a "relevant interest" in five per cent. or more of the voting securities in the public issuer. The definition of "relevant interest" in section 5 is both complicated and comprehensive, but there is no need to examine its terms

because, although the matter was disputed in the courts below, Meridian has accepted before their Lordships' Board

that the effect of the transaction was to give Meridian a relevant interest in the 49 per cent. holding in E.N.C. between 9 November 1990, when its money was used to buy it, and 10 December 1990 when the scheme was unwound. It gave no notice under section 20(3).

Section 30 of the Act provides that where there are "reasonable grounds to suspect" that a substantial security holder has not complied with, among other provisions, section 20, the court may, on the application of the Securities Commission, make one or more of a number of orders mentioned in section 32. These range from ordering the substantial security holder to comply with the Act to forfeiting the shares in which he has an interest. After holding its own inquiry in March 1991, the commission applied for orders against various participants in the scheme. Meridian was not among the original defendants but was joined a few days before the trial began.

Heron J. held that Meridian knew on 9 November that it was a "substantial security holder" in E.N.C. for the purposes of section 20(4)(e). He arrived at this conclusion by attributing to Meridian the knowledge of Koo and Ng, who undoubtedly knew all the relevant facts. He did not go into the juridical basis for this attribution in any detail. It seemed obvious to him that if Koo and Ng had authority to enter into the transaction, their knowledge that they had done so should be attributed to Meridian. It had therefore been in breach of its duty to give notice under section 20(3). In view of the fact that its relevant interest had ceased on 10 December 1990 the judge made no order against Meridian except that it should pay $50,000 towards the commission's costs and $15,000 towards the costs of a minority shareholder in E.N.C. The finding that Meridian was in breach was incorporated in a declaration made by the judge at the request of Meridian so that it could have an order against which to appeal. The Court of Appeal [1994] 2 N.Z.L.R. 291 affirmed the decision of Heron J. on somewhat different grounds. It decided that Koo's knowledge should be attributed to Meridian because he was the "directing mind and will" of the company. The Court of Appeal received some evidence about how Meridian functioned. The members of the board lived partly in Hong Kong and partly in Australia and met only once a year, for the formal business before the annual general meeting. Other matters which required a board resolution were circulated by post. Koo used to be managing director but was replaced by a Mr. Armour on 1 August 1990. Although Koo thereafter in theory reported to Mr. Armour, in the matter of buying and selling securities he went on in the same way as before. The E.N.C. purchases and sales were openly recorded in the books but Koo did not specifically report them to Mr. Armour, who only found out about them after Koo had left. Nor did Koo report anything else and there was no evidence that Mr. Armour or the other members of the board tried to supervise what he was doing. By leave of the Court of Appeal, Meridian now appeals to their Lordships' Board. It says that its only directing mind and will was that of its board, or possibly of Mr. Armour, but not Koo, whom the Court of Appeal, at p. 301, correctly described as "under Mr. Armour" in the corporate hierarchy.

The phrase "directing mind and will" comes of course from the celebrated speech of Viscount Haldane L.C. in Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd. [1915] A.C. 705, 713. But their Lordships think that there has been some misunderstanding of the true principle upon which that case was decided. It may be helpful to start by stating the nature of the problem in a case like this and then come back to Lennard'scase later.

Any proposition about a company necessarily involves a reference to a set of rules. A company exists because there is a rule (usually in a statute) which says that a persona ficta shall be deemed to exist and to have certain of the powers, rights and duties of a natural person. But there would be little sense in deeming such a persona ficta to exist unless there were also rules to tell one what acts were to count as acts of the company. It is therefore a necessary part of corporate personality that there should be rules by which acts are attributed to the company. These may be called "the rules of attribution."

The company's primary rules of attribution will generally be found in its constitution, typically the articles of association, and will say things such as "for the purpose of appointing members of the board, a majority vote of the shareholders shall be a decision of the company" or "the decisions of the board in managing the company's business shall be the decisions of the company." There are also primary rules of attribution which are not expressly stated in the articles but implied by company law, such as

"the unanimous decision of all the shareholders in a solvent company about anything which the company under its memorandum of association has power to do shall be the decision of the company:" see Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd.[1983] Ch. 258.

These primary rules of attribution are obviously not enough to enable a company to go out into the world and do business. Not every act on behalf of the company could be expected to be the subject of a resolution of the board or a unanimous decision of the shareholders. The company therefore builds upon the primary rules of attribution by using general rules of attribution which are equally available to natural persons, namely, the principles of agency. It will appoint servants and agents whose acts, by a combination of the general principles of agency and the company's primary rules of attribution, count as the acts of the company. And having done so, it will also make itself subject to the general rules by which liability for the acts of others can be attributed to natural persons, such as estoppel or ostensible authority in contract and vicarious liability in tort.

It is worth pausing at this stage to make what may seem an obvious point. Any statement about what a company has or has not done, or can or cannot do, is necessarily a reference to the rules of attribution (primary and general) as they apply to that company. Judges sometimes say that a company "as such" cannot do anything; it must act by servants or agents. This may seem an unexceptionable, even banal remark. And of course the meaning is usually perfectly clear. But a reference to a company "as such" might suggest that there is something out there called the company of

which one can meaningfully say that it can or cannot do something. There is in fact no such thing as the company as such, no ding an sich, only the applicable rules. To say that a company cannot do something means only that there is no one whose doing of that act would, under the applicable rules of attribution, count as an act of the company.

The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person "himself," as opposed to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of the defendant himself. How is such a rule to be applied to a company?

One possibility is that the court may come to the conclusion that the rule was not intended to apply to companies at all; for example, a law which created an offence for which the only penalty was community service. Another possibility is that the court might interpret the law as meaning that it could apply to a company only on the basis of its primary rules of attribution, i.e. if the act giving rise to liability was specifically authorised by a resolution of the board or an unanimous agreement of the shareholders. But there will be many cases in which neither of these solutions is satisfactory; in which the court considers that the law was intended to apply to companies and that, although it excludes ordinary vicarious liability, insistence on the primary rules of attribution would in practice defeat that intention. In such a case, the court must fashion a special rule of attribution for the particular substantive rule. This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply? Whose act (or knowledge, or state of mind) was for this purpose intended to count as the act etc. of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy.

The fact that the rule of attribution is a matter of interpretation or construction of the relevant substantive rule is shown by the contrast between two decisions of the House of Lords, Tesco Supermarkets Ltd. v. Nattrass [1972] A.C. 153 and In re Supply of Ready Mixed Concrete (No. 2) [1995] 1 A.C. 456. In the Tesco case [1972] A.C. 153 the question involved the construction of a provision of the Trade Descriptions Act 1968. Tesco were prosecuted under section 11(2) for displaying a notice that goods were being "offered at a price less than that at which they were in fact being offered . . ." Its supermarket in Northwich had advertised that it was selling certain packets of washing powder at the reduced price of 2s. 11d., but a customer who asked for one was told he would have to pay the normal price of 3s.

11d. This happened because the shop manager had negligently failed to notice that he had run out of the specially marked low-price packets. Section 24(1) provided a defence for a shopowner who

could prove that the commission of the offence was caused by "another person" and that: "He took all reasonable precautions and exercised all due diligence to avoid the commission of such an offence by himself or any person under his control." The company was able to show that it owned hundreds of shops and that the board had instituted systems of supervision and training which amounted, on its part, to taking reasonable precautions and exercising all due diligence to avoid the commission of such offences in its shops. The question was: whose precautions counted as those of the company? If it was the board, then the defence was made out. If they had to include those of the manager, then it failed.

The House of Lords held that the precautions taken by the board were sufficient for the purposes of section 24(1) to count as precautions taken by the company and that the manager's negligence was not attributable to the company. It did so by examining the purpose of section 24(1) in providing a defence to what would otherwise have been an absolute offence: it was intended to give effect to "a policy of consumer protection which does have a rational and moral justification:" per Lord Diplock, at pp. 194-195. This led to the conclusion that the acts and defaults of the manager were not intended to be attributed to the company. As Lord Diplock said, at p. 203:

"It may be a reasonable step for an employer to instruct a superior servant to supervise the activities of inferior servants whose physical acts may in the absence of supervision result in that being done which it is sought to prevent. This is not to delegate the employer's duty to exercise all due diligence; it is to perform it. To treat the duty of an employer to exercise due diligence as unperformed unless due diligence was also exercised by all his servants to whom he had reasonably given all proper instructions and upon whom he could reasonably rely to carry them out, would be to render the defence of due diligence nugatory and so thwart the clear intention of Parliament in providing it."

On the other hand, in In re Supply of Ready Mixed Concrete (No. 2)[1995] 1 A.C. 456, a restrictive arrangement in breach of an undertaking by a company to the Restrictive Practices Court was made by executives of the company acting within the scope of their employment. The board knew nothing of the arrangement; it had in fact given instructions to the company's employees that they were not to make such arrangements. But the House of Lords held that for the purposes of deciding whether the company was in contempt, the act and state of mind of an employee who entered into an arrangement in the course of his employment should be attributed to the company. This attribution rule was derived from a construction of the undertaking against the background of the Restrictive Trade Practices Act 1976: such undertakings by corporations would be worth little if the company could avoid liability for what its employees had actually done on the ground that the board did not know about it. As Lord Templeman said, at p. 465, an uncritical transposition of the construction in Tesco Supermarkets Ltd. v. Nattrass [1972] A.C. 153:

"would allow a company to enjoy the benefit of restrictions outlawed by Parliament and the benefit of arrangements prohibited by the

courts provided that the restrictions were accepted and implemented and the arrangements were negotiated by one or more employees who had been forbidden to do so by some superior employee identified in argument as a member of the 'higher management' of the company or by one or more directors of the company identified in argument as 'the guiding will' of the company."

Against this background of general principle, their Lordships can return to Viscount Haldane L.C. In Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd. [1915] A.C. 705 the substantive provision for which an attribution rule had to be devised was section 502 of the Merchant Shipping Act 1894 (57 & 58 Vict. c. 60), which provided a shipowner with a defence to a claim for the loss of cargo put on board his ship if he could show that the casualty happened "without his actual fault or privity." The cargo had been destroyed by a fire caused by the unseaworthy condition of the ship's boilers. The language of section 502 excludes vicarious liability; it is clear that in the case of an individual owner, only his own fault or privity can defeat the statutory protection. How is this rule to be applied to a

company? Viscount Haldane L.C. rejected the possibility that it did not apply to companies at all or (which would have come to the same thing) that it required fault or privity attributable under the company's primary rules. Instead, guided by the language and purpose of the section, he looked for the person whose functions in the company, in relation to the cause of the casualty, were the same as those to be expected of the individual shipowner to whom the language primarily applied. Who in the company was responsible for monitoring the condition of the ship, receiving the reports of the master and ship's agents, authorising repairs etc.? This person was Mr. Lennard, whom Viscount Haldane L.C., at pp. 713-714, described as the "directing mind and will" of the company. It was therefore his fault or privity which section 502 attributed to the company.

Because Lennard's Carrying Co. Ltd. does not seem to have done anything except own ships, there was no need to distinguish between the person who fulfilled the function of running the company's business in general and the person whose functions corresponded, in relation to the cause of the casualty, to those of an individual owner of a ship. They were one and the same person. It was this coincidence which left Viscount Haldane L.C.'s speech open to the interpretation that he was expounding a general metaphysic of companies. In H. L. Bolton (Engineering) Co. Ltd. v. T. J. Graham & Sons Ltd. [1957] 1 Q.B. 159 Denning L.J. certainly regarded it as a generalisation about companies "as such" when, in an equally well known passage, at p. 172, he likened a company to a human body: "It has a brain and nerve centre which controls what it does. It also has hands which hold the tools and act in accordance with directions from the centre."

But this anthropomorphism, by the very power of the image, distracts attention from the purpose for which Viscount Haldane L.C. said, at p. 713, he was using the notion of directing mind and will, namely to apply the attribution rule derived from section 502 to the particular defendant in the case:

"For if Mr. Lennard was the directing mind of the company, then his action must, unless a corporation is not to be liable at all, have been

an action which was the action of the company itself within the meaning of section 502." (Emphasis supplied.)

The true nature of the exercise became much clearer, however, in later cases on the Merchant Shipping Act 1894. In Admiralty v. Owners of the Steamship Divina (The Truculent) [1952] P. 1, an action to limit liability for damage caused by collision under section 503, which also required the owner of the ship which caused the collision to show that the casualty happened without his "actual fault or privity," the offending ship was a Royal Navy submarine. Her collision with a fishing vessel had been caused by the inadequate system of navigation lights then carried by submarines. Willmer J. held that for this purpose the "directing mind and will" of the Crown, which owned the submarine, was the Third Sea Lord, to whom the Board of Admiralty had entrusted the function of supervising such matters as the systems of navigation lights carried by warships. That function was one which an individual owner of a ship would be expected to fulfil. In The Lady Gwendolen [1965] P. 294 the owners of the ship were Arthur Guinness, Son & Co. (Dublin) Ltd. The collision occurred because the master, in accordance with his custom, had taken his vessel laden with stout up the Mersey Channel to Liverpool at full speed in dense fog without more than the odd casual glance at his radar. Owning ships was a very subsidiary part of the company's activities. It had a traffic department which managed the ships under the general supervision of a member of the board who was a brewer and took no interest in the safety of their navigation. The manager of the traffic department knew about railways but took equally little interest in ships. The marine superintendent, one beneath him in the hierarchy, failed to observe that the master of The Lady Gwendolen was given to dangerous navigation although, as Willmer L.J. said, at p. 338:

"It would not have required any very detailed examination of the engine room records in order to ascertain that The Lady Gwendolen was frequently proceeding at full speed at times when the deck log was recording dense fog."

In applying section 503 of the Merchant Shipping Act 1894, Sellers L.J. said of the company, at p. 333:

"In their capacity as shipowners they must be judged by the standard of conduct of the ordinary reasonable

shipowner in the management and control of a vessel or of a fleet of vessels."

The court found that a reasonable shipowner would have realised what was happening and given the master proper instruction in the use of radar. None of the people in the company's hierarchy had done so.

It is difficult to see how, on any reasonable construction of section 503, these findings would not involve the actual fault or privity of Guinness. So far as anyone in the hierarchy had functions corresponding to those to be expected of an individual owner, his failure to discharge them was attributable to the company. So far as there was no such person, the superior management was at fault in failing to ensure that there was. In either case, the fault was attributable to the company. But the Court of Appeal found it necessary to identify a "directing mind and will" of the

company and lodged it in the responsible member of the board or (in the case of Willmer L.J.) the railway expert who managed the traffic department.

Some commentators have not been altogether comfortable with the idea of the Third Sea Lord being the directing mind and will of the Crown or the traffic manager being the directing mind and will of Guinness. Their Lordships would agree that the phrase does not fit the facts of The Truculent[1952] P. 1 or The Lady Gwendolen [1965] P. 294 as happily as it did those of Lennard's case [1915] A.C. 705. They think, however, that the difficulty has been caused by concentration on that particular phrase rather than the purpose for which Viscount Haldane L.C. was using it. It will often be the most appropriate description of the person designated by the relevant attribution rule, but it might be better to acknowledge that not every such rule has to be forced into the same formula.

Once it is appreciated that the question is one of construction rather than metaphysics, the answer in this case seems to their Lordships to be as straightforward as it did to Heron J. The policy of section 20 of the Securities Amendment Act 1988 is to compel, in fast-moving markets, the immediate disclosure of the identity of persons who become substantial security holders in public issuers. Notice must be given as soon as that person knows that he has become a substantial security holder. In the case of a corporate security holder, what rule should be implied as to the person whose knowledge for this purpose is to count as the knowledge of the company? Surely the person who, with the authority of the company, acquired the relevant interest. Otherwise the policy of the Act would be defeated. Companies would be able to allow employees to acquire interests on their behalf which made them substantial security holders but would not have to report them until the board or someone else in senior management got to know about it. This would put a premium on the board paying as little attention as possible to what its investment managers were doing. Their Lordships would therefore hold that upon the true construction of ection 20(4)(e), the company knows that it has become a substantial security holder when that is known to the person who had authority to do the deal. It is then obliged to give notice under section 20(3). The fact that Koo did the deal for a corrupt purpose and did not give such notice because he did not want his employers to find out cannot in their Lordships' view affect the attribution of knowledge and the consequent duty to notify.

It was therefore not necessary in this case to inquire into whether Koo could have been described in some more general sense as the "directing mind and will" of the company. But their Lordships would wish to guard themselves against being understood to mean that whenever a servant of a company has authority to do an act on its behalf, knowledge of that act will for all purposes be attributed to the company. It is a question of construction in each case as to whether the particular rule requires that the knowledge that an act has been done, or the state of mind with which it was done, should be attributed to the company. Sometimes, as in In re Supply of Ready Mixed Concrete (No. 2) [1995] 1 A.C. 456 and this case, it will be appropriate. Likewise in a case in which a company was required to make a return for revenue purposes and the statute made it an offence

to make a false return with intent to deceive, the Divisional Court held that the mens rea of the servant authorised to discharge the duty to make the return should be attributed to the company: see Moore v. I. Bresler Ltd. [1944] 2 All E.R. 515. On the other hand, the fact that a company's employee is authorised to drive a lorry does not in itself lead to the conclusion that if he kills someone by reckless driving, the company will be guilty of manslaughter. There is no

inconsistency. Each is an example of an attribution rule for a particular purpose, tailored as it always must be to the terms and policies of the substantive rule.

The commission in their printed case put forward an alternative argument based upon section 35 of the Act of 1988, which creates a presumption of knowledge:

"In any proceedings under this Part of this Act, it shall be presumed in the absence of proof to the contrary, that a person knew, at a material time, of the existence of a relevant interest in voting securities in a public issuer or of a fact or matter concerning the existence of a relevant interest in the securities if, at that time, an employee or agent of that person knew in his or her capacity as employee or agent of the existence of the relevant interest or of a fact or matter concerning the existence of it."

Their Lordships did not find it necessary to call upon counsel for the commission on this or any other point and have therefore heard no oral submissions in support of the commission's alternative argument. But they find it difficult to see how, on the facts of this case, section 35 can advance the matter. There is no doubt that the knowledge of Koo and Ng would have activated the presumption. But the presumption may be rebutted by "proof to the contrary." Proof of what? Proof, presumably, that in fact none of the persons whose knowledge counted as the knowledge of the company did know about the relevant interest. But the section gives no guidance as to who those persons are. That is left to the process of construction of section 20(4)(e) which their Lordships have undertaken. If, as they think, Koo's knowledge was attributable to the company, the evidence made reliance on the presumption unnecessary. And if only the knowledge of Mr. Armour or the board was so attributable, then the evidence showed clearly that they did not know and the presumption was rebutted. Either way, it would have had no effect on the outcome of the case.

Their Lordships will humbly advise Her Majesty that the appeal should be dismissed. Meridian must pay the costs of the commission before their Lordships' Board.

**SOLICITORS:**

Solicitors: Bower Cotton & Bower; Alan Taylor & Co.

S.S.

(c)2001 The Incorporated Council of Law Reporting for England & Wales